1
2
3
4
5
6
7
8

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  KEITHLEY,                                    No. C03-04447 MJJ

12              Plaintiff,                        **CLAIMS CONSTRUCTION ORDER**

13       v.

14  THE HOMESTORE.COM, INC. ET AL,

15              Defendant.
    _____/

16

17                          **INTRODUCTION**

18       Before the Court are Plaintiffs Kevin Keithley and TREN Technologies Holdings, LLC

19  (collectively, "Plaintiffs" or "TREN"), and Defendants Homestore, Inc., The National Association of

20  Realtors, and The National Association of Home Builders of the United States' (collectively, "Home

21  store") proposed constructions of disputed terms in a Patent held by TREN.  The parties filed briefs

22  and joint claims construction statements submitting proposed constructions of the disputed terms.

23  On August 1, 2007, the Court held a claim construction hearing lasting several hours.  The Court,

24  having considered the parties' papers, oral arguments, evidence, and the patent-in-suit, now

25  construes the disputed terms as set forth below.

26                        **FACTUAL BACKGROUND**

27       The patent-in-suit is U.S. Patent No. 5,584,025 ("the '025 Patent") entitled, "Apparatus and

28  Method For Interactive Communication For Tracking and Viewing Data."  The '025 Patent lists

    Kevin Keithley ("Keithley") as the inventor.  The claimed inventions is generally directed to the use

1    of an information processing system for acquiring and displaying information relating to a specific

2    industry or interest, the example therein being real estate and related goods and services.  The '025

3    Patent describes and claims methods for acquiring and displaying real estate and property-related

4    information and a related system for tracking such information that address the inefficiencies of the

5    traditional real estate industry associated with the logistics of matching buyers and sellers, and the

6    actual showing of the prospective property.  In describing the '025 Patent to the Patent and

7    Trademark Office ("PTO"), the inventor explained that the "invention relates to a method of

8    accessing industry specific information, such as real estate properties for sale, through multimedia

9    personal computers."  (Herbst Decl. ¶ 5, Ex. 3, Abstract.)

10   **DISPUTED CLAIM TERMS**

11          At issue in the current case are a total of ten claim terms taken from Claim 1, Claim 3, and

12   Claim 5.  The following is a list of the disputed claim terms identified by the parties in their joint

13   claims construction statement.

14          1.      "said end user inquiries being the retrieving and viewing of test and/or graphic data

15                  from a database" (*Id.*, Claim 1(e), 3(f).)

16          2.      "demographics" (*Id.*, Claim 1.)

17          3.      "compiling and merging a plurality of first end user inquiries"  (*Id.*, Claim 1(f), 3(g),

18                  and 5.)

19          4.      "demographic information"  (*Id.*, Claim1(f), 1(g), 2, 4, and 5.)

20          5.      "media means for receiving analog and digitized data and transmitting digitized data"

21                  (*Id.*, Claim 3.)

22          6.      "server"  (*Id.*, Claim 3.)

23          7.      "file server means for receiving data from said media means, receiving data inquiries

24                  and transmitting data in response to said data inquiries"  (*Id.*, Claim 1, 1(b), 3, 3(b),

25                  3(c), and 3(d).)

26          8.      "media unit"  (*Id.*, Claim 5.)

27          9.      "digitizer"  (*Id.*, Claim 5.)

28          10.     "server's unit"  (*Id.*, Claim 5.)

**LEGAL STANDARD**

The construction of a patent is a matter of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). In construing terms, the Court must conduct an independent analysis of the claim terms; it is insufficient to simply choose between the competing constructions that the parties have submitted. *Exxon Chem. Patents v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995). To determine the meaning of a patent claim, the Court primarily considers three sources: (1) the claims; (2) the specification; and (3) the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, *Markman*, 517 U.S. 370.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Accordingly, in construing disputed terms, the Court first looks to the words of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Generally, the Court ascribes the words of a claim their ordinary and customary meaning. *Id.* "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

Other claims of the patent in question can also assist in determining the meaning of a claim term. *Vitronics*, 90 F.3d at 1582. Because an inventor normally uses claim terms consistently throughout a patent, the usage of a term in one claim may reveal the meaning of the same term in other claims. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Conversely, use of a term in a different way in another claim may also be useful in determining the particular meaning of the disputed term. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). Particularly, the existence of a dependent claim that adds a particular limitation creates a presumption that the limitation in question is not present in the independent claim. *Liebel-Flarseim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

**United States District Court**
For the Northern District of California

Because the claims are part of a fully integrated written instrument comprised principally of the specification, the Court must next review the specification. *Markman*, 52 F.3d at 978-79. Because the specification must contain a description of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it, the specification is "always highly relevant" to the Court's claim construction analysis. *Vitronics*, 90 F.3d at 1582. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." *Phillips*, 415 F.3d at 1316. In some cases, the specification may reveal that the patentee has given a special definition to a claim term that differs from its ordinary meaning. "In such cases, the inventor's lexicography controls." *Id.* at 1316. The specification also may reveal the patentee's intentional disclaimer or disavowal of claim scope. "In that instance, as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* Thus, the specification can act as a dictionary when it expressly or impliedly defines terms used in the claims. *Id.*

Next, in addition to reviewing the specification, the Court should consider the patent's prosecution history, if it is in evidence. *Markman*, 52 F.3d at 980. The prosecution history is intrinsic evidence and consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and includes the prior art cited during the examination of the patent. *Phillips*, 415 F.3d at 1317. "The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower then it would otherwise be." *Phillips*, 415 F.3d 1317; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

In addition to the foregoing intrinsic evidence, the Federal Circuit has also authorized district courts to rely on extrinsic evidence in claim construction, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned

United States District Court

For the Northern District of California

1   treatises." *Markman*, 52 F.3d at 980.  However, extrinsic evidence is "less significant than the

2   intrinsic record in determining the legally operative meaning of claim language."  *C.R. Bard, Inc. v.*

3   *U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).  "Because dictionaries, and especially

4   technical dictionaries, endeavor to collect the accepted meanings of terms used in various field of

5   science and technology, those resources have been properly recognized as among the many tools

6   that can assist the court in determining the meaning of particular terminology to those of skill in the

7   art of the invention."  *Phillips*, 415 F.3d 1318.  Accordingly, the Court may consider this evidence,

8   if the Court deems it helpful in deciphering the true meaning of the claim terms.  *Id.*

9   With these canons of construction in mind, the Court turns to the construction of the disputed

10  claim terms.

**ANALYSIS**

11

12  **1.   "said end user inquiries being the retrieving and viewing of text and/or graphic data**
          **from a database"**

13

14  The parties dispute the meaning of the term, "said end user inquiries being the retrieving and

15  viewing of test and/or graphic data from a database" which appears in Claim 1(e) and Claim 3(f) of

16  the '025 Patent.  The claim term reads as follows:

17          accessing data files by said first end users, said accessing data
            files by said first end users being a plurality of inquiries from
18          individual first end users, **said end user inquiries being the**
            **retrieving and viewing of text and/or graphic data from a**
19          **database**.

20  (Herbst Decl. ¶ 5, Ex. 3, Claim 1(e), 3(f).)

21  Plaintiffs contend that the proper construction of the term is "said end user inquiries being

22  requests for information that are passively monitored."  Defendants propose that the proper

23  construction of the term is "said end user inquiries being the opening and viewing data received by

24  an end user in response to one or more requests for data from a database."  Both parties' proposed

25  constructions restate the initial claim language,  "said end user inquiries being."  Accordingly,

26  putting aside this restated initial claim language, the parties' dispute centers on the meaning of the

27  remaining claim phrase, "the retrieving and viewing of text and/or graphic data from a database."

28  As discussed more fully below, the Court finds that the available evidence supports Plaintiffs'

5

United States District Court

For the Northern District of California

1    proposed construction of the term at issue.

2         In support of their construction, Plaintiffs initially argue that Defendants' proposed

3    construction is not a construction at all, but is only a slightly revised restatement of the claim

4    language that adds an unnecessary limitation.  Specifically, Plaintiffs state that Defendants'

5    proposed construction unnecessarily adds a limitation that the "end user inquiries" must consist of

6    data "*received by an end user in response to one or more requests for data*."  Plaintiffs insist that

7    reading such a limitation into the claim construction is improper.

8         Next, Plaintiffs rely on the '025 Patent prosecution reexamination history.  Specifically,

9    Plaintiffs point to Keithley's March 2005 and April 2005 representations to the PTO, made during

10   reexamination of the '025 Patent.  (Herbst Decl. ¶ 7, Ex. 5, Response to Office Action in Ex Parte

11   Reexamination and Request for Continued Examination, submitted March 14, 2005 at ¶. 28-30; ¶ 8,

12   Ex. 6, Response to Office Action in Ex Parte Reexamination and Request for Continued

13   Examination, submitted April 14, 2005 at ¶. 30-32.)  In Keithley's March 2005 representation to the

14   PTO, in an attempt to differentiate the '025 Patent from other prior art, he explained the difference

15   between "actively" collecting data—as taught by prior art, and "passively" collecting data—as

16   taught by the '025 Patent.  (Herbst Decl. ¶ 7, Ex. 5 at ¶. 28-30.)  There, Keithley conceded that claim

17   elements 1(c) and 1(d) include an *initial form* of collecting data that is similar to the "active" data

18   collection feature found in the prior art because the data is collected by having the end user answer

19   specific questions.  (*Id*.)  However, Keithley further explained that claim element 1(e) teaches a

20   *second form* of collecting data, not found in the prior art.  (*Id*.)  In particular, Keithley stated that

21   claim element 1(e) relates only to the system "passively" collecting data by watching the end user,

22   rather than requiring the end user to respond to questions.  (*Id*.)  In his March 2005 reexamination

23   representation, Keithley stated, "Claim 1 [ ] claims a second form of collecting data, which is a

24   relatively PASSIVE collection . . . Thus, a second set of data may be collected by PASSIVELY

25   watching the inquiries of the first end user as they 'retrieve and view text and/or graphic data.' . . . It

26   is the collection of data by watching the actions of the end user." (*Id*. ¶. 29-30.)  Keithley made an

27   nearly identical reexamination representation to the PTO in April 2005.  (*Id*. ¶ 8, Ex. 6 at ¶. 30-32.)

