IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KEVIN KEITHLEY, et al.,

        Plaintiffs,

  v.

THE HOME STORE.COM, INC., et al.,

        Defendants.

_____/

No. C-03-04447 SI (EDL)

**ORDER FOR MONETARY SANCTIONS AND REPORT AND RECOMMENDATION FOR ADVERSE INFERENCE INSTRUCTION TO REMEDY DISCOVERY MISCONDUCT**

     Before the Court is Plaintiffs' request for terminating, evidentiary and monetary sanctions arising from Defendants' alleged spoliation of evidence.  Since Plaintiffs filed their initial request for sanctions on February 12, 2008, the Court has held several hearings and received extensive briefing on the spoliation issue, which became a moving target because of Defendants' belated production of evidence that it had previously stated was either nonexistent or destroyed.  The Court is very troubled by Defendants' late production, particularly given Defendants' representations to the Court that some of these documents no longer existed.  For the reasons stated in this Order and at the various hearings, the Court grants a monetary sanction of fees and costs associated with Defendants' discovery misconduct and recommends that the district court give a tailored jury instruction to address the spoliation that did occur, but declines to recommend terminating sanctions.  The Court previously granted Plaintiffs' request for $148,269.50 in fees and costs expended in bringing the original motion regarding spoliation based on some of the conduct described in this Order.

     The discovery misconduct by Defendants in this case is among the most egregious this Court has seen.  Not only have Defendants made representations to Plaintiffs that have turned out to be false or misleading, they have also made material misstatements to the Court on more than one

occasion.  At least some spoliation by Defendants has occurred in this case, although the extent of that destruction was not as extensive as was once thought, due to Defendants' very belated production of responsive documents from alternative sources that it only recently bothered to identify and search.  While the Court does not impose sanctions of any type lightly, and would prefer to see the resources of the Court directed to addressing the substantive issues of the case on the merits, rather than the collateral issue of sanctions for discovery abuse, this is the unusual case in which Defendants' conduct warrants stiff monetary, as well as evidentiary, sanctions.  See United Medical Supply Co. v. United States, 77 Fed. Cl. 257, 258-59 (Fed. Cl. 2007) ("Aside perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence. Our adversarial process is designed to tolerate human failings - erring judges can be reversed, uncooperative counsel can be shepherded, and recalcitrant witnesses compelled to testify. But, when critical documents go missing, judges and litigants alike descend into a world of *ad hocery* and half measures-and our civil justice system suffers."); North American Watch Corp. v. Princess Ermine Jewels, 786 F.2d 1447, 1451 (9th Cir. 1986) ("Belated compliance with discovery orders does not preclude the imposition of sanctions. . . . Last-minute tender of documents does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts.") (citing G-K Properties v. Redevelopment Agency, 577 F.2d 645, 647-48 (9th Cir.1978)); Fjelstad v. American Honda Motor Co., Inc., 762 F.2d 1334, 1338 (9th Cir. 1985) (stating that sanctions, including dismissal, are warranted under the court's inherent power "when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.").

**LEGAL STANDARD**

The Court's authority to sanction the parties in this case stems from its inherent power to impose sanctions in response to litigation misconduct and from Rule 37 under which sanctions are available against a party "who fails to obey an order to provide or permit discovery."  See Fed. R. Civ. P. 37(b)(2)(C); Fjelstad, 762 F.2d at 1338; Settlegoode v. Portland Public Schools, 2002 WL 31495823, *6 (D. Or. May 16, 2002) (holding that the sanction of public reprimand was appropriate where the plaintiff's counsel, *inter alia*, ignored and violated court orders regarding trial

1  presentation, misrepresented statements made by defense counsel in closing argument, and

2  recklessly or intentionally misled the jury).  Available sanctions range from monetary sanctions to

3  adverse inference instructions to dismissal.  See generally, Fjelstad, 762 F.2d at 1338;

4  Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 348 (9th Cir.1995).

5        **1.    Court's inherent power**

6        Under its inherent power to control the judicial process, the Court may enter sanctions for

7  litigation misconduct, including spoliation.  See Chambers v. NACSO, Inc., 501 U.S. 32, 45-46

8  (1991) (recognizing the inherent power of the courts to impose appropriate sanctions where conduct

9  disrupts the judicial process).  A party engages in willful spoliation if the party has "some notice that

10 the documents were potentially relevant to the litigation before they were destroyed." United States

11 v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002).  The policies underlying the

12 spoliation sanctions are many: "to punish the spoliator, so as to ensure that it does not benefit from

13 its misdeeds; to deter future misconduct; to remedy, or at least minimize, the evidentiary or financial

14 damages caused by the spoliation; and last, but not least, to preserve the integrity of the judicial

15 process and its truth-seeking function."  United Medical Supply, 77 Fed. Cl. at 264 (citing West v.

16 Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); see also National Hockey League v.

17 Metropolitan Hockey Club, Inc., 427 U.S. 639, 642-43 (1976).

18        Although there is some ambiguity in the caselaw as to the state of mind required to support

19 the imposition of sanctions under the Court's inherent power (see United Medical Supply, 77 Fed.

20 Cl. at 266-67), the Ninth Circuit has concluded that sanctions are available under the Court's

21 inherent power if "preceded by a finding of bad faith, or conduct tantamount to bad faith," such as

22 recklessness "combined with an additional factor such as frivolousness, harassment, or an improper

23 purpose."  See Fink v. Gomez, 239 F.3d 989, 994 (9th Cir. 2001); see also Gomez v. Vernon, 255

24 F.3d 1118, 1134 (9th Cir. 2001).  Dismissal sanctions under a court's inherent power may be

25 imposed upon a finding of willfulness, fault or bad faith.  See Leon v. IDX Systems Corp., 464 F.3d

26 951, 958 (9th Cir. 2006).

27        **2.    Rule 37**

28        Sanctions for violations of Rule 37, by contrast,  may be imposed for negligent conduct.  See

3

**United States District Court**
For the Northern District of California

1   Fed. R. Civ. P. 37(b); Fjelstad, 762 F.2d at 1343; Hyde & Drath v. Baker, 24 F.3d 1162, 1171 (9th

2   Cir. 1994) ("We have not required a finding of bad faith on the part of the attorney before imposing

3   sanctions under Rule 37.").  The lack of bad faith does not immunize a party or its attorney from

4   sanctions, although a finding of good or bad faith may be a consideration in determining whether

5   imposition of sanctions would be unjust, see Hyde & Drath, 24 F.3d at 1171, and the severity of the

6   sanctions.  The most drastic sanction, dismissal, generally requires a finding that the conduct was

7   "due to willfulness, bad faith or fault of the party," including "[d]isobedient conduct not shown to be

8   outside the litigants's control."  In re Phenylpropanolamine (PPA) Products Liability Litig., 460

9   F.3d 1217, 1233 (9th Cir.2006).  The Court may, in deciding whether to grant a motion for sanctions

10  under Rule 37, "properly consider all of a party's discovery misconduct ..., including conduct which

11  has been the subject of earlier sanctions." Payne v. Exxon Corp., 121 F.3d 503, 508 (9th Cir.1997).

12  Further, "[b]elated compliance with discovery orders does not preclude the imposition of sanctions."

13  See North American Watch Corp., 786 F.2d at 1451; see also G-K Properties v. Redevelopment

14  Agency of City of San Jose, 577 F.2d 645, 647-48 (9th Cir.1978).

15      **3.    Adverse inference instruction**

16          Under either the Court's inherent authority or Rule 37, a court may order an adverse

17  inference instruction.  Imposition of an adverse inference is:

18      based on two rationales, one evidentiary and one not. The evidentiary rationale is
        nothing more than the common sense observation that a party who has notice that a
19      document is relevant to litigation and who proceeds to destroy the document is more
        likely to have been threatened by the document than is a party in the same position
20      who does not destroy the document....