28        Conversely, in support of their construction, Defendants similarly point to the '025 Patent

1    prosecution reexamination history.  (Pleune Decl. ¶ 25, Ex. X, Response to Office Action in Ex

2    Parte

3    Reexamination and Request for Continued Examination, submitted April 14, 2005 at ¶. 30-33.)[1]

4    Defendants accord significance to Keithley's distinction between "active" and "passive" data

5    collection by focusing on the term, "inquiries," and argue that Plaintiffs' election to focus on the

6    second form of data collection, at the exclusion of the first form of data collection, is somehow

7    improper.  However, Defendants fail to adequately explain how Plaintiffs' data collection distinction

8    supports Defendants' proposed construction over Plaintiffs'.

9    Conflicting with Defendants' construction is the '025 Patent prosecution reexamination

10   history wherein it reveals Keithley's express clarification that the claim term at issue focuses on

11   "watching the actions of the end user" and monitoring "the behavior of the first end user as they surf

12   through the database."  (Herbst Decl. Ex. 5, ¶. 30, 32.)   Accordingly, the Court finds Defendants'

13   reliance on the '025 Patent prosecution reexamination history to be unsupportive of their proposed

14   construction.

15   Lastly, without citing legal authority, Defendants argue against Plaintiffs' proposed

16   construction on grounds that it would require the Court to further interpret the phrase, "passively

17   monitored."  However, because "courts construe claim terms in order to assign a fixed,

18   unambiguous, legally operative meaning to the claim," the Court finds Defendants' argument

19   unconvincing.  *Chime v. PPG Indus., Inc*., 402 F.3d 1371, 1377 (Fed. Cir. 2005).

20   In reviewing the current record, the Court finds Keithley's statements during the '025 Patent

21   prosecution reexamination history to be compelling evidence in support of Plaintiffs' proposed

22   construction.  Plaintiffs' proposed construction incorporates the term "passively monitored."  To that

23   end, it is undisputed that Keithley consistently explained in March 2005, and again in April 2005,

24   that Claim 1(e) relates only to the system "passively" collecting data by watching the end user,

25

26        [1]In their joint claims construction statement, the parties generally cite to the same portions of the specification in
support of their respective constructions.  (Jt. Claims Construction Statement 3-7) (containing parallel citations to: col. 1, ll.
12-45; col. 4, ll. 23-26; col. 7, ll. 17-30; col. 11, ll. 16-20.)  As noted above, the parties also generally cite to the same portions

27   of the '025 Patent prosecution history and re-examination history.  (*Id.* 5-12) (containing parallel citations to: '025 Patent
Prosecution History: Second Preliminary Amendment, filed 7/20/95, p. 10; Reexam History: Response filed 3/14/05 and

28   Response filed 4/14/05.)  However, with the exception of the '025 Patent prosecution reexamination history explained above,
neither party provides analysis as to how their citations support their respective construction of the term at issue.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  rather than requiring the end user to respond to questions.  Because the prosecution history is

2  compelling and because Defendants' arguments to the contrary lack merit, the Court finds that the

3  prosecution history weighs heavily in favor of Plaintiffs' proposed construction.

4      Additionally, although not specifically addressed by the parties in their claims construction

5  briefs, the Court notes that the other claims in the '025 Patent also tend to support Plaintiffs'

6  proposed construction of the term at issue.  As to the other claims, claims 1(c) explicitly refers to

7  obtaining "end user information *from* a first end user . . . ."  (Herbst Decl. ¶ 5, Ex. 3, '025 Patent at

8  col. 14, ll. 46-47) (emphasis added.)  Claim 1(d) explicitly refers to the act of the "end user"

9  "*providing*" "digital electronic end user information.  (*Id*. at col. 14, ll. 49-53) (emphasis added.)

10 Thus, in comparing the volitional nature of the contemplated conduct in the claim terms, it is

11 apparent that Claim 1(c) and Claim 1(d) envision more affirmative conduct than does Claim 1(e).

12 Both Claim 1(c) and Claim 1(d) indicate that information will be taken "from," or "provided" by, the

13 end user.  In contrast, Claim 1(e) indicates no such requirement on the part of the end user.

14      Finally, although the specification does not conclusively resolve the construction of the term

15 at issue, the Court finds that it tends to weigh in favor of Plaintiffs' proposed construction.

16 Although not specifically addressed by the parties in their claims construction briefs, the Court notes

17 that the specification states that "the instant invention provides detailed data on all aspects of

18 *viewership* and *response*."  (*Id*. at col. 1, ll. 37-38.)  Accordingly, the specification contemplates

19 both the passive act of observing the end user's viewership, along with the more active conduct of

20 eliciting a response.  This reasoning in consistent with Plaintiffs' repeated explanation between the

21 passive conduct associated with Claim 1(e), and the more active conduct associated with Claim 1(c)

22 and Claim 1(d).

23      Taking into account the claims, the specification, and the relevant patent prosecution history,

24 the Court construes "said end user inquiries being the retrieving and viewing of test and/or graphic

25 data from a database" as "said end user inquiries being requests for information that are passively

26 monitored."

27 **2.    "demographics"**

28      The parties dispute the construction of the term, "demographics."  "Demographics" is a term

United States District Court

For the Northern District of California

1   that appears in each of the independent claims of the '025 Patent.  (Herbst Decl. ¶ 5, Ex. 3.)

2          Plaintiffs' proposed construction of "demographics" is "characteristics of human populations

3   and population segments, especially when used to identify consumer markets."  Defendants

4   proposed construction of the term is "physical characteristics of human populations and population

5   segments, such as age, occupation, income, sex, and marital status, to identify consumer markets."

6   Thus, the parties' proposed constructions are similar to the extent they both define "demographics"

7   in terms of "characteristics of human populations and population segments" that can "identify

8   consumer markets."  However, the parties proposed constructions are different to extent that

9   Defendants' construction proposes the use of additional terms.  Defendants use the additional term,

10  "physical," as a method of limiting the meaning of the subsequent phrase, "characteristics of human

11  populations."  Defendants also use the additional phrase,  "such as age, occupation, income, sex, and

12  marital status," as means of providing examples of "characteristics of human populations and

13  population segments."  The Court now turns the parties' arguments in support of their respective

14  constructions.

15         Initially, in support of their construction, Plaintiffs attack Defendants' construction on

16  grounds that it adds unnecessary terms thereby rendering Defendants' construction internally

17  inconsistent and confusing.  In addressing Defendants' use of the term, "physical," Plaintiffs

18  emphasize that none of the intrinsic evidence make reference to the term as a way of describing the

19  "characteristics of human populations."  Plaintiffs also argue that Defendants' use of the examples

20  "age, occupation, income, sex, and marital status" is internally inconsistent because some of the

21  examples are *non-physical* in nature, such as occupation, income, and marital status.

22         Next, Plaintiffs point to the prosecution history wherein Keithley consistently defined

23  "demographics" in exact accordance with Plaintiffs' proposed construction.  In April 1995, Keithley

24  stated, "[t]he term demographics has a clear and definite meaning, based on standard dictionary

25  usage and the explanations in the instant application.  Demographics means the characteristics of

26  human populations and population segments, especially when used to identify consumer markets.

27  (American Heritage Dictionary.)"  (Herbst Decl. ¶ 9, Ex. 7, Amendment After Final, submitted April

28  11, 1995 at p. 15.)  In July 1995, Keithley again stated that "demographics" meant the characteristics

of human populations and population segments, especially when used to identify consumer markets. (American Heritage Dictionary.)" (*Id.* ¶ 10, Ex. 8, Second Preliminary Amendment, submitted July 20, 1995 at p. 6.)

Conversely, in support of Defendants' construction, Defendants accuse Plaintiffs of ignoring critical statements made by the applicants during the prosecution history. Defendants argue that Plaintiffs' definition "was insufficient to obtain allowance of the '025 Patent" and that Plaintiffs ultimately submitted four articles[2] to the examiner that provided "additional information and examples of demographics." (Def.s' Claim Construction Br. 10:3-8; Pluene Decl. ¶¶ 4, 7, 8, 11, 13-16, Exs. C, F, G, J, L, M, N, O.) Pointing to the express demographic examples taken from the four articles submitted by Plaintiffs, Defendants argue that similar examples should be included in the construction of the term at issue. Defendants fail to provide factual citations that would support the importation of the demographic examples found in Defendants' proposed construction. However, the Court's independent review of the prosecution history reveals that the cited articles generally describe "demographics" as including such dimensions as age, sex, family size, income, occupation, education, family life cycle, religion, race, nationality, and social class. (Pluene Decl. ¶¶ 15, 16, Exs. N, O.)