21      The other rationale for the inference has to do with its prophylactic and punitive
        effects. Allowing the trier of fact to draw the inference presumably deters parties
22      from destroying relevant evidence before it can be introduced at trial.

23
    Sensonics v. Aerosonic Corp., 81 F.3d 1566 (Fed. Cir.1996) (citing 2 Wigmore on Evidence § 291,
24
    at 228 (Chadbourn rev.1979)).  In drawing an adverse inference, a court need not find bad faith
25
    arising from intentional, as opposed to inadvertent, conduct.  See Unigard Sec. Ins. Co. v. Lakewood
26
    Eng'r & Mfg. Corp., 982 F.2d 363, 368-69, n.2 (9th Cir. 1992) (affirming exclusion of evidence for
27
    negligent destruction of evidence).  To decide whether to impose an adverse inference sanction
28
    based on spoliation, several California district courts have adopted the Second Circuit's test

4

1   requiring that a party seeking such an instruction establish that: "(1) the party having control over

2   the evidence had an obligation to preserve it; (2) the records were destroyed with a culpable state of

3   mind; and (3) the destroyed evidence was relevant to the party's claim or defense." Residential

4   Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 105 (2d Cir.2002) (followed by In re Napster,

5   462 F.Supp.2d 1060, 1078 (N.D. Cal.2006); Hamilton v. Signature Flight Support Corp., 2005 WL

6   3481423, at *3 (N.D. Cal. Dec.20, 2005); AmeriPride Svs, Inc. v. Valley Indus. Svc., Inc., 2006 WL

7   2308442, at *5 n. 6 (E.D. Cal. Aug.9, 2006)).  That approach has, however, been thoughtfully

8   critiqued by the court in United Medical Supply, which rejected a bad faith requirement in context of

9   Rule 37 sanctions and stated that: "Guided by logic and considerable and growing precedent, the

10  court concludes that an injured party need not demonstrate bad faith in order for the court to impose,

11  under its inherent authority, spoliation sanctions." United Medical Supply, 77 Fed. Cl. at 269.

12       Finally, a court should narrowly tailor any sanctions award to the circumstances in a given

13  case. See United Medical Supply, 77 Fed. Cl. at 270.  As aptly stated by the First Circuit, "the judge

14  should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a

15  dragon looms." Anderson v. Beatrice Foods Co., 900 F.2d 388, 395 (1st Cir.), cert. denied, 498 U.S.

16  891 (1990).

17  **DISCUSSION**

18       At issue in this case is Plaintiffs' United States Patent No. 5,584,025, entitled "Apparatus

19  and Method for Interactive Communication for Tracking and Viewing Data."  As stated in the Claim

20  Construction Order, the patent "describes and claims methods for acquiring and displaying real

21  estate and property-related information and a related system for tracking such information."  See

22  Sept. 12, 2007 Claim Construction Order at 2:3-4.  The "invention relates to a method of accessing

23  industry specific information, such as real estate properties for sale, through multimedia personal

24  computers."  See '025 patent, Abstract.  Of particular relevance are patent claims 1(f) and 1(g)

25  stating:

26       1. A method of acquiring and displaying real estate information utilizing an
         information processing system containing file server means for serving files, said file
27       server means having i/o means for receiving and transmitting data, and database
         storage means for storing information in database files, the method comprising the
28       steps of:

5

. . .

> f) generating a demographics information database by compiling and merging a plurality of first end user inquiries and storing said compiled and merged inquiries; and

> g) providing a second end user with said demographic information, said demographics information corresponding to the specific text and graphic data selected from said database files by said first end users.

See '025 patent, col. 14, ll. 58-65.  Plaintiffs filed this lawsuit on October 1, 2003, arguing that Defendants' websites directly infringe the '025 patent.

On February 12, 2008, Plaintiffs filed a motion for sanctions for Defendants' spoliation of evidence, arguing that Defendants had destroyed three types of evidence: (1) source code; (2) early architectural, design and implementation documents; and (3) reports.  Plaintiffs contended that the spoliation of these materials impacted Plaintiffs' ability to meet its burden of proving infringement.  Specifically, Plaintiffs contended that they would have to rely on circumstantial evidence rather than the actual source code and design documents to show direct infringement.  Moreover, Plaintiffs argued that the spoliation of reports would impact their ability to prove infringement resulting from both earlier and later versions of Defendants' websites.

The scope of the duty to preserve extends to what the party "knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request."  W.T. Thompson Co. v. General Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984); Columbia Pictures Industries v. Bunnell, 2007 WL 2080419, *14 (C.D. Cal. May 29, 2007); Hynix Semiconductor v. Rambus, Inc., 2006 WL 565893, *21 (N.D. Cal. Jan. 5, 2006).  Further, Rule 37(e) provides a limited safe harbor from sanctions arising under Rule 37 for loss of electronically stored information as a result of the "routine, good faith operation of an electronic information system."  See Fed. R. Civ. P. 37(e).  However, good faith may require

> a party's intervention to modify or suspend certain features of that routine operations to prevent the loss of information, if that information is subject to a preservation obligation.  A preservation obligation may arise from many sources, including common law, statutes, regulations, or a court order in  the case.  The good faith requirement of Rule 37(f) [now Rule 37(e)] means that a party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

> that it is required to preserve.  When a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system is one aspect of what is often called a "litigation hold."  Among the factors that bear on a party's good faith in the routine operation of an information system are the steps the party took to comply with a court order in the case or party agreement requiring preservation of specific electronically stored information.

Rule 37 Advisory Committee Notes (2006 Amendment); <u>see</u> <u>Disability Rights Counsel of Greater Washington v. Washington Metro Transit Authority</u>, 242 F.R.D. 139 (D. D.C. 2007) (compelling production of the defendant's backup tapes containing electronically stored information where the defendant did not suspend its routine e-mail deletion process, leaving only the backup tapes, which the defendant then argued were not reasonably accessible).

A threshold question that initially dogged this case is when the duty to preserve this evidence arose.  "There is no doubt that a litigant has a duty to preserve evidence it knows or should know is relevant to imminent litigation."  <u>A. Farber & Partners, Inc. v. Garber</u>, 234 F.R.D. 186, 193 (C.D. Cal.2006).  Specifically:

> The court in <u>A. Farber</u> thus held imminence to be sufficient, rather than necessary, to trigger the duty to preserve documents. Furthermore, the court in <u>A. Farber</u> did not reach the issue of when, exactly, the duty attached. The duty to preserve documents attaches "when a party should have known that the evidence may be relevant to future litigation." <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 216 (S.D.N.Y.2003). <u>See also</u> <u>National Ass'n of Radiation Survivors</u>, 115 F.R.D. at 556-57. The future litigation must be "probable," which has been held to mean "more than a possibility." <u>Hynix Semiconductor Inc. v. Rambus, Inc.</u>, 2006 WL 565893 at *21 (N.D. Cal.2006) (Whyte, J.).

<u>In re Napster Inc. Copyright Litigation</u>, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006); <u>see also</u> <u>Doe v. Norwalk Community College</u>, 2007 WL 2066497 (D. Conn. July 16, 2007) (determining that the defendant's failure to suspend its destruction of electronic documents at any time after receiving notification of the litigation did not satisfy the good faith requirement of Rule 37(f) and was at least grossly negligent, if not reckless, thereby justifying an adverse inference and costs).