In examining the parties' respective constructions of "demographics," the Court finds that Defendants' additional limitation ("physical") and extra exemplary language ("such as age, occupation, income, sex, and marital status"), are both unnecessary. The Court now addresses Defendants' proposed constructions in turn.

**a.    "physical"**

Defendants' proposal of limiting the "characteristics of human populations and population segments" to only those that are "physical" fails for two reasons. First, it would effectively require the Court to read in an unsupported additional limitation. Defendant has not cited, and the Court has not located, any support for such a limitation in the claim language, the specification, or the prosecution history. Because neither the claim language, the specification, nor the prosecution

---

[2] *The Lifestyle Market Analyst*, 1989, Standard Rate & Data Service, Inc.; *Basic Marketing: A managerial approach*, 6th Edition, McCarthy, 1978; *Introduction to Marketing Management*, Rewoldt, et al., 1977, and *Marketing Research*, Boyd, Jr., et al. 1977. (Pluene Decl. ¶ 11, Ex. J at p. 15.)

United States District Court

For the Northern District of California

history include such a specific limitation, the Court shall not impose one.  *See e.g., Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 334 F. Supp.2d 197, 214 (N.D.N.Y. 2004) (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 313 F. Supp. 2d 114, 126 (N.D.N.Y. 2004)); *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 289 F. Supp. 2d 1347, 1351 (M.D. Fla. 2003), *vacated & remanded*, 381 F.3d 1111, 72 USPQ 2d 1001 (Fed. Cir. 2004) ("Adding limitations neither required by claim terms nor unambiguously required by either the specification or the prosecution history of a patent is impermissible."); *Bristol-Myers Squibb Co. v. Teva Pharmaceuticals USA, Inc.*, 288 F. Supp. 2d 562 (S.D.N.Y. 2003); *Intertrust Technologies Corp. v. Microsoft Corp.*, 275 F. Supp. 2d 1031, 1056 (N.D. Cal. 2003) ("the Court is wary of reading into claims a limitation that is not expressly there."); *ICN Pharmaceuticals, Inc. v. Geneva Pharmaceuticals Technology Corp.*, 272 F. Supp. 2d 1028, 1039 (C.D. Cal. 2003) ("while the specification and prosecution history may provide interpretive context for the claims, the court may not read limitations into the claims.").

The second reason that Defendants' proposed limitation fails is because it creates a facial inconsistency when read in conjunction with the rest of Defendants' proposed construction.  In particular, Defendant urges the Court to limit the "characteristics of human populations and population segments" to only those that are "physical" in nature.  Defendant then encourages the Court to include a list of examples of such characteristics.  However, Defendants' own proposed list includes examples that are *non-physical* in nature, such as occupation, income, and marital status.

For these reasons, the Court finds Defendants' proposed construction of limiting "characteristics" to only those that are "physical" in nature to be unconvincing.

**b.     Exemplary language—"such as age, occupation, income, sex, and marital status"**

Defendants' proposal of further describing the "characteristics of human populations and population segments" with a non-exhaustive list that includes "age, occupation, income, sex, and marital status" could create unnecessary confusion.  While Defendants' examples are certainly within the dimensions of the term, "demographics," their list is by no means exhaustive of what the term encompasses.  By including such a list, a jury could mistakenly interpret the scope of the term to be narrower than intended by: (1) finding the list of examples to be exhaustive; or (2) finding that the term is somehow limited to a subset of the items on the list.  Defendant fails to explain how the

1    proposed exemplary language would aid in the determination of infringement.  Accordingly, the

2    Court finds that Defendants' proposed exemplary language is superfluous.

3        Having considered the claims, the specification, and the relevant patent prosecution history,

4    the Court construes "demographics" as "characteristics of human populations and population

5    segments, especially when used to identify consumer markets."

6    **3.    "compiling and merging a plurality of first end user inquiries"**

7        The parties dispute the construction of the term, "compiling and merging a plurality of first

8    end user inquiries."  The term at issue appears in claim elements 1(f), 3(g), and 5 of the '025 Patent.

9    (Herbst Decl. ¶ 5, Ex. 3.)

10       Plaintiffs' proposed construction of the term is "collecting and combining the results of

11   passively monitoring requests for information."  Defendants' proposed construction of the term is

12   "dynamic computer generation of information for a demographics database by continually

13   analyzing, organizing and combining multiple related first end user inquiries to identify distinct

14   trends that is more than maintaining a time record, count of the length of time, or number of user

15   inquiries."   In support of their respective constructions, Plaintiffs point to the claim language, the

16   specification, and the prosecution history, while Defendants primarily rely on the prosecution

17   history.  The Court now turns to the claim language, the specification, and the prosecution history.

18       Turning to the claim language, in construing "compiling and merging a plurality of first end

19   user inquiries," the Court is guided by general principles of claim construction and begins with the

20   phrase's ordinary meaning.  *See Vitronics*, 90 F.3d at 1583 (instructing the court to look first at the

21   words themselves).  The Court may look to other words in the claims to provide contextual support

22   for the proper interpretation.  *Faroudja Lab., Inc. v. Dwin Elecs., Inc*., 76 F. Supp. 2d 999, 1007

23   (N.D. Cal. 1999).  At first blush, this phrase appears to lack any obvious "ordinary or customary

24   meaning."  *See Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1196 (Fed. Cir. 1994).

25   However, its meaning becomes slightly more evident when the Court considers the phrase in

26   context.

27       The Court observes that the phrase at issue, in context of the claim language, essentially

28   refers to what is done with the information collected from the passive monitoring of the end user

United States District Court
For the Northern District of California

12

inquiries encompassed by the preceding claim element 1(e).  Although the parties contest the construction of the preceding claim element 1(e), the parties do not appear to dispute that the phrase at issue relates to the sequential step associated with the information collected from the end user inquiries and how a demographics database is generated therefrom.  The claim language supports an interpretation that describes the particular step whereby the demographics databases are generated.

The '025 Patent specification tends to support this interpretation as described in Figure 1. (Herbst Decl. ¶ 5, Ex. 3.)  The description of this diagram illustrates that certain databases at issue "consists of all qualitative inquiries generated by viewers seeking more information on specific property profiles viewed on the disclosed system," (*id*., at col. 7, ll. 17-20), and are "generated by viewership of any property profiles wherein the viewer may or may not be interested in pursuing the transaction but has viewed the property," (*id*., at col. 7, ll. 20-23).  In referring to related databases at issue, the specification describes it as "compris[ing] all qualitative inquires generated by viewers seeking more information on specific goods or services advertised on the disclosed invention," (*id*., at col. 7, ll. 23-26), and are "generated by viewership of any advertising message wherein the viewer may or may not be interested in obtaining more information about the advertiser's goods and/or services," (*id*. at col. 7, ll. 26-30).  Accordingly, the specification contemplates that "respective databases" would consist of, and be generated by, first end user inquiries pertaining to property or advertisements. (*Id*. at col. 7, l. 31.)

However, the Court's review of the claim language and the specification does not appear to support a wholesale adoption of either parties' proposed construction.  In following the canons of construction, the Court now addresses the '025 Patent prosecution history.

The '025 Patent prosecution history reveals that the inventor described the claim at issue to be one that generally "collects" inquiries.  The inventor stated that the phrase at issue "compiles the inquires and from the inquiries, generates a demographics database, from which consumer trends can be ascertained . . . ."  (*Id*. ¶ 9, Ex. 7, Amendment After Final, submitted April 11, 1995 at p. 16.) Subsequently, the inventor stated that,

it is possible to *collect* data about the actual behavior of the end user, using the actual behavior of the end user.  By collecting data about the end users actions, as they are "retrieving and viewing . . . data" it is possible to more accurately assess actual preferences of the end user.  This is a *collection* of data that does not require active

United States District Court

For the Northern District of California

1    work by the end user, like answering a questionnaire.  It is the *collection* of data by
2    watching the actions of the end user . . . .

3    (*Id*. ¶ 7, Ex. 5, Response to Office Action in Ex Parte Reexamination and Request for Continued
4    Examination, submitted March 14, 2005 at p. 30) (emphasis added.)  In further describing claim 1(f)
5    the inventor stated that "[t]he features . . . state how to use data *collected* by assessing the user's
6    actions."  (*Id*. at p. 31) (emphasis added.)  In light of the prosecution history, the Court finds that the
7    phrase at issue necessarily means the process of "collecting the results of first end user inquiries."

8           Both parties urge the Court to include additional words and phrases in its construction of the
9    phrase at issue.  Plaintiffs request the Court to import the words, "collecting and combining" and
10   "passively monitoring requests."  Defendants ask the Court to import the phrases, "dynamic
11   computer generation," "by continually analyzing, organizing and combining multiple related first
12   end user inquiries," "to identify distinct trends that is more than maintaining a time record, count of
13   the length of time, or number of user inquiries."  The only proposed additional word offered by both
14   parties is "combining."  However, the Court finds the remainder of the parties' proposed extraneous
15   words and phrases to be unnecessary.