Plaintiffs argued that Defendants had notice of infringement shortly after the patent issued in December 1996, but no later than 1998, based on a July 14, 1998 letter to Defendants regarding licensing.  That letter, however, does not threaten litigation or even mention infringement.  <u>See</u> Declaration of Scott Mosko in Support of Pls.' Mot. for Sanctions for Spoliation of Evidence at Ex. 3.  However, the duty to preserve had certainly arisen by August 3, 2001, when Plaintiffs sent

Defendants a letter stating that "we assume that Homestore.com wishes to litigate this matter. Unless we hear otherwise by close of business Tuesday, August 7, 2001, we will advance this matter accordingly." See Mosko Decl. Ex. 11.  Indeed, the duty probably arose even earlier either on June 25, 2001, when Plaintiffs stated in a letter that Defendant has been notified of the infringement of the '025 patent (Mosko Decl. Ex. 4) or January 24, 2000, when Plaintiffs stated in a letter that  "our counsel has advised willful intent proceedings to enforce intellectual property rights" (Mosko Decl. Ex. 5.).  Therefore, Defendants had a duty to preserve documents well before this lawsuit was filed on October 1, 2003.

As it turned out upon further investigation, however, the question of how far in advance of the filing of the lawsuit the duty arose is largely academic, because Defendants did not satisfy their duty to preserve even after this lawsuit was filed and recklessly allowed the destruction of some relevant source code as late as 2004.  Defendants initially contended that they followed proper document retention policies.  Specifically, according to Mr. Dawley, one of the original founders of Defendant Homestore.com, previously its Chief Information Officer and Chief Technology Officer, and now an Architect at Homestore.com's affiliated company, Move.com, when he "was made aware of potential litigation with Keithley," he was "instructed not to destroy any materials that might be relevant" to potential litigation.  See Declaration of Philip Dawley in Support of Defs.' Opp'n to Pls.' Motion to Sanctions (docket number 361) at ¶ 2.  Notably, however, Mr. Dawley did not provide any specific information about Defendants' document retention plan, other than a vague claim that there has always been a policy "to retain any information that might be relevant to ongoing or imminent litigation."  Nor does he state how that policy is implemented.

At the hearing on March 18, 2008, Defendants conceded that there was no written litigation hold policy in place during any of the relevant time periods.  Indeed, no written policy exists even today.  Nor was there any evidence, other than oral testimony, of what employees were told with respect to preservation of documents relevant to this case.  See Mar. 18, 2008 Tr. at 43:17-45:10. The lack of a written document retention and litigation hold policy and procedures for its implementation, including timely reminders or even a single e-mail notice to relevant employees, exemplifies Defendants' lackadaisical attitude with respect to discovery of these important

1  documents.  See, e.g., In re NTL Securities Litigation, 244 F.R.D. 179, 198-99 (S.D. N.Y. 2007)

2  (finding that the failure to have an adequate litigation hold in place and the failure to issue reminders

3  to employees regarding the duty to preserve evidence was at least grossly negligent).  The harm

4  caused by the lack of a preservation policy was compounded by an egregious failure to diligently

5  search for responsive documents in alternate locations until well after the eleventh hour, in the wake

6  of the initial hearing on the motion for sanctions for spoliation.

7      In December 2006, the Court issued an order granting, inter alia, Plaintiffs' motion to compel

8  production of documents relating to production of source code for Defendants' allegedly infringing

9  websites and other website documents in response to Plaintiffs' requests for production.  Because

10  the Court's order is a crucial piece of this spoliation and misconduct puzzle, the relevant portions are

11  quoted here in full:

12      Plaintiff's motion regarding Requests seeking website documents is
       GRANTED. Regarding those Requests calling for the production of source code,

13      within a reasonable time after the date of this Order, Defendants shall serve a report
       and/or index from all their Source Code Control Systems that details all projects,

14      directory structures, documents (including source code files) for each accused service
       and/or Homestore Website as defined in the Requests at issue during the timeframes

15      from initial check-in of website documents to the present. The report shall include
       any project or product release labeling, version numbering, or other forms of tagging

16      maintained by the Source Code Control System along with any textual description of
       the release label, version number, or tag and its associated date. The report shall also

17      include descriptive material sufficient to identify the functionality implemented by
       the source-code files and any other source-code entities. If portions of the

18      Defendant's source code are not under the control of a Source Code Control System,
       then Defendants shall prepare a report and/or index as described above by other

19      means. Similarly, if the Defendants' Source Code Control System provides
       inadequate support for producing all or portions of the report and/or index described

20      above, then Defendants shall prepare such report and/or index using other means in
       addition to those provided by the Source Code Control System. Plaintiff will then

21      identify what source code it requests. Within a reasonable time of receiving the
       request from Plaintiff, Defendants will produce its source code. Defendants have

22      communicated with Plaintiff that they will attempt to complete this production by the
       end of December, 2006.

23
       Regarding the actual production of source code, it shall be produced to

24      Plaintiff on one or more DVDs along with the necessary keys that will enable its
       access. These DVDs shall be maintained by Plaintiff's counsel or Plaintiff's experts

25      in a locked box when not in use. This source code shall be loaded only on a
       non-networked, stand alone computer under the control of Plaintiff's counsel or

26      experts. Any printouts from the DVD shall be labeled CONFIDENTIAL – SOURCE
       CODE – OUTSIDE COUNSEL ONLY, and the DVD and printouts shall be returned

27      to Defendants' counsel at the end of this action.

28      Plaintiff's motion to compel the production of website documents responsive
       to Requests that do not call for source code is GRANTED. The parties represent that

9

they have conferred after the hearing regarding these Requests. Defendants have stated to Plaintiff that they are in the process of gathering for production all business requirements documents and development methodology documents as defined in the Lanovaz declaration, that concern each of their websites and products, as they initially existed to the present. These documents will include all writings that describe the websites' and products' functionality, design and how they were implemented. Defendants will use their best efforts to produce these documents by December 31, 2006.

Dec. 19, 2006 Order at 1:11-2:15.

Defendants failed to adequately search for and produce the relevant documents that the Court ordered it to produce. One example concerns reports. Plaintiffs argued that the lack of reports showing how the websites were used and the content of Defendants' databases directly impact Plaintiff's ability to prove infringement of Claim 1. Specifically, Plaintiff argues that it will be hampered in showing that the accused websites meet Claim 1(f) and (g), which contain terms that have been construed as "collecting and combining the results of first end user inquiries," and as "stores data in the form of files and provides data responsive to user requests."

Defendants' first argument that the reports were not relevant or responsive to this Court's order is based on an unduly narrow reading of the Court's granting of Plaintiffs' motion as to website documents other than source code ("Plaintiffs' motion to compel production of website documents responsive to requests that do not call for source code is GRANTED."). Defendants' counsel stated in his April 30, 2008 declaration that: "I have always believed and understood that the Court's Order on that motion [to compel website documents] was not directed to reports that could be generated by Move. Rather, I understood it to apply to source code, business requirements documents, and other architectural documents sufficient to show the operation of the websites, and I believed Move complied with that order." See Declaration of Bruce Rose in Support of Defs.' Reply to Pls.' Response to Defs.' Supp. Memo. re: Spoliation ¶ 4. Yet included among the discovery requests that do not call for source code was request six, which seeks reports specifically, as well as request eight, which seeks documents related to the operation of the accused services. See Declaration of Robert McCauley in Support of Plaintiffs' Mot. to Compel Website Documents from Defs. and Mot. to Compel Financial and Related Documents Ex. D at 7 (request 6 stating: "All documents and things sufficient to determine the operation of accused services, including without limitation, white papers, manuals, engineering documents, prototypes, *reports*, correspondence,

memoranda, presentations, specifications and drawings.") (emphasis added); id. (request 8 stating: "All documents and things relating to any databases associated with the operation of accused services."). Yet even after this Order, Defendants refused Plaintiffs' demand to inspect databases from which reports and other documents could be found on the grounds, inter alia, that such request sought evidence that was not relevant to this action. See, e.g., Declaration of Scott Mosko in Support of Pls.' Statement of Defs.' Misrepresentations at Ex. 9 at 4. That Plaintiffs did not immediately bring the issue of Defendants' failure to produce reports to the Court's attention does not insulate Defendants from sanctions for their lack of production or, more importantly, as discussed below, for their subsequent misrepresentations to the Court regarding the very existence of reports.