16          Regarding Plaintiffs' proposed additional words, the Court finds it unnecessary to repeat
17   language relating to information that is "passively monitored."  Such a construction would be
18   repetitive of the Court's construction of claim term 1(e).  Next, regarding Defendants' proposed
19   additional limiting phrases, the Court finds insufficient support in the record for their use here.  *See*
20   *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (citing
21   *Hoganas AB v. Dresser Indus., Inc*., 9 F.3d 948, 950, (Fed. Cir. 1993) ("It is improper for a court to
22   add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to
23   interpret what the patentee meant by particular words or phrases in the claim.") (quoting *E.I. du Pont*
24   *de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433, (Fed. Cir. 1988)); *see also*
25   *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a specification
26   does not require a limitation, that limitation should not be read from the specification into the
27   claims.") (citing *Lemelson v. United States*, 752 F.2d 1538, 1551-52  (Fed. Cir. 1985)); *cf. Constant*
28   *v. Advanced Micro-Devices, Inc*., 848 F.2d 1560, 1571 (Fed. Cir. 1988) (holding that the written

description provided "no evidence to indicate that [ ] limitations must be imported into the claims to give meaning to disputed terms")). Defendant fails to identify applicable portions of the record that support the importation of additional limitations to the phrase at issue.  For these reasons, the Court finds the parties' proposed additional language to be unnecessary.

Having considered the claims, the specification, the relevant patent prosecution history, and the parties respective use of the term, "combining," the Court construes "compiling and merging a plurality of first end user inquiries" as "collecting and combining the results of first end user inquiries."

**4.    "demographic(s) information"**

The parties dispute the construction of the term, "demographic(s) information."  The term appears in claim elements 1(f), 1(g), 2, 4, and 5, of the '025 Patent.  (Herbst Decl. ¶ 5, Ex. 3.)[3]

The parties appear to agree that the term, "demographics information," generally refers to the information that populates the database that is subsequently made available to a second end user. (*Id.*)  However, the parties do not agree on how to define such "demographic information." Plaintiffs' proposed construction of the term is "information from which interests or preferences can be assessed."  Defendants proposed construction of the term is "a collection of analyzed and processed user inquiries that identify distinct trends or profiles regarding certain physical characteristics of human populations and population segments, such as age, occupation, income, sex, and marital status, to identify consumer markets.  Such a collection results in something more than a time period, count of the length of time, or number of user inquiries."  In support of their respective constructions, both parties primarily rely on the specification and the prosecution history.  However, before turning to the parties' reliance on the specification and the prosecution history, the Court first addresses the claim language.

In examining the claim language, a claim term is to be given its ordinary meaning unless the patentee has explicitly redefined the term, or the term itself is so ambiguous it is incapable of being

---

[3]Plaintiff identifies the term in plural form as "demographics information," while Defendant identifies the term in singular form as "demographic information."  At the outset the Court notes that the parties are referring to the same term and that the term's construction does not depend on the Court adopting one form of the term over the other.  (*See* Joint Claim Construction Stmt. at 41) (referring to singular and plural form of the term as the same term at issue.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

understood without reference to the specification. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990, 991 (Fed. Cir. 1999) ("A court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms."). Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997). Here, the Court notes that it has previously construed the claim term, "demographics." The Court construed the claim term in accordance with its ordinary meaning as, "characteristics of human populations and population segments, especially when used to identify consumer markets." As such, the Court is compelled to build on its previous construction of "demographics" unless there is evidence the patentee has otherwise redefined "demographics information" as having a wholly independent and unrelated meaning. In order to determine whether the patentee has done so here, the Court now turns to the specification and the prosecution history of the '025 Patent.

Turning to the '025 Patent specification, Plaintiff argues for a broad definition of "demographic information." Plaintiff points to portions of the specification whereby the patentee has described the invention as relating to a broad array of consumer trends such as, "design trends, new housing development, and competitive practices," (Herbst Decl. ¶ 5, Ex. 3 at col. 5 ll. 51-55), "market trends and research as well as targeting advertising messages," and "increasing demand for housing . . . which could bring new deposit account relationship as well as the opportunity to book new mortgages," (*id.* at col. 11, ll. 37-46). Plaintiff contends that these examples are evidence that the term, "demographic information," relates broadly to trends that reflect market interest and preferences of the end user.[4]

Defendants do not address the specification's impact on the construction of the term at issue. Instead, Defendants focus on the '025 Patent's prosecution history.

Turning to the '025 Patent prosecution history, the Court denotes that the parties have

---

[4]After a review of the '025 Patent specification, the Court does not find any evidence that the inventor intended the term, "demographics information," to be wholly independent from the previously defined term, "demographics."

16

1    differing interpretations regarding its impact in construing, "demographics information."

2    Defendants aver that the patentee made certain relevant representations in an effort to avoid prior art.

3    Specifically, Defendants point to the patentee's March 1995 remarks wherein he described the

4    invention as one that "analyzed," "processed," and "created profiles of," "inquiries."  (Pluene Decl.

5    ¶ 8, Ex. G; ¶ 11, Ex. J.)  According to Defendants, the patentee expressly carved out certain

6    functions that are not "demographics information"—such as the "maintaining a time record, a count

7    of the length of time, or the number of user inquiries."  As such, Defendants insist that the

8    construction of the term at issue must be narrowed to include only such information that is

9    "analyzed, processed, and created" from the first end user inquiries.

10        Plaintiffs disagree that prosecution history requires such a limited definition of the term at

11   issue.  Plaintiffs maintain that "demographics information" is broad so as to include "the trend in

12   popularity of houses in a particular price range, or style or location, or type of windows, or types of

13   appliances," (Herbst Decl. ¶ 9, Ex. 7 at p. 16), and "consumer trends," (*id*.), and "forecast[s] [of]

14   demand for public goods and services," (*id*. at p. 22).  Accordingly, Plaintiffs argue that the

15   limitations in Defendants' construction are unnecessary.

16        To the extent, Defendants' construction consists of a second attempt to add a "physical"

17   characteristic limitation, or to add exemplary language to the term at issue, the Court finds

18   Defendants' construction unavailing.  However, in light of the patentee's descriptions of the term in

19   the prosecution history, the Court finds that Plaintiffs' construction is similarly unavailing.  In the

20   prosecution history it is evident that the information at issue was more than a report of the time

21   spent, or number of inquiries made by, the first end user.  Accordingly, the construction

22   "demographics information" lies somewhere between the parties' competing interpretations.

23        Having considered the claim terms, the specification, and the relevant patent prosecution

24   history, the Court construes "demographics information" as "characteristics of human populations

25   and population segments, especially when used to identify consumer markets, that are created from

26   the collection of first end user inquiries that identify distinct trends in interests or preferences."

27   **5.    "media means for receiving analog and digitized data and transmitting digitized data"**

28        The parties dispute the construction of the phrase, "media means for receiving analog and

17

United States District Court
For the Northern District of California

1   digitized data and transmitting digitized data."  The phrase appears in Claim 3 as follows:

2       A method of acquiring and displaying property related information utilizing an
    information processing system containing media **means for receiving analog and**
3   **digitized data and transmitting digitized data**; file server means for receiving data
    from said media means, receiving data inquiries and transmitting data in response to
4   said data inquiries; data bases and data base storage means for sorting, storing and
    retrieving information received, the method comprising the steps of: . . . .

5

6   (Herbst Decl. ¶ 5, Ex. 3.)

7       The parties agree that the phrase is means-plus-function language that the Court must

8   construe pursuant to Section 112(6) of the Patent Act, 35 U.S.C. § 112 ¶ 6 ("Paragraph 6" or

9   "Section 112(6)").  However, the parties do not agree as to how to define the mean-plus-function

10  phrase.  Plaintiffs contend that when properly construed in light of the specification, the phrase

11  "receiving analog and digitized data and transmitting digitized data" should be construed to

12  encompass "receiving analog data or receiving digitized data."  Defendants insist that the patentee

13  failed to adequately disclose structure corresponding to the means-plus-function limitation and that

14  the claim is therefore invalid for indefiniteness.  Consequently, the parties' principal dispute is

15  whether the specification discloses "corresponding structure" for the means-plus-function phrase at

16  issue.  Before addressing the parties' dispute, the Court identifies the applicable legal standard for

17  constructing means-plus-function claim elements.

18      A "means-plus-function" claim is a special type of claim provided for in 35 U.S.C. § 112,

19  paragraph 6, which provides: "An element in a claim for a combination may be expressed as a

20  means or a step for performing a specified function without the recital of structure, material, or acts

21  in support thereof, and such claim shall be construed to cover the corresponding structure, material,

22  or acts described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6.

23      Under this provision, an inventor can describe an element of the invention by the result

24  accomplished or the function served, rather than by describing the item or element to be used.

25  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 27 (1997).  When using

26  means-plus-function language, "[t]he applicant must describe in the patent specification some

27  structure which performs the specified function."  *Valmont Industries, Inc. v. Reinke Manufacturing*

28  *Co., Inc.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259,

1266-67 (Fed. Cir. 1999).  A structure disclosed in the specification is only deemed to be "the corresponding structure" if the specification clearly links or associates that structure to the function recited in the claim.  *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998).  The duty to link or associate structure in the specification with the function is the quid pro quo for the convenience of employing the means-plus-function format.  *Id.*

An accused device with a structure that is not identical to the structure described in the patent will literally infringe the patent if the accused device performs the identical function required by the means-plus-function claim with a structure identical or equivalent to that described in the patent. *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998) (en banc); *Kahn*, 135 F.3d at 1476.  "Thus, the statutory provision prevents an overly broad construction by requiring reference to the specification, and at the same time precludes an overly narrow construction that would restrict coverage solely to those means expressly disclosed in the specification." *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991) (citations omitted).