Defendants' stance with respect to reports has evolved over time in this litigation. In the initial stages of briefing on this issue, Defendants argued that it would be impossible to retain all reports because of space limitations, but that Defendants keep records of the databases and of the searches that can be run in those databases, allowing the production only of exemplars of the type of reports that can be generated. Further, in a March 16, 2008 letter to Plaintiffs, Defendants state that "Move does not generate many types of reports." See Declaration of Scott Mosko in Support of Pls.' Response to Defs.' Supp. Memo. re: Spoliation Remedy at Ex. 3; see also Supplemental Decl. of Scott Mosko in Support of Pls.' Reply in Support of Mot. for Order Issuing Sanctions for Spoliation Ex. E (Defendants' responses to Plaintiffs' third request for production of documents) at 11:25-26 (quoting the March 16, 2008 letter).

Then, at the March 18, 2008 hearing on the motions for sanctions, in response to the Court's questioning, Defendants' counsel told the Court that Defendants do not store reports, but only permits users to make ephemeral queries and do not store the responses. In other words, Defendants did not keep any reports in the normal course of business, so nothing could have been lost or destroyed that should have been kept. Counsel concluded that:

> Nothing's been destroyed. *Move doesn't capture those reports that you are seeing*; some other user does it. *Just like you would, when you do a search on Google or Lexis*. . . . We don't get a copy of when a -- when a Realtor runs a query such as those, a copy goes into some files at Move. It's not been destroyed.

Mar. 18, 2008 Tr. at 26:10-20 (emphasis added). This representation to the Court was false.

Incredibly, following that hearing, and over a two-month period in 2008, Defendants did locate and produce numerous reports that were responsive to Plaintiffs' earlier discovery requests as ordered produced by the Court's December 2006 order.  See, e.g., Declaration of Scott Mosko in Support of Pls.' Statement of Defs.' Misrepresentations Ex. 7 (Plaintiffs' second request for production of documents) at 30 (request 71 seeking documents representing or concerning "internal monthly and year end reports on sales, net sales, net contribution, gross profit, gross margin or profit related expenses for each division or group involved with said Homestore websites."); at 36 (request 78 seeking documents including those that "represent, reflect or concern sales reports, print outs and/or summaries for each of the services."); at 68 (request 124 seeking documents concerning "information collected by users."); at 70 (request 126 seeking documents concerning "'anonymous data automatically gathered by . . . servers.'").  A little over two weeks after the March 18, 2008 hearing, Defendants produced approximately 480,000 hard copy reports on a hard drive that included  directories aptly titled "reports."  See Declaration of Daniel Lanovaz in Support of Pls.' Response to Defs.' Supp. Memo. re: Spoliation Remedy at ¶ 2 (revealing that the hard drive produced by Defendants under cover of letter dated April 3, 2008 contained "over 480,000 files containing reports or report-related material").  On March 28, 2008, Defendants produced screen shots of available internal reports.  See Declaration of Scott Mosko in Support of Pls.' Statement of Defs.' Misrepresentations Ex. 1; Declaration of Daniel Lanovaz in Support of Pls.' Statement of Defs.' Misrepresentations ¶¶ 4-6 (describing screen shots of reports).  Defendants produced still more screen shots of reports on March 31, 2008.  See Declaration of Scott Mosko in Support of Pls.' Statement of Defs.' Misrepresentations Ex. 2.

Still later, Defendants provided Plaintiffs with online access to several report systems, each of which shows the types of reports generated since 2005.  See Declaration of Scott Mosko in Support of Pls.' Statement of Defs.' Misrepresentations Ex. 3, 4 (providing instructions on using the on demand system); Declaration of Daniel Lanovaz in Support of Pls.' Statement of Defs.' Misrepresentations ¶¶ 7-8 (describing contents of on demand system).  Even after this belated production of reports, Defendants produced additional hard copies of reports approximately two months after the March 18, 2008 hearing.  See Declaration of Scott Mosko in Support of Pls.'

**United States District Court**
For the Northern District of California

1    Statement of Defs.' Misrepresentations Ex. 5-6.

2         Finally, there is evidence that employees at Top Producer, one of the accused websites, were

3    never even asked to collect reports in response to discovery requests until April 2008.  See

4    Declaration of Weiguo Chen in Support of Pls.' Statement of Defs.' Misrepresentations ¶¶ 4-5, Ex.

5    A (testimony of Dinesh Adithan, produced as a deponent under Federal Rule of Civil Procedure

6    30(b)(6) for issues regarding Top Producer, stating that he was not told to collect reports for this

7    litigation, and that reports would only be printed out to check for quality assurance and he does not

8    think the reports are kept).

9         Defendants' primary argument against sanctions based on their very belated production of

10   reports after denying their existence to Plaintiffs and the Court is that Plaintiffs' continued reference

11   to 480,000 reports is "grotesquely misleading."  Defendants have provided Kevin Johnson's

12   declaration in which Mr. Johnson states that: "[w]hile it may be true that the hard drive [of reports

13   produced to Plaintiffs] contains approximately 480,000 files, I believe that after eliminating system

14   files on the hard drive, it is closer to 462,500 for stats.realselect.com.  The number of uniquely

15   named reports - which would reveal the types of information provided in the reports - I estimate to

16   be in the low hundreds, minuscule by comparison."  Declaration of Kevin Johnson in Support of

17   Defs.' Reply to Pls.' Response to Requests for Terminating, Evidentiary and Monetary Sanctions ¶

18   5.  Defendants also argue that the number of reports is not a meaningful measure of the burden

19   involved in examining them because the issue is not the specific content of the reports, but the type

20   of information contained therein.  Regardless, the evidence shows that Defendants produced 480,000

21   files containing reports two weeks after they stated in Court in response to the Court's questioning

22   that *no* reports existed, and approximately sixteen months after the Court ordered production of

23   reports.  Moreover, whether there are thousands or hundreds of reports, Plaintiffs need to analyze

24   these late-produced documents to see for themselves, being understandably reluctant to rely on

25   Defendants' estimates.  Although it appears that Defendants did not destroy any reports, the fact that

26   they represented to the Court that no reports existed because Defendants did not create them only

27   two weeks before producing multiple reports constitutes serious misconduct that is grounds for

28   sanctions.

1    Further, the inadequate production of source code and the attendant design documents raises

2    issues not only of belated production, but also of spoliation.  Defendants acknowledge that the

3    Court's December 2006 order specifically required production of all versions of source code and

4    related documents for each accused website.  In their initial briefing on this issue, Plaintiffs noted

5    that Defendants originally produced the source code in the format of TIFF images, rather than the

6    more useful format of DVDs as expressly required by the Court's order.  See Declaration of Scott

7    Mosko in Support of Pls.' Statement of Defs.' Misrepresentations Ex. 11.  Defendants do not dispute

8    that they produced TIFF images.  They claim dubiously that they used the "most meaningful format

9    available," without grappling with the fact that the Court specifically ordered production in another

10   format.  See Defs.' Opp'n to Pls.' Mot. for Order Issuing Sanctions for Defs.' Spoliation at 13:16.