Where an element is expressed as a "means" to perform a particular function, a presumption arises that the claim element should be construed as a means-plus-function claim under section 112(6). *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999).  Conversely, a claim term that does not use the words "means" or "step for" is presumptively not governed by section 112(6). *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).  This presumption "is a strong one that is not readily overcome." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004).  However, even in the absence of express means-plus-function language, a claim may be construed to include a means-plus-function element if the proponent of the means-plus-function construction demonstrates that "the claim term fails to 'recite sufficiently definite structure for performing that function.'" *CCS Fitness*, 288 F.3d at 1369 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).  In making this determination, the court must assess whether the "term, as a name for a structure, has a reasonably well understood meaning in the art." *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996). If the specification lacks an adequate disclosure of corresponding structure, "the claim is invalid for failure to satisfy the definiteness requirement of § 112, ¶ 2." *Cardiac Pacemakers, Inc. v. St. Jude*

United States District Court

For the Northern District of California

19

1    *Medical, Inc.*, 296 F.3d 1106, 1114 (Fed. Cir. 2002).

2         At the outset, the Court notes that it will construe the phrase at issue as a means-plus-

3    function term.  Because Claim 3 describes the phrase at issue as a "*means for,*" there is a

4    presumption that the Court should construe the phrase in accordance with section 112(6).  Neither

5    the parties or the Court have located evidence indicating that the claim should be construed

6    otherwise.  In light of the existing presumption, and the parties' agreement to have the phrase

7    construed as a means-plus-function term, the Court will construe the phrase at issue in accordance

8    with section 112(6).  *See Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d

9    1205, 1210 (Fed. Cir. 2003) (stating that where the parties agree that a term is a means-plus-function

10   term, the court's task is to identify the function of the term and its corresponding structure.).  The

11   Court now turns to the merits of the parties' respective contentions as to whether specification

12   sufficiently discloses the structure for performing the claimed function.

13        In support of their proposed construction, Plaintiffs argue that the specification sufficiently

14   discloses the structure associated with "receiving analog and digitized data and transmitting

15   digitized data."  Plaintiffs assert that the following excerpt from the '025 Patent specification

16   supports their interpretation of the functional language:

> FIG. 2 illustrates the information flow to and from the Media's
> multimedia device 100 to the Server's Processor 400.  The raw
> data is either gathered from outside sources, generally in the
> form of analog information 110, or entered directly at the
> Media's multimedia PC 102 [in digital form].  Any analog
> information 110, albeit audio, video, photos, text, or graphics,
> must be digitized by Media's digitizer 108 to be read by the PCs
> used herein.  The digitized information is sent directly to the
> Media's multimedia PC 102.  Information from . . . other sources
> is received via the Media's modem 104, or by any other means,
> for entry into the Media's multimedia device 100.  Data
> produced by the Media's personnel is directly entered onto the
> multimedia PC 102.  Once entered, the information is edited at
> the media's multimedia PC 102.

24   (Herbst Decl. ¶ 5, Ex. 3, col. 7, ll. 37-67.)  According to Plaintiffs, this passage teaches that the

25   multimedia PC (one of several structures corresponding to the claims "media means") can receive

26   data in two different forms—"analog" or "digitized" (digital) form.  Plaintiffs aver that the

27   specification, as restated in the context of section 112(6), teaches that the "media means" performs

28   two distinct functions: (1) receiving analog data; or (2) receiving digital data.  Consequently,

United States District Court

For the Northern District of California

20

United States District Court

For the Northern District of California

1    consistent with the teaching, the phrase "receiving analog and digital data" should be construed to

2    reflect that the "media means" "receives analog data or receives digital data."[5]

3         In support of their indefiniteness contention, Defendants make a series of arguments.  First,

4    Defendants contend that the '025 Patent specification expressly addresses the term, "Media," only

5    once wherein it does not disclose the structure associated with intended the recited function.

6              Media—The primary party responsible for production of
              property files and possibly all other advertising displayed on the
7              system.  The Media has access to all files on the Server and,
              alternatively, may be part of the Server's system.  The Media can
8              include multimedia communications, conglomerates, or local
              media entities.

9

10   (*Id*., col. 5, ll.16-23.)  Second, Defendants accuse Plaintiffs of improperly attempting to broaden the

11   phrase at issue by changing the argued function from the conjunctive—"receiving analog data *and*

12   digitized data," to the disjunctive—"receiving analog data *or* digitized data."  Third, Defendants

13   assert that Plaintiffs' proposed construction is incorrectly directed to the "media's multimedia

14   device," rather than the true claim at issue, which is "media means."  Thus, according to Defendants,

15   Plaintiffs' attempt to link "multimedia device" to the specification necessarily fails.

16        Here, a review of the '025 Patent reveals that its specification sets forth sufficient

17   corresponding structure to perform the function of "receiving analog and digitized data and

18   transmitting digitized data."  (*Id*.); *See Default Proof Credit Card System, Inc. v. Home Depot*

19   *U.S.A., Inc. (d/b/a The Home Depot)*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (stating "a

20   'corresponding structure' must include all structure that performs the recited function.).  The '025

21   Patent specification makes clear that the function can receive both analog and digital data.  (Herbst

22   Decl. ¶ 5, Ex. 3 at col. 7, ll. 37-52.)  Per the specification, the analog data may be received from

23   outside sources and is then digitized to be entered the PC 102; whereas the digital data may be

24   received directly into the PC 102.  (*Id*.)  The specification also discloses that the function transmits

25

26        [5]According to Plaintiffs, there are additional excerpts from the specification that sufficiently discloses the structure
     associated with "receiving analog and digitized data and transmitting digitized data."  (Joint Claims Construction Stmt. at
27   54-55) ("The system further, includes medial terminal for production of fields, including digitized property descriptions.  The
     media terminal has digitizing capabilities to digitize analog input and i/o for receiving and transmitting the digitized
28   information." (Herbst Decl. ¶ 5, Ex. 3 at col. 3, ll. 39-43.)  "The media's multimedia device 100 would preferably consist
     of a digitizer 108, compress/decompress unit 106, modem 104, and multimedia PC 102." (*Id*. at col. 5, ll. 58-60.))

21

1   digitized information.  (*Id.*, at col. 3, ll. 39-43; col. 7, ll. 66-col. 8, ll. 3); *see Altilis, Inc. v. Symantec*

2   *Corp.*, 318 F.3d 1363, 1377 (Fed. Cir. 2003) (stating "under § 112 every structure disclosed in the

3   specification and its equivalents should be considered.").

4         The components of such a function, and their operation, are as follows:

5                -the multimedia PC 102

6                -the digitizer 108, or data entry device, or modem 104 and compress/decompress unit

7                106.

8         Thus, the Court finds that the specification sufficiently discloses the components and the

9   operation of the phrase at issue such that one skilled in the art would identify the structure therein.

10  *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999).  Having

11  considered the parties arguments and the specification, the Court construes "media means" as "(i)

12  receiving analog data that is digitized for entry into a PC; or (ii) receiving digitized data for direct

13  entry into a PC.  Such resulting digitized data is later transmitted to the server's computer where it is

14  designated a location and stored with other similar files on the database."

15  **6.   "server"**

16        The parties dispute the construction of the term, "server," as it appears in claim element 3

17  ("server").[6]

18        Plaintiffs' proposed construction for the term, "server," is "a computer system that receives

19  requests and provides responsive information."  Defendants' proposed construction is "system that

20  receives digital property information and stores digital property information."  As such, the parties

21  agree that the proper "server" construction should describe "server" as a "system."  The parties also

22  agree that under the doctrine of claim differentiation, the construction of "file server means" and

23  "server's unit" are presumed to be different.  *See Inpro II Licensing, S.A.R.L. v. T-Mobile U.S.A.,*

24  *Inc.*, 450 F.3d 1350, 1354 (Fed. Cir. 2006) (citing *Tandon Corp. v. United States Int'l Trade*

25  *Comm'n*, 831 F.2d 1017, 1023-24 (Fed. Cir. 1987) (stating that under the doctrine of claim

26  differentiation, different claims are presumed to be of different scope.)).  However, because the

27  _____

28      [6]The term, "server," appears in claim elements 1 ("file server means"), 1(b) ("file server means"), 3 ("file server means"), 3(b) ("file server means"), 3(c) ("file server means"), 3(d) ("file server means"), 3 ("file server meansr"), 5 ("server's unit"), 6 ("server's unit"), 7 ("server's unit"), and 8 ("server's unit").  (Herbst Decl. ¶ 5, Ex. 3.)

United States District Court

For the Northern District of California

1   Court separately construes the terms, "file server means" and "server's unit," the Court will limit its

2   current construction of the term, "server," only to the extent it appears in claim element 3.