11   Subsequently, Defendants produced some source code in native format.  But shortly after that

12   production, Plaintiffs uncovered evidence that not all versions of the source code had been

13   produced, contrary to the Court's order.

14   In January 2008, Plaintiffs took the deposition of Defendants' Rule 30(b)(6) witness, Mr.

15   Dawley, who testified not only that not all versions of source code for all websites were produced,

16   but also incredibly, that "sometime after 2001," the database containing earlier versions of source

17   code was eliminated, so those earlier versions of source code were no longer available.  See

18   Declaration of Scott Mosko in Support of Pls.' Motion for Order Issuing Sanctions for Defs.'

19   Spoliation Ex. 17 at 527:6-528:10; 532:15-533:13; see also Defs.' Opp'n to Pls.' Mot. for Order

20   Issuing Sanctions for Defs.' Spoliation of Evidence at 6 (stating that in April 2007, Defendants

21   produced the then current version of the source code with a log of all changes, noting that there are

22   no discrete versions of the code).  Through a "pour-over" process, Defendants changed their source

23   code control system and copied only the then-current version of the source code from the

24   Development Computer to a newer machine running Microsoft's Visual Source Safe.[1]  Defendants

25

26   [1]    As explained below, the testimony on when exactly the pour-over occurred is not clear.
     Mr. Dawley stated in his April 10, 2007 deposition that the pour-over occurred and the old database was
27   eliminated "sometime after 2001."  See Declaration of Scott Mosko in Support of Pls.' Mot. for
     Sanctions for Spoliation of Evidence Ex. 17 at 533:5-13.  In his later-filed declaration on February 26,
28   2008, however, Mr. Dawley testified that the pour-over occurred "sometime after 2000, in 2001."  See
     Declaration of Philip Dawley in Support of Defs.' Opp'n to Pls.' Mot. for Order Issuing Sanctions for

**United States District Court**
For the Northern District of California

1   only kept the old Development database, with its prior versions of source code, "as a backup to the

2   new database and also continu[ing] to back up the source code running on the Development database

3   with tapes." <u>See</u> Declaration of Philip Dawley in Support of Defs.' Opp'n to Pls.' Mot. for Order

4   Issuing Sanctions for Defs.' Spoliation at ¶¶ 4-5.

5       One key fact is clear: in 2004, after the pour-over and after this lawsuit was filed, the

6   Development Computer suffered a catastrophic failure and its contents, including pre-pour-over

7   source code, became unreadable. <u>See</u> <u>id.</u> ¶ 6. Mr. Dawley stated that because the Development

8   Computer was only one of many supporting the Move system, technical personnel did not consider it

9   a high priority and did not realize that the failure of the Development Computer might raise an issue

10  of preservation. <u>See</u> <u>id.</u> ¶ 7. By the time that Defendants realized that the Development Computer

11  contained a log of changes to the original source code that was not carried over to the new source

12  code control, the backup tapes from the Development Computer had been written over. <u>See</u> <u>id.</u>

13      The ignorance of the technical personnel of the importance of the old source code to

14  Defendants' preservation obligation is not, of course, a legitimate excuse. Defendants had a duty to

15  notify and periodically remind technical personnel of Defendants' preservation obligation and

16  ensure that they took adequate steps to safeguard the data. At a minimum, Defendants were reckless

17  in their conduct regarding the Development Computer. Had Defendants imposed a proper litigation

18  hold in this case, the evidence on the Development Computer, in particular, the log of changes to the

19  websites' source code, would have been preserved. Instead, evidence of prior versions of source

20  code was destroyed.

21      The question of how much source code was destroyed, however, has become complicated by

22  the fact that after the March 18, 2008 hearing on Plaintiffs' motion for spoliation sanctions, and

23  despite Defendants' statement in their February 26, 2008 opposition to that motion that "Defendant

24  has produced all required source code," Defendants belatedly began producing additional source

25  code, some related to the spoliated code. It appears that only after the Court held a hearing on the

26  _____

27  Defs.' Spoliation of Evidence at ¶ 4. Even Mr. Dawley's statements at the March 18, 2008 hearing did
    not clear up the issue; there, he stated: "I don't know the exact time frames. It was sometime after 2000

28  and 2001 time frame that we began transitioning to a new source code control system. And that process
    continued as things were drawn out of the old system into the new system, over the course of a year, or
    even more, potentially." Mar. 18, 2008 Tr. at 42:2-7.

United States District Court
For the Northern District of California

motion for sanctions and indicated that sanctions may be appropriate, and *fifteen months after the Court's express order to produce all versions of source code*, did Defendants make any real effort to fulfill their discovery obligations to search for and gather source code.  Moreover, even while the motion for sanctions was being briefed, Defendants stated that the production of source code was adequate and that Plaintiffs could request source code as it existed at any point in time.  See Defs.' Opp'n to Pls.' Mot. for Sanctions for Spoliation at 6:25-7:3.  It is now known, however, that the change log and at least some source code on the Development Computer was permanently destroyed due to its catastrophic failure in 2004.

Following the March 18, 2008 hearing, Defendants conducted an investigation into which of the web-sites accused of infringement could have been implicated by the loss of the Development Computer.  However, as many questions about the status of Defendants' source code were raised as were answered by the investigation.  The investigation revealed that the source code developed and stored on the Development Computer pertained only to websites that were under development using Microsoft software at Homestore's Westlake Village offices before the pour-over.  See Declaration of Philip Dawley in Support of Defs.' Supp. Memo. re: Spoliation Remedy at  ¶¶ 3, 10; Declaration of Linda Lane in Support of Defs.' Reply to Pls.' Response to Supp. Memo. re: Spoliation Remedy at ¶¶ 4, 6.  Therefore, Mr. Dawley concluded that the only websites that are accused of infringing whose code could have been found on the Development Computer are: www.realtor.com, www.homestore.com, www.homebuilder.com, www.factorybuilthousing.com, and possibly www.remodel.com.  See Declaration of Philip Dawley in Support of Defs.' Supp. Memo. re: Spoliation Remedy at  ¶ 12; Declaration of Linda Lane in Support of Defs.' Reply to Pls.' Response to Supp. Memo. re: Spoliation Remedy at ¶ 7.  For various reasons, the other accused websites would not have been on the Development Computer and therefore were not lost when the Computer crashed.  See Declaration of Philip Dawley in Support of Defs.' Supp. Memo. re: Spoliation Remedy at  ¶ 4 (www.moving.com was not launched until January 2006; www.move.com was not launched until May 2006; www.homeinsight.com was not launched until May 2007); at ¶ 5 (www.rentnet.com, www.springstreet.com, www.seniorhousing.com were developed by company acquired by Homestore); at ¶ 6 (www.topproducer.com and www.homeinsight.com were developed

United States District Court
For the Northern District of California

in Vancouver); at ¶ 7 (www.moving.com was developed in Boston); at ¶ 8

(www.welcomewagon.com was developed in New York); at ¶ 9 (www.homeplans.com was

developed in Minnesota); at ¶ 10 (www.rentnet.com, www. seniorhousing.com, www.homefair.com

were developed using Java/Unix, not Microsoft software).  Whereas Mr. Dawley had previously

been unable to pin down specific dates for the pour-over, even when questioned at court hearings,

Mr. Dawley now stated that he had determined when the pour-over began with respect to the

websites that were on the Development Computer.  See id. at ¶ 16 (www.realtor.com was poured

over beginning in May 2000; www.homebuilder.com was poured over beginning in December 1999;

www.homestore.com was poured over beginning in April 2002; www.factorybuilthousing.com was

poured over beginning April 2002).  He states that it does not appear that the source code for

www.remodel.com was poured over at all.  Id.