3          In support of their competing constructions of "server," both parties primarily rely on the

4   '025 Patent specification.  However, before turning to the specification, the Court must first

5   addresses the claim language.  *See Vitronics Corp.*, 90 F.3d at 1582 (stating that in construing

6   disputed terms, the Court first looks to the words of the claims ascribing the words their ordinary

7   and customary meaning.)  "[T]he ordinary and customary meaning of a claim term is the meaning

8   that the term would have to a person of ordinary skill in the art in question at the time of the

9   invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

10  In construing the ordinary and customary meaning, the Court notes that the dictionary definition for

11  "server" reads, "[a] computer that manages centralized data storage or network communications

12  resources.  A server provides and organizes access to these resources for other computers linked to

13  it." *American Heritage Science Dictionary* (2007); *See also Microsoft Computer Dictionary* (4th

14  Ed. 1994) (defining "server" as "[o]n a local area network, a computer running administrative

15  software that controls access to all or part of the network and its resources (such as disk drives or

16  printers).  A computer acting as a server makes resources available to computers acting as

17  workstations on the network.").[7]  Although not dispositive, the Court finds that the claim language in

18  light of the ordinary and customary meaning of "server" to be illustrative.

19         Turning to the '025 Patent specification, Defendants insist that it clearly defines "server" as,

20  "Server—The computer system which stores all files.  Input facilities for raw data may be located at

21  the Server's location."  (Herbst Decl., ¶ 5, Ex. 3 at col. 5, ll. 23-25.)  Plaintiffs argue that Defendants

22  misapply the specification because the specification explicitly qualifies its "server" description by

23  providing that "the following terminology is used for consistency and should in no way limit the

24

25         [7]Dictionary definitions and other objective reference materials available at the time that the patent was issued may
    also provide evidence of the ordinary meaning of a claim. *Phillips*, 415 F.3d at  1322; *Texas Digital Sys., Inc. v. Telegenix*,

26  Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002). A dictionary "has the value of being an unbiased source, accessible to the public
    in advance of litigation." *Phillips*, 415 F.3d at 1322 (internal quotation omitted). Thus, district courts "are free to consult

27  such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions
    when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained

28  by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n. 6.  A court should be cautious, however, not to place
    too much reliance on dictionaries, as the resulting construction may be too broad. *Phillips*, 415 F.3d at 1321.

scope of the invention." (*Id.* at col. 5, ll. 2-4.)  Plaintiffs also assert that Defendants' construction unduly restricts "server" to "digital property information" per the disclosed embodiment.

The Court finds that construction of term, "server," is somewhere in between the parties' proposed constructions.  Most compelling is the specification's description of the term, "server." *See Vitronics*, 90 F.3d at 1582 ("Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.").  From that description it is clear that "server" includes a "system which stores files" and also has "input facilities for raw data."  (Herbst Decl., ¶ 5, Ex. 3 at col. 5, ll. 23-25.)  Also instructive is the specification's description of the invention.  The specification repeatedly describes "server" as a component with an "input/output [device]" for "receiving and providing [or transmitting] data [and database storage]."  (*Id.* at col. 3, ll. 33-35; col. 4, ll. 10-14.)  As such, the Court construes "server," in part, as "computer system that receives, stores, and provides data."  The remaining issue is whether the "data" at issue should be limited to "digital property data."

It is evident that the disclosed embodiments of the '025 Patent describe "server" as a component "storing digital real estate information," (*id.* at col. 3, ll. 35-36) and "stor[ing] information regarding property profiles, real estate professionals, community profiles, real es [sic] state financing, local businesses and services . . . ." (*id.* at col. 4, ll. 2-5).  However, because it is improper to read limitations from the specification into the claim, the Court may not limit "data" to "digital data" as Defendants' proposed construction does.  *See, e.g., Phillips*, 415 F.3d at 1323.  For this reason, the Court refuses to adopt Defendants' proposed limitation.

Having considered the claim terms, the specification, and the relevant patent prosecution history, the Court construes "server" as  "computer system that receives, stores, and provides data."

**7.   "file server means for receiving data from said media means, receiving data inquiries and transmitting data in response to said data inquiries"**

The parties dispute the construction of the term, "file server means."  The term appears in claim elements 1, 1(b), 3, 3(b), 3(c), and 3(d).  (Herbst Decl. ¶ 5, Ex. 3.)  Within Claim 1, the term appears as follows:

> 1.  A method of acquiring and displaying real estate information
> utilizing an information processing system containing **file server**

24

**means** for serving files, said **file server means** having i/o means for receiving and transmitting data, and database storage means for storing information in database files, the method comprising the steps of:

. . .

b) storing digitized real estate data and related information as information records in said database storage means of **said file server means** in a manner in which data can be selectively accessed . . . .

(*Id*.)   The complete phrase at issue appears in Claim 3 as follows:

3.   A method of acquiring and displaying property related information utilizing an information processing system containing media means for receiving analog and digitized data and transmitting digitized data; **file server means for receiving data from said media means, receiving data inquiries and transmitting data in response to said data inquiries**; databases and database storage means for sorting, storing and retrieving information received, the method comprising the steps of: . . . .

. . .

b) transmitting said property related information in appropriate format to said **file server means**;

c) said **file server means** analyzing said property related information and storing said property related information in related database storage means,

. . .

d) said **file server means** receiving an information request from multiple end users relating to the end users' information needs, the extent of information available to said end users being determined by said end users' access code . . . .

(*Id*.)

**a.    Is the term at issue a means-plus-function element?**

The threshold issue is whether "file server means" constitutes a mean-plus-function element subject to Section 112(6).  The parties dispute whether the phrase is a means-plus-function element.

As previously discussed, Section 112(6) applies to a limitation expressed as a "means or step for performing a specified function without the recital of structure, material, or acts in support therefor." 35 U .S.C. § 112, ¶ 6.  A means-plus-function claim "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  *Id*.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1  However, a means-plus-function claim is limited to the structure, and equivalents, disclosed in the

2  specification for performing that function.  *Default Proof Credit Card Sys., Inc.*, 412 F.3d at 1298.

3  Thus, a court first must determine whether Paragraph 6 applies.  *Apple Computer v. Burst.com, Inc.*,

4  2007 WL 1342504 at *18 (N.D. Cal. 2007).  Where it applies, the court must then identify the

5  claimed function and the corresponding structure.  *Id.* (citing *Medical Instr. & Diag. Corp. v. Elekta*

6  *AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003).  As noted above, the use of the word "means" in a term

7  creates a presumption that Paragraph 6 applies.  *Id.*  However, that presumption is rebuttable by

8  evidence that the limitation "recites sufficient structure or material for performing [the] function."

9  *Id.* (citing *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999)); *see also*

10  *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000); *Kemco Sales, Inc.*

11  *v. Control Papers Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000); *Cole v. Kimberly-Clark Corp.*, 102

12  F.3d 524, 531-32 (Fed. Cir. 1996).  A court must decide on an "element-by-element basis" based

13  upon the patent and the prosecution history whether section 112(6) applies.  *Cole*, 102 F.3d at 531.

14       In determining whether section 112(6) applies here, the Court notes that the disputed phrase

15  uses the word "means" combined with another term: "file server."  Thus, as a threshold matter, the

16  Court must determine whether Plaintiffs have overcome the presumption that section 112(6) applies.

17  Plaintiffs contend that the presumption "fails" because the term, "file server," connotes a structure to

18  a person of ordinarily skill in the art, citing *Cole* and *Envirco Corp*.  Defendants, in turn, argue that

19  the presumption does apply, citing *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir.

20  1999).

21       In *Cole*, the issue was whether section 112(6) applied.  There, the Federal Circuit affirmed

22  the district court's conclusion that the term "perforation means ... for tearing" was not a

23  means-plus-function clause, because the claim sufficiently described a structure (*i.e.*, the perforation

24  itself) to perform the function of tearing.  *Cole*, 102 F.3d at 531.  Relying on the dictionary

25  definition for the word "perforation," the court construed the term, "perforation means ... for

26  tearing" to mean "perforations."  *Id.*

27       Similarly, in *Envirco Corp.*, the issue was whether section 112(6) applied.  There, the

28  Federal Circuit held that the word "baffle" alone constituted sufficient structure, and trumped the use

of the word "means." *Envirco Corp.*, 209 F.3d at 1364-65.  Relying on the dictionary definition of "baffle," the court stated "[b]ecause the term 'baffle' itself imparts structure, meaning a surface which deflects air, its use in the claims rebuts the presumption that § 112, ¶ 6 applies." *Id*. at 1365. Accordingly, the court determined that the district court erred in construing the "second baffle means" as a means-plus-function claim element under § 112, ¶ 6.  *Id*. .

However, in *WMS Gaming*, the Federal Circuit addressed a different issue.  There, Federal Circuit had already determined that section 112(6) applied, and subsequently held that the district court erred by identifying the corresponding structure for a means-plus-function limitation as "an algorithm executed by a computer."  *WMS Gaming*, 184 F.3d at 1349.  The court held that this identification of structure was overly broad because it was not limited to the algorithm disclosed in the specification.  *Id*. at 1348.  Specifically, the court stated, "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."  *WMS Gaming*, 184 F.3d at 1349.

Here, the Court finds Defendants have misapplied *WMS Gaming*.  Unlike the current case, in *WMS Gaming*, the issue was not whether section 112(6) applied.  There, the court had already determined that section 116(6) applied.  *Id*.  Rather, the issue there was whether the patent sufficiently disclosed the corresponding structure.  *Id*.  Because the issue in the current case is whether section 112(6) applies, the Court finds that *WMS Gaming* is factually inapposite.