Adding to the confusion, another of Defendants' declarants, Linda Lane, who served as a

release engineer responsible for coordinating release of software code from development to quality

control to production from October 2000 until April 2005, and then as the database administrator

until the present, contradicted Mr. Dawley's interpretation of the pour-over dates.  See Declaration

of Linda Lane in Support of Defs.' Reply Supp. Memo. re: Spoliation Remedy ¶¶ 1, 20 (stating that

Mr. Dawley's "interpretation of information obtained from the system is not accurate in certain

respects," but that she reached the same conclusions regarding the availability of information about

source code).  For example, the Show History feature of the Microsoft Visual Source Safe system

shows when source code files are created and documents each change that is made in the source

code over time.  See id. ¶ 13.  Mr. Dawley interpreted the first "created" or "checked in" date as

specifying the date when the source code was poured over from the Development Computer, but in

fact the first created or checked in date is the date when the poured over source code was created on

the Development Computer.  See id. ¶ 14.  Ms. Lane concludes that the result is the same, that is,

that the first checked in date "would mark the earliest date of poured over source code on the current

source code computer."  Id.  Ms. Lane stated that the earliest creation date of source code pertaining

to www.realtor.com is June 15, 1999, the earliest date pertaining to www.homebuilder.com is

December 20, 1999, and the earliest date pertaining to www.homestore.com is October 29, 2001.

17

1  See id. ¶¶ 21, 22, 23, 25.  She did not find any earlier source code pertaining to

2  www.factorybuilthousing.com.  See id. ¶ 24.  However, the earliest date of source code on the

3  current source code computer pertaining to www.realtor.com is May 25, 2000, the earliest date

4  pertaining to www.homebuilder.com is December 29, 1999, the earliest date pertaining to

5  www.homestore.com is April 8, 2002 and the earliest date pertaining to

6  www.factorybuilthousing.com is March 23, 2001.  See id. ¶ 20.  The conflicting and confusing

7  declarations from Mr. Dawley and Ms. Lane on this point and the Defendants' prior contrary

8  representations do not give the Court confidence that all source code has been produced.  To the

9  contrary, the Court is left with the impression that Defendants are not exactly sure how to interpret

10  their own source code system, and that the true dates have not been discovered.

11       On April 3, 2008, Defendants produced a CD with 220 megabytes of source code, explaining

12  that Mr. Dawley had a resurgence of memory "some weeks ago" when he recalled that his work

13  computer's hard drive, which likely contained copies of pre-pour-over source code, had crashed at

14  some unspecified time and that he had stored the crashed hard drive at his home.  See Declaration of

15  Philip Dawley in Support of Defs.' Supp. Memo. re: Spoliation Remedy at ¶ 18-20.  Engineers were

16  able to reconstruct source code files from that hard drive.  See id.

17       Amazingly, on April 24, 2008, Defendants produced yet another massive quantity of source

18  code that was kept by Ms. Lane, the engineer responsible for pouring over the source code, who had

19  apparently only recently been enlisted to help locate responsive code.  See Declaration of Scott

20  Mosko in Support of Pls.' Response to Defs.' Supp. Memo. re Spoliation Remedy at Ex. 8 (cover

21  letter from Defendants enclosing archive CD).  Ms. Lane stated in her declaration that in April 2008,

22  she spoke with Mr. Dawley who explained to her "that the loss of source code as a result of the

23  failure of the Development Computer was presenting problems to Move in this lawsuit."

24  Declaration of Linda Lane in Support of Defs.' Supp. Memo. re: Spoliation Remedy at ¶ 9.  After

25  that conversation, Ms. Lane stated that she searched for the archive CD that she remembered had

26  been used to store dormant files in order to save space in Visual Source Safe system.  See id.  Ms.

27  Lane found the archive CD in "a drawer in [her] cubicle at Move."  See id. at ¶ 10 (emphasis

28  added).

The Court is frankly shocked that when searching for source code to be produced pursuant to an unambiguous court order issued in December 2006, Defendants apparently waited until April 2008 to consult with the person at Move who was responsible for pouring over the files from the Development Computer to the new source code control system to determine whether she had responsive electronically stored information. Defendants do not dispute that the archive CD was responsive, and they have provided no adequate explanation, and the Court can fathom none, for why the CD was not found and produced earlier. Apparently, neither normal discovery obligations that apply even in the absence of a court order, nor even a court order, nor a pending motion for sanctions for spoliation, were sufficient to get Defendants' attention. Instead, only the very slowly dawning realization that serious sanctions would be imposed finally resulted in a key IT employee searching a readily accessible office drawer for the archive CD containing source code.

Thereafter, on May 1, 2008, Defendants produced two hard drives containing source code from the Top Producer website that was the subject of the Court's December 2006 order, after not including Top Producer in their index of source code produced in January 2007. See Declaration of Scott Mosko in Support of Pls.' Statement of Defs.' Misrepresentations Ex. 10, 15; Declaration of Daniel Lanovaz in Support of Pls.' Statement of Defs.' Misrepresentations ¶¶ 1, 2. Defendants attempt to shift blame to Plaintiffs with respect to the Top Producer source code and argue that Plaintiffs should have sought this source code sooner given that Plaintiffs had accused that website of infringement. Plaintiffs' delay in following up on Defendants' delinquent production of this source code does not excuse Defendants from failing to produce the code for all the websites as ordered by the Court in December 2006. On May 9, 2008, Defendants produced two DVDs containing source code. See id. Ex. 16. In sum, Defendants made at least four additional productions of source code in 2008 after the Court informed Defendants that sanctions were likely, from sources that should have been searched and turned over back in December 2006 when the Court issued the initial order requiring production of all source code.[2]

---

[2] Although Rule 26(b)(2)(B) excuses production of electronically stored information that is "not reasonably accessible because of undue burden or cost" absent good cause, Defendants have wisely not relied on this exception. Under that Rule, a court may nonetheless order such discovery for good cause shown, including the absence of more readily accessible information and the failure of

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

In arguing against sanctions for their egregious discovery misconduct, Defendants contend that sanctions are not warranted on the ground that Plaintiffs have suffered no prejudice as a result of Defendants' belated responses to discovery.  Defendants argue that because the post-pour-over source code supported all of the *functionalities* enabled by the pre-pour-over source code as well as new functionalities added after the pour-over, Plaintiffs have all the information they need to make their infringement case.  However, Plaintiffs should not have to take at face value Defendants' word that the functionalities remained the same or increased throughout the life of the source code, particularly when Defendants' representations have repeatedly proven to be unreliable.  In addition, Plaintiffs have suffered prejudice; by making these late productions, Plaintiffs have so far been unable to engage in follow-up discovery, and the discovery they took based on the prior production of source code is incomplete.  The fact that Defendants have flagrantly disregarded their discovery obligations with respect to reports and source code calls out for sanctions.

Defendants argue that because the Court has stated that it will recommend an adverse inference along the lines that the source code for the accused websites before the pour-over was identical to that after the pour-over, analysis of the archive CD and the source code from Mr. Dawley's hard drive is not necessary.  To the extent that any inference renders analysis of these two sources irrelevant, the Court will not award the full amount of monetary sanctions sought by Plaintiffs based on future costs to analyze the contents of the archive CD and the hard drive.