The current case is more analogous to *Cole* and *Envirco Corp*. because there the courts considered the same issue now before this Court—whether section 112(6) applies.  Similar to *Cole* and *Envirco Corp*., this Court finds the dictionary definition of the term at issue to be instructive here.  As noted above, the relevant dictionary definitions of "server" are: (1)  "[a] computer that manages centralized data storage or network communications resources.  A server provides and organizes access to these resources for other computers linked to it."  *American Heritage Science Dictionary* (2007); and (2) "On a local area network, a computer running administrative software that controls access to all or part of the network and its resources (such as disk drives or printers).  A computer acting as a server makes resources available to computers acting as workstations on the

27

network." *Microsoft Computer Dictionary* (4th Ed. 1994); *see also American Heritage Dictionary* (2007) (defining "file server" as "[a] computer that controls a central repository of data that can be downloaded or manipulated in some manner by a client."). Thus, the relevant dictionary definitions connote an inherent structure in the term, "file server."

Additionally, reviewing the operative claims on an element-by-element basis, the Court concludes that "server means" is not a means-plus-function term. Each of the functions recited as part of the claimed method have a corresponding structure that is evident from the language of Claim 1 itself or from Claim 3. First, it is clear from the patent and Claim 1 that the "file server" has "[input/output] means for receiving and transmitting data, and database storage means for storing information in database files." (Herbst Decl., ¶ 5, Ex. 3.) Second, Claim 3 provides that the "file server" "receive[s] data . . ., and transmit[s] data in response to said data inquiries." (*Id.*) Thus, consistent with the relevant dictionary definitions the term "file server" inherently connotes a sufficient structure such that the section 112(6) presumption does not apply here. Because the "file server means" element does not qualify for section 112(6) treatment, it is not limited to the structure corresponding to the claimed function as "described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. Instead, this Court construes the term in accordance with standard claim construction rules.

**b.     "file server"**

The parties' proposed constructions are as follows. Plaintiffs' proposed construction for the term, "file server," is "a server that receives property related information, analyzes and stores that information in files, and provides data derived from one or more files responsive to requests." Plaintiffs' proposed construction for "file server" is inconsistent with their previous proposed construction for "server." As noted above, in construing "server" Plaintiffs opposed Defendants' importation of a "digital property information" limitation. However, in their proposed construction of "file server," Plaintiffs now seek a construction that imports a "property related information" limitation. Because Defendants argue that "file server" is a means-plus-function element, they do not offer an alternative construction. In construing "file server," the Court now turns to the claim language, the specification, and the prosecution history.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    As to the claim language, the Court initially emphasizes that it has previously construed part

2    of the term at issue when it construed the term, "server," as "computer system that receives, stores,

3    and provides data."  Because claim terms are normally used consistently throughout the patent, the

4    usage of a term in one claim can often illuminate the meaning of the same term in other claims.  *See*

5    *Rexnord Corp.*, 274 F.3d at 1342; *CVI/Beta Ventures, Inc.*, 112 F.3d at 1159.  As such, from the

6    outset, the Court is partially guided by its previous construction of "server."  To that end, a claim

7    term is to be given its ordinary meaning unless the patentee has explicitly redefined the term, or the

8    term itself is so ambiguous it is incapable of being understood without reference to the specification.

9    *See Johnson Worldwide Assocs., Inc.*, 175 F.3d at 991.  Therefore, this Court will look to the

10   ordinary meaning of "file server" unless there is evidence the patentee has otherwise redefined "file

11   server" as having a wholly independent and unrelated meaning.   In considering the term's ordinary

12   meaning, the Court finds that "file server" does have an ordinary meaning as set forth in the relevant

13   dictionary definitions, as noted above.  However, before turning to the '025 Patent specification, the

14   Court does recognize that the claims at issue do limit themselves to "real estate information,"

15   (Herbst Decl. ¶ 5, Ex. 3 at col. 14, ll. 34-36, Claim 1), and "property related information," (*id.* at col.

16   15, ll. 3-4, Claim 3).

17   Turning to the '025 Patent specification, the Court again finds that the specification's

18   description of the term, "server," is compelling.  (Herbst Decl. ¶ 5, Ex. 3 at col. 5, ll. 23-25); *see*

19   *Vitronics*, 90 F.3d at 1582 ("Usually, [the specification] is dispositive; it is the single best guide to

20   the meaning of a disputed term.").  The specification also references "file" and "server" together.

21   The specification reads "[e]ach file sent [from the Media's multimedia device 100] to the Server's

22   computer 412 is designated a location, ensuring that it will be stored with other similar files on the

23   database in the Server's computer 412.  (Herbst Decl. ¶ 5, Ex. 3 at col. 7, ll. 67-col. 8, ll. 3.)

24   Consequently, if the Court is to construe  "file server" differently than "server," the specification

25   supports only a slight modification.

26   Turning to the '025 Patent prosecution history, the Court has not located, and the parties

27   have not provided, guidance as to how to construe "file server."

28   Thus, having considered the claim terms and the specification, the Court construes "file

1  server" as "computer system that receives, stores, and provides data.  Said file server that stores data

2  in the form of files and provides data responsive to user requests."

3  **8.  "media unit"**

4      The parties dispute the construction of the term, "media unit."  The term at issue appears in

5  Claim 5 of the '025 Patent as follows:

6          5.  A system of tracking real estate and real estate related
            demographic information using a computer network system
7          comprising:

8                  a **media unit**, said **media unit** having:

9                      a multimedia computer;

10                     a digitizer, said digitizer receiving information
                           from outside said network system and
11                         within said multimedia computer;

12                     i/o means, . . . .

13  (Herbst Decl. ¶ 5, Ex. 3 at col. 15, ll. 57-66.)

14      Plaintiffs' proposed construction of the term is "a computer system capable of producing real

15  estate related information."  Defendants first contend that "media unit" declared invalid for

16  indefiniteness.  However, in the event the term is not indefinite, Defendants alternatively propose the

17  term's construction to be a "system that receives analog property information and transmits digital

18  property information via modem to the server's unit."  In support of their respective constructions,

19  the parties primarily rely on the '025 Patent specification.  However, before turning to the

20  specification, the Court first addresses the words of the claims.  *See Vitronics Corp.*, 90 F.3d at

21  1582.

22      Turning to the claim language, the Court notes again that is must ascribe the words of a claim

23  their ordinary and customary meaning.  *Id.*  "[T]he ordinary and customary meaning of a claim term

24  is the meaning that the term would have to a person of ordinary skill in the art in question at the time

25  of the invention, *i.e.*, as of the effective filing date of the patent application."  *Phillips*, 415 F.3d at

26  1313.  Here, the Court finds that the claim language is not helpful in ascertaining the ordinary

27  meaning of "media unit."  Consequently, the Court will turn to the specification.

28      The '025 Patent specification provides slightly more insight into the meaning of "media

unit." Although the specification does not directly refer to "media unit," it contains several references to "media" and "media multimedia device." Both parties cite to these portions of the specification in support of their respective constructions.

In referring to the term, "media," the specification provides, "[t]he system further includes media terminals for production of files, including digitized property descriptions. The media terminal has digitizing capabilities to digitize analog input and i/o for receiving and transmitting the digitized information." (Herbst Decl. ¶ 5, Ex. 3 at col. 3, ll. 39-43.) The specification also refers to "media multimedia device," reading "[t]he media's multimedia device 100 would preferably consist of a digitizer 108, compress/decompress unit 106, modem 104, and multimedia PC 102." (*Id.* at col. 5, ll. 58-60.) Next, the specification also refers generally to "media" in describing Figures 2 and 3. There, the specification provides,

> FIG. 2 illustrates the information flow to and from the Media's multimedia device 100 to the Server's Processor 400. The raw data is either gathered from outside sources, generally in the form of analog information 110, or entered directly at the Media's multimedia PC 102. Any analog information 110, albeit audio, video, photos, text, or graphics, must be digitized by Media's digitizer 108, to be read by the PCs used herein. The digitized information is sent directly to the Media's multimedia PC 102. Information from Real Estate Agents and other sources is received via the Media's modem 104, or by any other means, for entry into the Media's multimedia device 100. Data produced by the Media's personnel is directly entered onto the multimedia PC 102. Once entered, the information is edited at the media's multimedia PC 102, as illustrated in FIG. 3.

> In FIG 3, the edited information is placed in a file which corresponds to its existing database and compressed at the Media's compress/decompress unit 106. For example, the agent property profile is sent via Media's modem 104 to the Real Estate Agent's modem 206. The new file is received via the Real Estate Agent's modem 206 where it is sent to the Real Estate Agent's compress/decompress unit 204. After decompression, the file is sent to the Agent's multimedia PC 202 for review and proofing. The Real Estate Agent enters either approval or proofing instructions at this point.

> After proofing, the file is sent back to the Media's multimedia device 100 with instructions for changes. When final approval has been granted by the Agent, the file is sent, as shown in FIG. 2, via the Media's modem104 to the Server's modem 410. Each file sent to the Server's computer 412 is designated a location, ensuring it will be stored with other similar files on the database in the Server's computer 412.

United States District Court

For the Northern District of California

1  (*Id.* at col. 7, ll. 37-col. 8, ll. 3.)  Finally, in providing terminology, the specification also refers to

2  "media" by providing,

3         Media—The primary party responsible for production of
       property files and possibly all other advertising displayed on the

4       system.  The Media has access to all files on the Server and,
       alternatively, may be part of the Server's system.  The Media can

5       include multimedia communications, conglomerates, or local
       media entities.