Finally, Plaintiffs also argue that Defendants have spoliated design and architectural documents.  The Court's December 2006 Order required production of "business requirements documents and development methodology documents."  Plaintiffs argue that not all architectural, design and implementation documents were produced, and suspect that they were destroyed with the earlier source code, particularly those documents pre-dating 2001.  Plaintiffs' expert Lanovaz

---

Defendants to preserve readily accessible information in its accessible form.  See Fed. R. Civ. P. 26(b)(2)(B); see also Fed. R. Civ. P. 26, Advisory Committee Notes, 2006 Amendments ("The decision whether to require a responding party to search for and produce information that is not reasonably accessible depends not only on the burdens and costs of doing so, but also on whether those burdens and costs can be justified in the circumstances of the case"); Disability Rights Council, 242 F.R.D. at 147 (analyzing factors from Rule 26 Advisory Committee Notes and ordering discovery of back up tapes that the defendant claimed were not readily accessible).  Good cause exists under the circumstances presented here.

**United States District Court**
For the Northern District of California

testified that he would have expected to see more such documents and found some embedded in the source code control that were produced in native format.  See Declaration of Daniel Lanovaz in Support of Pls.' Motion for Sanctions re: Spoliation of Evidence at ¶¶ 4-6.  In addition, Plaintiffs point to a 1999 Overview of Realtor.com containing technical information (see Declaration of Philip Dawley in Support of Defs.' Opp'n to Pls.' Motion for Sanctions re: Spoliation of Evidence Ex. 1) as an example of pre-2001 design documents, and argue that additional similar documents must exist.

Mr. Dawley responded in his declaration that Defendants did not create elaborate software design documents, architectural layouts and database schema as precursors to drafting code; rather a small group of programmers worked closely together to write the code.  See Declaration of Philip Dawley in Support of Defs.' Opp'n to Pls.' Motion for Sanctions re: Spoliation of Evidence at ¶ 3. He also testified that he did not believe that the source code previously residing on the Development Computer contained "any pertinent embedded software design documents, architectural layouts, or database schemas that Move has not otherwise produced."  Id. at ¶ 11.  Mr. Dawley did state at the March 18, 2008 hearing that design documents could be stored in the source code repository, but that the repository had been thoroughly searched.  See Mar. 18, 2008 Tr. at 56:25-57:1; 71:21-72:7. While Mr. Dawley's recollection has not proven to be always reliable and it is somewhat suspicious that more design and architectural documents were not produced, the Court declines to impose sanctions on this basis as too speculative.

**AWARD OF SANCTIONS**

Defendants engaged in reckless and egregious discovery misconduct as described above. Defendants were on notice no later than August 2001 that documents relevant to this case should have been maintained pursuant to a litigation hold.  See, e.g., Phoenix Four, Inc. v. Strategic Resources Corp., 2006 WL 1409413, *5-6 (S.D. N.Y. 2006) (stating that lack of a litigation hold can constitute gross negligence and can justify monetary sanctions).  Yet during 2001 and, according to at least one version of Mr. Dawley's testimony, even *after* that time, Defendants engaged in a large scale transfer of source code to a new source code control system without taking adequate precautions to safely maintain the older information, which was plainly relevant to this litigation and

**United States District Court**
For the Northern District of California

should have been the subject of a litigation hold, leading to destruction of some source code in 2004. The facts -- specifically that Defendants have no written document retention policy nor was there a specific litigation hold put in place, that at least some evidence was destroyed when the Development Computer failed, that Defendants made material misrepresentations to the Court and Plaintiffs regarding the existence of reports, and that Defendants have produced an avalanche of responsive documents and electronically stored information only after the Court informed the parties that sanctions were appropriate -- show a level of reckless disregard for their discovery obligation and for candor and accuracy before the Court sufficient to warrant severe monetary and evidentiary sanctions.

Defendants' reckless conduct not only warrants sanctions under Rule 37, which does not have a bad faith requirement, but also warrants sanctions under the Court's inherent power. Specifically, Defendants' pattern of deceptive conduct and malfeasance in connection with discovery and production of documents under this Court's order and reckless and frivolous misrepresentations to the Court amounts to bad faith for purposes of sanctions under the Court's inherent power. Defendants' conduct was not inadvertent or beyond their control or merely negligent; to the contrary, Defendants did not even come close to making reasonable efforts to carry out their preservation and other discovery obligations and to determine that their representations to the Court and to opposing counsel were accurate. As a whole, Defendants' discovery misconduct in this case was both reckless and frivolous. See, e.g., Fink, 239 F.3d at 994.

In light of the course of conduct described above, the Court has already awarded $148,269.50 in sanctions to Plaintiffs for their fees and costs incurred in bringing the motion for sanctions regarding spoliation. The Court will impose certain additional monetary sanctions, as well as recommend a curative inference. However, because there is no evidence that Defendants engaged in deliberate spoliation, and dismissal is the most extreme sanction and would go beyond what is necessary to cure the prejudice to Plaintiffs, the Court does not recommend terminating sanctions.

The Court declines Defendants' belated request to limit the sanctions award to Defendant Homestore.com alone, and not to Defendants National Association of Realtors (NAR) and National Association of Homebuilders of the United States (NAHB). Defendants claim that there has been no

United States District Court
For the Northern District of California

1    showing that NAR and NAHB were involved in any way in the loss of source code or other alleged

2    spoliation.  This distinction, raised for the first time in the briefing in advance of the second hearing

3    on the sanctions issue on May 13, 2008, comes too late.  Further, all Defendants have been

4    represented by the same counsel and have never raised any separate issues of any kind in discovery

5    until this belated argument, and Defendants have provided no authority in support .

6    **Adverse inference instruction**

7        As the Court previously informed the parties at the hearings, it will recommend that an

8    adverse inference instruction be given to the jury regarding the pre-pour-over and post-pour-over

9    source code.  The parties do not dispute that an adverse inference is warranted, but have submitted

10   competing versions.  Plaintiffs' proposed adverse inference states:

11       If Plaintiffs prove that Defendants infringed any claim of the '025 patent after pour-
         over by the operation of any one of the accused websites, the jury shall infer that said
12       website infringed the '025 patent from the date it was launched.

13   Defendants propose two alternative inferences, based on the dates proffered by Ms. Lane and Mr.

14   Dawley as the earliest dates that source code for the websites was poured over to the new source

15   code control system:

16       The jury shall be instructed that it may infer that the source code residing on
         Defendants' source code control system for the www.realtor.com,
17       www.homebuilder.com, www.homestore.com or www.factorybuilthousing.com
         websites as of the date specified above for that website - or as of any date for the
18       www.remodel.com website - was the same at all times before that date from the date
         each such website was launched;

19
20       or

21       If Plaintiffs prove that the www.realtor.com, www.homebuilder.com,
         www.homestore.com, or www.factorybuilthousing.com websites infringe the '025
22       patent on the basis of source code existing as of the date specified above for that
         website - or the www.remodel.com website as of any date - the jury shall infer that
23       said website infringed the '025 patent from the date it was launched.

24       Defendants raise one issue with respect to Plaintiffs' proposed adverse inference instruction

25   that is well-taken.  There is undisputed evidence that source code for only certain websites was

26   housed on the Development Computer that is the source of the spoliation.  Plaintiffs' proposed order

27   would apply to all accused websites, many of which were not housed on the Development

28   Computer.  Any adverse inference will be limited to the websites that were contained on the

     Development Computer.  Less persuasively, Defendants also complain that Plaintiffs' proposed

inference does not contain a source code limitation, and would somehow permit a finding of infringement for the time before the pour-over even if the finding of infringement was somehow not based on lost source code.  But if the source code for a website was the same, then the operation of the website would infringe (or not) in the same way; websites, after all, operate through source code (and the corresponding object code). Further, unlike Defendants' first proposed inference stating only that the jury "may" make certain inferences, the inference should be mandatory.

Defendants' argument about the time frame of any adverse inference is also not persuasive. Defendants argue that the Ms. Lane and Mr. Dawley have established that the earliest dates that the source code was preserved on the current source code control system were March 23, 2001 for www.factorybuilthousing.com, December 29, 1999 for www.homebuilder.com, April 8, 2002 for www.homestore.com, and May 25, 2000 for www.realtor.com.  After Defendants' ever-shifting narratives, as described above, the Court is not convinced that Defendants have accurately portrayed the dates relating to pour-over of these websites.  Therefore, an adverse inference will not be tied to these dates.

Based on the conduct described above, the Court recommends that the trial judge give the following jury instruction:  "If Plaintiffs prove that Defendants infringed any claim of the '025 patent after pour-over by the operation of the www.realtor.com, www.homebuilder.com, www.homestore.com, www.factorybuilthousing.com or www.remodel.com websites, the jury shall infer that the same websites infringed the '025 patent from the date it was launched."

**Monetary sanctions**

In addition, a sizeable monetary sanction is warranted.  The monetary sanction reflects the fees and costs that Plaintiffs has incurred as a result of Defendants' recent large production of documents that should have been produced earlier as well as the fees and costs Plaintiffs expect to incur as a result of Defendants' failure to respond to the Court's order compelling production of documents.  Defendants argue that sanctions for Plaintiffs' expert's time and for additional discovery are not warranted because Plaintiffs would have had to conduct discovery in the first instance had the documents been timely produced.  This argument ignores the fact that if Plaintiffs had received all of the discovery due in a timely manner, they would not have had to waste time with

expert reports and depositions based on only partial information.

First, Plaintiffs seek $62,035.00 for fees and costs incurred as a result of Defendants' refusal to produce source code, design and implementation documents and reports, which culminated in the Court's December 2006 order granting Plaintiffs' motion to compel.  An award of expenses incurred in making a successful motion to compel is mandatory absent substantial justification for the opposing party's nondisclosure or objections, or where an award of expenses would be unjust.  See Fed. R. Civ. P. 37(a)(5)(A).  As described above, Defendants did not have substantial justification for failing to produce these documents, and an award of sanctions would not be unjust.  Thus, the Court will award the reasonable fees and expenses incurred with respect to this motion, subject to Plaintiffs' submission in camera of billing records, to support the amount.

Second, Plaintiffs seek $12,478.00 in attorneys' fees and expert fees incurred as a result of Defendants' refusal to provide a complete interrogatory response to number 20 seeking the source of income generated from accused websites.  Although the Court granted in part Plaintiffs' motion to compel further response to interrogatory number 20, Plaintiffs have not shown that the issues raised by that motion, including revenue sources for the accused websites and costs of sales or operating expenses for each revenue source, are sufficiently intertwined with this motion for sanctions, which focused on design documents, source code and reports, to warrant sanctions pursuant to this motion.

Third, Plaintiffs seek payment of future expenses that they expect to incur as a result of the need to "do over" certain tasks due to Defendants' belated production of documents and electronically stored information.  Plaintiffs seek $292,585.50 in attorneys' fees for re-doing the infringement analysis of the accused websites and Top Producer, re-preparing and taking functionality depositions of the technology witnesses, and revising the current drafts of expert reports, which represents thirty percent of the actual costs already incurred for these tasks.  Plaintiffs also seek $135,000 in expert fees for analyzing the late-produced evidence, which reflects thirty percent of Plaintiffs' technical consultants' time devoted to analyzing the earlier evidence.  The Court has determined that it is appropriate to award $135,000 for expert fees at this time, subject to production for in camera review, with appropriate redactions, if any, of documentation of that amount.  Plaintiffs are entitled to some, if not all, of the attorneys' fees they seek for re-doing

25

**United States District Court**
For the Northern District of California

1  discovery.  Because these fees have not yet been incurred, however, the Court will award one-third,

2  or $97,528.50, of the total amount sought at this time.  The Court defers a further award of

3  attorney's fees until such time as Plaintiffs have actually incurred them and show their justification

4  more specifically.

5          Fourth, Plaintiffs seek $862,125.00 representing estimated expenses for their expert, Daniel

6  Lanovaz, to evaluate the late productions of documents and electronically stored information, and to

7  assimilate them into the infringement and damages analysis.  See Declaration of Daniel Lanovaz in

8  Support of Pls.' Statement of Incurred Costs and Projected Additional Expenses ¶¶ 1-3 (estimating

9  an average of thirty minutes to properly analyze each relevant document for a total of 3,135 hours at

10  $275 per hour).  Defendants argue that if the Court gives Plaintiffs' proposed jury instruction, Mr.

11  Lanovaz need not analyze all of the late-produced data.  In light of the Court's recommendation to

12  the district court regarding the adverse inference as described above, Plaintiffs shall provide a

13  further declaration from Mr. Lanovaz as to which portions of the analysis would be unnecessary in

14  light of that inference.

15          Fifth, Plaintiffs also seek $50,000.00 representing the estimated cost to prepare for and take

16  additional depositions regarding late-produced reports, $25,000 representing the estimated cost to

17  take additional depositions on late-produced source code, and $25,000 representing the estimated

18  cost to take additional depositions on late-produced design documents, for a total of $100,000.  As

19  stated above, the Court will not award sanctions for spoliation of design documents.  Therefore,

20  Plaintiffs' request for $25,000 attributable to the estimated cost for additional discovery regarding

21  those design documents is denied.  Again, Plaintiffs are entitled to some of the expenses they seek

22  for taking additional depositions regarding source code and reports, to the extent that the adverse

23  inference instruction does not address the need for more discovery work due to late production.

24  Because these fees have not yet been incurred, however, the Court will award one-third, or

25  $25,000.00, of the total amount sought at this time.  The Court defers a further award of attorney's

26  fees until such time as Plaintiffs have actually incurred them and can show their justification more

27  specifically.

28          Plaintiffs propose two evidentiary sanctions in lieu of the majority of the monetary sanctions

1 described above.  The Court declines to issue any additional evidentiary sanctions.

2 **CONCLUSION**

3      The Court awards monetary sanctions as stated in this Order, subject to production of

4 Plaintiffs' billing records or other documentation to substantiate that amount.  An award of expert

5 fees for Mr. Lanovaz or other technical consultants to re-analyze the evidence is warranted, subject

6 to an additional declaration(s) detailing what additional work is necessary in light of the Court's

7 recommended adverse inference.  Plaintiffs shall file any declarations no later than September 2,

8 2008.

9      The Court also recommends that the district court give the following adverse inference jury

10 instruction: "If Plaintiffs prove that Defendants infringed any claim of the '025 patent after pour-

11 over by the operation of the www.realtor.com, www.homebuilder.com, www.homestore.com,

12 www.factorybuilthousing.com or www.remodel.com websites, the jury shall infer that the same

13 websites infringed the '025 patent from the date it was launched."

14      Any party may serve and file specific written objections to the recommendation portion of

15 this Order within ten (10) working days after being served with a copy.  See 28 U.S.C. §

16 636(b)(1)(C); Fed. R. Civ. P. 72(b); Civil Local Rule 72-3.  Failure to file objections within the

17 specified time may waive the right to appeal the District Court's order.

18      **IT IS SO ORDERED.**

19 Dated: August 12, 2008           _Elizabeth D. Laporte_
                                        

20                                  ELIZABETH D. LAPORTE
                                 United States Magistrate Judge

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

27