6

7  (*Id.* at col. 5, ll. 16-22.)  In light of the specification, the Court now turns to the parties' proposed

8  constructions.

9         At the outset, the Court finds that "media unit" is not an indefinite term as Defendants

10  contend.  According to the Supreme Court, "[t]he statutory requirement of particularity and

11  distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what

12  went before in the art and clearly circumscribe what is foreclosed from future enterprise."

13  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citing *United*

14  *Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)).  The definiteness requirement,

15  however, does not compel absolute clarity.  *Id.*  Only claims "not amenable to construction" or

16  "insolubly ambiguous" are indefinite.  *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348,

17  1353 (Fed. Cir. 2003); *Honeywell Intern., Inc. v. International*, 341 F.3d 1332, 1338 (Fed. Cir.

18  2003); *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Thus,

19  the definiteness of claim terms depends on whether those terms can be given any reasonable

20  meaning.  *Datamize*, 417 F.3d at 1347.  Here, as discussed more fully below, because "media unit"

21  has a reasonable meaning in light of the intrinsic evidence, the Court finds it is not an indefinite

22  term.

23         In construing the term, "media unit," the Court recognizes that the specification identifies a

24  list of parties, entities, systems, and devices associated with the invention.  (Herbst Decl. ¶ 5, Ex. 3

25  at  col. 5.)  The specification identifies "media" as a the primary party responsible for production of

26  property files and possibly all other advertising displayed on the system.  (*Id.* at col 5, ll. 17-23.)

27  The device associated with the "media" is a "multimedia device" described as "[a] device and/or

28  system which includes, but is not limited to, video and audio-graphic conferencing and multimedia

32

United States District Court

For the Northern District of California

1    messaging . . . capable of storing, transmitting, receiving, compressing, decompressing and error

2    correcting, digital information for displaying text, graphics, audio and video." (*Id*. at col 5., ll. 26-

3    34.) From there, the patent describes the "media unit" as comprised of a multimedia computer,

4    digitizer, and input/output means. (*Id*. at col. 15, ll. 61-66, Claim 5.) Taken together, the

5    specification and claim language contemplate that the "media unit" is "computer system capable of

6    receiving analog or digital real estate and real estate related information, and transmitting said real

7    estate and real estate related information."

8         The Court now turns to the parties' proposed limitations in their respective constructions.

9    Defendants' proposed construction imports three limitations into "media unit": (1) requiring receipt

10   of "analog" property information; (2) requiring transmission of "digital" property information; and

11   (3) requiring that the transmission be "via modem to the server's unit." As to Defendants' first

12   proposed limitation, the Court finds no basis to conclude that the media unit receives only "analog

13   property information." To the contrary, the specification clearly contemplates that the "media unit"

14   is capable of receiving both analog and digital information. Similarly, the claim itself does not

15   contain any indication of such a limitation. The Court finds Defendants' second and third proposed

16   limitations also to be problematic. Defendants' second and third proposed limitations both attempt

17   to import limitations from the '025 Patent's embodiment. Because claims should not be limited to

18   the preferred embodiment, the Court also finds no basis to conclude that the transmissions from the

19   "media unit" are required to be either "digital" or "via modem to the server's unit." *See Northern*

20   *Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1292 (Fed. Cir. 2000); *see also*

21   *Kemco*, 208 F.3d at 1362 (stating "particular embodiments appearing in a specification will not be

22   read into the claims when the claim language is broader than such embodiments").

23        Plaintiffs' proposed limitation limits the information associated with "media unit" to be "real

24   estate related information." The Court finds this limitation to be appropriate because the claim itself

25   specifically teaches "[a] system of tracking *real estate and real estate related* demographic

26   information using a computer network system comprising . . . a media unit." (Herbst Decl. ¶ 5, Ex.

27   3 at col. 15, ll. 58-60) (emphasis added.)

28        Thus, having considered the claim terms and the specification, the Court construes "media

unit" as "computer system capable of receiving analog or digital real estate and real estate related information, and transmitting said real estate and real estate related information."

**9.   "digitizer"**

The parties dispute the construction of the term, "digitizer."  The term at issue appears in Claim 5 of the '025 Patent as follows:

> 5.  A system of tracking real estate and real estate related demographic information using a computer network system comprising:
>
> a media unit, said media unit having:
>
> a multimedia computer;
>
> a **digitizer**, said digitizer receiving information from outside said network system and within said multimedia computer;
>
> i/o means, . . . .

(Herbst Decl. ¶ 5, Ex. 3 at col. 15, ll. 57-66.)

Plaintiffs' proposed construction of the term is "a device that converts information in analog form to digital form."  Defendants' proposed construction of the term is "hardware device for converting analog audio, video, text, photograph and graphics to a digital format."  Thus, the parties agree that the claimed "digitizer" functions to convert information from analog format to digital format."  However, the parties disagree as to whether the claimed function should be limited to converting only particular types of analog data into digital data.

Here, the Court finds that Defendants' proposed construction is improper for two primary reasons.  First, by limiting the claimed function to "analog audio, video, text, photograph and graphics," the proposed construction improperly imports limitations from the specification.  (Herbst Decl. ¶ 5, Ex. 3 at col. 7, ll. 39-45); *See, e.g., Phillips*, 415 F.3d at 1323.  Second, by restricting the claim in such a manner, the proposed construction also improperly limits the claimed function to the preferred embodiment.  (*See* Herbst Decl. ¶ 5, Ex. 3 at col. 7, ll. 39-45); *See Northern Telecom Ltd.*, 215 F.3d at 1292; *see also Kemco*, 208 F.3d at 1362.

For this reason, and after having considered the intrinsic evidence before the Court, the Court construes "digitizer" as  "a device that converts information in analog form to digital form."

34

**10.    "server's unit"**

The parties dispute the construction of the term, "server's unit."  The term at issue appears in Claim 5 of the '025 Patent as follows:

> 5.  A system of tracking real estate and real estate related demographic information using a computer network system comprising:
>
> . . .
>
> a **server's unit**, said **server's unit** having:
>
> > a computer, said computer having storage capabilities; communication means, said communication means enabling said server to interact with remote terminals;
> >
> > a plurality of databases, at least one of said plurality of databases being an automatically updated demographic pattern database, said demographics pattern database being updated automatically by analyzing database information requests, said database information requests being a plurality of inquiries from a plurality of individual remote terminals, said remote terminal inquiries being the retrieving and viewing of text and/or graphic data from a database;
> >
> > demographic database updating means, said updating means automatically updating said demographics pattern database by compiling and merging a plurality of end user inquiries and storing said compiled and merged inquiries in said demographics pattern database.

(Herbst Decl. ¶ 5, Ex. 3 at col. 15, ll. 67-col. 16., ll. 18.)

Plaintiffs' proposed construction of the term is "a server system providing storage information."  Defendants' proposed construction of the term is "a single unit that includes a modem, computer and multimedia database."  In support of their respective constructions, the parties primarily rely on the '025 Patent  specification.

The Court finds that Defendants' proposed construction is improper for the same two reasons as its previously proposed construction.  First, by limiting the claimed function to "modem,

*United States District Court*
For the Northern District of California

computer and multimedia database," the proposed construction improperly imports limitations from the specification. *See, e.g., Phillips*, 415 F.3d at 1323.  Second, by restricting the claim in such a manner, the proposed construction also improperly limits the claimed function to the preferred embodiment. *See Northern Telecom Ltd.*, 215 F.3d at 1292; *see also Kemco*, 208 F.3d at 1362. Accordingly, Defendants' proposed construction is too narrow.  However, Plaintiffs' proposed construction is too broad and is therefore similarly unacceptable.

Having considered the claim terms, the specification, the relevant patent prosecution history, and construction of earlier claim terms, the Court construes "server's unit" as "a computer unit with storage capabilities and communication means that also contains demographics databases."

## CONCLUSION

For the foregoing reasons, the Court construes the disputed terms as follows:

1.      "said end user inquiries being the retrieving and viewing of test and/or graphic data from a database" as "said end user inquiries being requests for information that are passively monitored."

2.      "demographics" as "characteristics of human populations and population segments, especially when used to identify consumer markets."

3.      "compiling and merging a plurality of first end user inquiries" as "collecting and combining the results of first end user inquiries."

4.      "demographic information" as "characteristics of human populations and population segments, especially when used to identify consumer markets, that are created from a collection of first end user inquiries that identify distinct trends."

5.      "media means for receiving analog and digitized data and transmitting digitized data" as "(i) receiving analog data that is digitized for entry into a PC; or (ii) receiving digitized data for direct entry into a PC.  Such resulting digitized data is later transmitted to the server's computer where it is designated a location and stored with other similar files on the database."

6.      "server" as "computer system that receives, stores, and provides data."

7.      "file server means" as  "computer system that receives, stores, and provides data. Said file server that stores data in the form of files and provides data responsive to user requests."

United States District Court

For the Northern District of California

8.      "media unit" as "computer system capable of receiving analog or digital real estate and real estate related information, and transmitting said real estate and real estate related information."

9.      "digitizer" as  "a device that converts information in analog form to digital form."

10.     "server's unit" as "a computer unit with storage capabilities and communication means that also contains demographics databases."

**IT IS SO ORDERED.**

Dated: September 10, 2007



MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE