IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN L. KEITHLEY, et al., | No. C-03-04447 SI (EDL) |
| Plaintiffs, | **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SANCTIONS** |
| v. | |
| HOMESTORE.COM, INC., et al, | |
| Defendants. | |

Before the Court is Defendants' request for terminating, evidentiary and monetary sanctions arising from Plaintiffs' late production of documents and alleged spoliation. For the reasons stated in this Order and at the October 17, 2008 hearing, the Court grants in part Defendants' Motion for Sanctions and awards monetary sanctions consisting of additional fees and costs incurred by Defendants as a result of Plaintiffs' conduct, but declines to recommend an adverse inference jury instruction, or terminating or evidentiary sanctions.

As a preliminary matter, at the hearing, Defendants' counsel expressed concern that the Court might not be giving Defendants the same consideration that it gave Plaintiffs when deciding Plaintiffs' earlier motion for sanctions. The Court regrets that Defendants have this misplaced concern, and can only reiterate that each motion is examined on its own merits and judged by the same standards, regardless of which party brings it. Unfortunately, this lengthy litigation has become highly adversarial and the litigants' emotions have run correspondingly high. Faced with highly contentious adversaries, the Court rules on motions impartially, without regard to the emotional reactions of the litigants. The Court has been disturbed by discovery misconduct on both sides, and in no way condones Plaintiffs' behavior that is the subject of this motion. At the same

1  time, the Court must carefully weigh the nature and degree of the misconduct, the nature and degree
2  of actual prejudice, and the ability to cure any prejudice in order to tailor appropriate and
3  proportionate sanctions.  In this instance, the posture of Defendants' motion for sanctions differs
4  significantly from that of Plaintiffs' prior motion for sanctions.  For example, Plaintiffs' motion
5  confronted the Court with material misrepresentations to the Court by Defendants, as well as belated
6  production of documents by Defendants after the motion for sanctions was filed, including
7  documents that Defendants had previously represented to Plaintiffs and to the Court had never
8  existed in the first place.  There has been no similar showing here.   Further, on close examination,
9  the prejudice claimed by Defendants is not as severe or incurable as Defendants contended.

**LEGAL STANDARD**

11  Under its inherent power to control the judicial process, the Court may enter sanctions for
12  litigation misconduct.  See Chambers v. NACSO, Inc., 501 U.S. 32, 45-46 (1991) (recognizing the
13  inherent power of the courts to impose appropriate sanctions where conduct disrupts the judicial
14  process).  Although there is some ambiguity in the caselaw as to the precise state of mind required to
15  support the imposition of sanctions under the Court's inherent power (see United Medical Supply,
16  77 Fed. Cl. at 266-67), the Ninth Circuit has stated that sanctions are available under the Court's
17  inherent power if "preceded by a finding of bad faith, or conduct tantamount to bad faith," such as
18  recklessness "combined with an additional factor such as frivolousness, harassment, or an improper
19  purpose."  See Fink v. Gomez, 239 F.3d 989, 994 (9th Cir. 2001); see also Gomez v. Vernon, 255
20  F.3d 1118, 1134 (9th Cir. 2001).  Dismissal sanctions under a court's inherent power may be
21  imposed upon a finding of willfulness, fault or bad faith.  See Leon v. IDX Systems Corp., 464 F.3d
22  951, 958 (9th Cir. 2006).  Here, the Court concludes that while Plaintiffs have been inexcusably
23  negligent, there has been no showing of bad faith or conduct tantamount to bad faith.  The Court
24  therefore declines to award sanctions pursuant to its inherent power.
25  Sanctions for violations of Rule 37, by contrast, may be imposed for even negligent conduct.
26  See Fed. R. Civ. P. 37(b); Fjelstad, 762 F.2d at 1343; Hyde & Drath v. Baker, 24 F.3d 1162, 1171
27  (9th Cir. 1994) ("We have not required a finding of bad faith on the part of the attorney before
28  imposing sanctions under Rule 37.").  The lack of bad faith does not immunize a party or its attorney

2

from sanctions, although a finding of good or bad faith may be a consideration in determining whether imposition of sanctions would be unjust, see Hyde & Drath, 24 F.3d at 1171, and how severe the sanctions should be. Dismissal, the most drastic sanction, generally requires a finding that the conduct was "due to willfulness, bad faith or fault of the party," including "[d]isobedient conduct not shown to be outside the litigants's control." In re Phenylpropanolamine (PPA) Products Liability Litig., 460 F.3d 1217, 1233 (9th Cir.2006). In deciding whether to grant a motion for sanctions under Rule 37, the Court may "properly consider all of a party's discovery misconduct ..., including conduct which has been the subject of earlier sanctions." Payne v. Exxon Corp., 121 F.3d 503, 508 (9th Cir.1997).

A court should narrowly tailor any sanctions award to the circumstances in a given case. See United Medical Supply, 77 Fed. Cl. at 270. As aptly stated by the First Circuit, "the judge should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms." Anderson v. Beatrice Foods Co., 900 F.2d 388, 395 (1st Cir.), cert. denied, 498 U.S. 891 (1990). As described below, the Court has determined that Plaintiffs' conduct in belatedly producing numerous documents and failing to produce attachments to e-mails was negligent and therefore sanctionable under Rule 37, and that appropriately tailored sanctions consist of reasonable fees and costs incurred as a result and the opportunity to take further depositions.

**BACKGROUND**

Defendants argue that they are entitled to wide-ranging and severe sanctions because they have suffered prejudice as a result of Plaintiffs' late production of documents and spoliation. At the hearing, Defendants acknowledged that the late production of voluminous documents, rather than the alleged spoliation of a much smaller number of documents, was the most prejudicial. See Oct. 17, 2008 Tr. at 8:7-8. With respect to the late production, Defendants argue that they were unable to conduct the type of follow up discovery they would have liked to had the documents been timely produced, and that instead, they have conducted last-minute "triage" discovery. Defendants also argue that witness memory loss constitutes prejudice. As to the allegedly spoliated materials, Defendants argue that they have been prejudiced by not being able to use those documents at all.

**Late Production**

Defendants argue that during the first four and one half years of this litigation, Plaintiffs produced only 1,700 pages in discovery, constituting 4% of the eventual total production of documents in this case, whereas since March 2008, Plaintiffs have produced the other 96% of their entire production. There is no dispute that Plaintiffs made the bulk of their document production earlier this year. However, many of the late-produced documents, such as court filings and documents from the Patent and Trademark Office, were duplicates. See Oct. 17, 2008 Tr. at 13:3-9; 15:4-9. And Plaintiffs argued plausibly that in their recent document production, they erred on the side of producing documents even if the documents were duplicative or irrelevant because it was easier. See Oct. 17, 2008 Tr. at 13:3-14:25. The parties dispute whether the late-produced documents were relevant such that the belated failure to produce them earlier prejudiced Defendants. As the examples described below show, the Court concludes that some relevant documents were produced late, causing some prejudice, but far less than Defendants contend.

For example, on February 28, 2008, Defendants served request for production number 53 which sought the entirety of Plaintiffs' hard drives and electronic information. See Malik Decl. Ex. 9. While this request was clearly overbroad, it encompassed relevant information that Plaintiffs still had not adequately searched for and produced.[1] In response, Plaintiffs belatedly and for the first time made an adequately thorough search of their electronic evidence. See Malik Decl. Ex. 10 at 20 ("Q: Did you search your hard drive back then [in summer of 2006]?. A: No."); at 18 (Keithley stated at his May 2008 deposition that his new counsel did not have his hard drive prior to the April 2007 deposition); but see Malik Decl. Ex. 2, Keithley Decl. ¶ 1, 2 ("Shortly thereafter [after May 2006], I reviewed the information I had in my possession, which included the hard copy files I had previously created concerning this matter and any media in my possession, including the computer I owned at that time. My purposes of reviewing my computer was to make sure that any documents that were relevant and responsive to these Requests were printed and added to my hard copy of

---

[1] On August 11, 2008, the Court denied Defendants' request for direct examination of Plaintiffs' hard drive without prejudice, instead ordering Plaintiffs to provide additional information about the electronic searches that Plaintiffs agreed to perform instead, and requiring the parties to meet and confer to agree on a search protocol. See Aug. 11, 2008 Order at 3:8-21.

4

1  documents."). Thus, while Plaintiffs are correct that request 53 was overbroad, that does not excuse
2  the failure to timely perform a reasonably diligent search of electronically stored information for all
3  relevant documents. Further, the fact that Plaintiff Keithley was pro se until mid-July 2006, while
4  perhaps a mitigating factor in terms of the severity of sanctions, does not excuse his failure to timely
5  produce all relevant documents. See Carter v. CIR, 784 F.2d 1006, 1008 (9th Cir. 1986) ("Although
6  pro se, he is expected to abide by the rules of the court in which he litigates."). Moreover, although
7  Plaintiffs produced some additional documents shortly after obtaining counsel, others were produced
8  only much later.

9  Ultimately, Plaintiffs analyzed the electronic information by loading thousands of files onto a
10 database, creating search parameters to find files related to the patent in suit, reviewing files for
11 privilege, tagging non-privileged files for production and producing over 4,000 non-privileged
12 responsive documents on a rolling basis on March 21, March 31, April 11 and April 12, 2008. See
13 Hong Decl. ¶¶ 1, 2; Mosko Decl. ¶ 5, Ex. A, B, C. Additional electronic documents were produced
14 in July 2008. See Hong Decl. ¶ 37. The belated production included some relevant e-mails, as well
15 as irrelevant material and duplicates of previously produced material. Plaintiffs have provided no
16 reasonable explanation for why the e-mails that were produced in 2008 were not produced at least
17 by mid-2006 when counsel substituted into this case, even though at least some of them pre-date
18 2006. Moreover, Plaintiff Keithley verified discovery responses in 2006 after he was represented by
19 counsel that did not include production of the e-mails that were recently produced. See Supp. Malik
20 Decl. Ex. B. The failure to adequately search electronic media for responsive documents until
21 several years into this litigation, and almost two years after Plaintiffs retained counsel, is troubling.
22 The resulting production of this electronic material, at least some of which is relevant, prejudices
23 Defendants insofar as they were rushed to complete discovery. See North American Watch Corp. v.
24 Princess Ermine Jewels, 786 F.2d 1447, 1451 (9th Cir. 1986) ("Last-minute tender of documents
25 does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket
26 the opportunity to use the courts.") (citing G-K Properties v. Redevelopment Agency, 577 F.2d 645,
27 647-48 (9th Cir.1978)).

28  On the other hand, many of the late-produced documents, such as pre-printed trade show

5

materials that were stored in Plaintiffs' garage, had little if any relevance to this case. Because Plaintiffs would not produce these documents on the ground that they were not relevant, on February 1, 2008, Defendants served a Request to Permit Entry Upon Land for Inspection to obtain those documents. While Defendants did not go to Plaintiff's garage, they did review the documents later at Plaintiffs' counsel's office. See Malik Decl. Ex. 5, 6; ¶ 9, 10. At the hearing, Plaintiffs' counsel explained that Plaintiff Keithley collected printed materials at trade shows from businesses in the real estate industry, and that the documents have no bearing on the patent at issue in this case. See Oct. 17, 2008 Tr. at 12:6-20. Defendants did not persuasively refute this argument. Thus, Defendants have not shown prejudice as to some of the late production.

Indeed, the primary prejudice claimed by Defendants is that they were unable to take important depositions from third parties such as Don Levy, Scott Tatro, Mark Holmes, Michael Starkweather and Peter Bennett as a result of the belated production. However, other factors led to some of these depositions not being taken. Moreover, the testimony that the witnesses could offer appears to be of such limited relevance that even if the documents had been produced earlier, Defendants might well have chosen to forego them under a rational cost/benefit approach to discovery.

For example, the evidence shows that Defendants were unable to serve Mr. Levy with a deposition subpoena in July 2008 despite several attempts due to the facts that Mr. Levy was no longer at the address Defendants had for him, and that when Defendants obtained a business address, they discovered that Mr. Levy was out of town with his ill father during that time. See Second Supp. Taylor Decl. ¶¶ 4-11; Ex. 4-7. Defendants did not pursue his deposition after discovery closed on August 8, 2008, either through stipulation with Plaintiffs or through an extension of time from the Court.

As to Mr. Tatro, Defendants argue that he has highly relevant information based on an October 2006 e-mail that he sent to Plaintiff Keithley stating that Plaintiff's '025 patent may be invalid in light of two earlier patents. See Malik Decl. Ex. 14. Yet Defendants' inability to depose Mr. Tatro flows from Mr. Tatro's hostility toward Defendants due to Defendants having filed a declaratory judgment action against him in 2007 relating to patents that are not at issue in this case.

1  See Foxhall Decl. ¶ 10. Ex. 9.  Defendants' argument that he would have been less hostile had he
2  been subpoenaed earlier in this case before he was actually sued by Defendants is not very
3  persuasive as it assumes, inter alia, that he had no reason to expect to be sued.  Moreover,
4  Defendants did not refute Plaintiffs' point that one of the patents mentioned by Mr. Tatro was cited
5  as prior art in Plaintiffs' '025 patent (see Oct. 17, 2008 Tr. at 16:17-19), rendering its importance to
6  the validity analysis questionable.  Moreover, Mr. Tatro's opinion about prior art would constitute
7  extrinsic evidence, which is of limited value under Federal Circuit authority (see Phillips v. AWH
8  Corp., 415 F. 3d 1303, 1318-19 (Fed. Cir. 2005)), and even less important than expert testimony.
9  When questioned by the Court at the hearing, Defendants' counsel could not say whether they even
10 wanted to proceed with Mr. Tatro's deposition.  See Oct. 17, 2008 Tr. at 7:4-24 ("The Court: Do you
11 even want to redepose [Tatro]?  Mr. Orton: "I don't know, Your Honor. . . . The Court: So I would
12 think as of today coming here to address me you would know whether you want to do it or not.  Mr.
13 Orton: "I don't, Your Honor.").

14         As to Mr. Holmes, there has been no showing that Defendants' inability to depose him was
15 attributable to Plaintiffs' late production.  The evidence shows that Defendants successfully
16 subpoenaed documents from PatentBridge, Mr. Holmes' patent brokerage company that assists
17 patent owners in selling or licensing their patents, in May 2008 (see Malik Decl. Ex. 16; Supp.
18 Malik Decl. Ex. G), and Mr. Holmes provided an August 7, 2008 declaration in support of
19 Defendants' reply in support of their second motion to compel.  Thus, Defendants plainly had an
20 opportunity to talk to him to ascertain whether he had relevant information besides the documents
21 produced in response to the subpoena that Mr. Keithley had given him regarding the '025 patent.
22 Although Defendants argue that the time crunch resulting from the late production caused them to
23 forego his deposition, there has been no showing why Mr. Holmes' deposition could not have been
24 taken before August.  Moreover, in response to the subpoena, Defendants received many documents
25 that were subject to the attorney-client privilege and of a type that Defendants rarely get to see.
26 Following Defendants' Motion to Compel and Plaintiffs' Motion for Protective Order based on
27 those documents, the Court found a waiver of privilege and permitted Defendants to retain the
28 otherwise privileged PatentBridge documents over Plaintiffs' objections.  See Sept. 16, 2008 Order.

7

1    As to Mr Starkweather, Plaintiffs' reexamination counsel, Defendants argue that they were
2 prejudiced by being unable to depose him. Defendants' explanation is that defense counsel was in a
3 security line at the airport when Plaintiffs' counsel informed Defendants that *Plaintiffs' counsel*
4 would not be attending the Starkweather deposition. See Alban Decl. ¶ 3, 4. The witness himself
5 was still available to be deposed. Yet Defendants made a tactical decision to forego his deposition,
6 apparently influenced by Plaintiffs' evaluation that attending his deposition was not worth the time
7 and expense. In other words, Plaintiffs did not cancel Mr. Starkweather's deposition but simply
8 decided not to attend, and any prejudice flowing from Defendants' tactical decision to cancel the
9 deposition was not due to misconduct by Plaintiffs.

10    Finally, as to Mr. Bennett, Defendants argue that he possessed highly relevant information
11 based on a February 2005 e-mail exchange between Mr. Bennett and Plaintiff Keithley in which Mr.
12 Bennett states that he has reviewed Plaintiffs' project and concluded that Plaintiffs should "refocus
13 your design, the technologies and documentation," and that he was disengaging from the bidding
14 process with Plaintiff Keithley. See Malik Decl. Ex. 15. Again, to the extent that Mr. Bennett has
15 an opinion regarding the validity of Plaintiffs' patent, any opinion would be merely extrinsic
16 evidence, and even less useful extrinsic evidence than an expert's opinion. Moreover, the evidence
17 shows that Defendants subpoenaed him in May 2008, before the discovery cutoff. See Second Supp.
18 Taylor Decl. Ex. 8; Oct. 17, 2008 Tr. at 20:4-14. Further, the evidence shows that his unexpected
19 personal problems, rather than anything that Plaintiffs did, derailed his deposition. See Taylor Decl.
20 ¶¶ 12-20.

21    Moreover, at the hearing, when the Court indicated its intention to extend the discovery
22 cutoff to allow Defendants to take these depositions, Plaintiffs stated their nonopposition to these
23 depositions or others, but stated that they may not attend the depositions. See Oct. 17, 2008 Tr. at
24 21:22-22:7. The Court expressly stated that it gave Defendants leave to take those additional
25 depositions. See Oct. 17, 2008 Tr. at 27:3-6. Yet in a recent filing, Defendants stated that given the
26 pretrial and trial schedule in this case, "the cost-benefit analysis weighs heavily against taking
27 additional depositions because Defendants do not have time to engage in the type of follow-up
28 discovery that Defendants would have been able to perform had Plaintiffs produced these materials

8

United States District Court
For the Northern District of California

1  years ago..." See Docket No. 832 at 1:16-17.

2  As described above, Defendants have shown that at least some of the late produced 3 documents are relevant to their defenses. See Malik Decl. Ex. 14, 15. Defendants have also shown 4 that they suffered some prejudice as a result of the late production. This prejudice, however, was 5 somewhat, though not entirely, mitigated by Plaintiffs' stipulation to extend the discovery cutoff for 6 several months until August 8, 2008. Furthermore, Defendants did not file a motion to compel 7 discovery based on the late production, nor did they seek a further extension of the discovery 8 deadline from the Court to conduct specific discovery. Instead, Defendants first brought this issue to 9 the Court by moving for terminating, evidentiary and monetary sanctions. In addition, when the 10 Court inquired why Defendants did not seek relief from the discovery deadline earlier, Defendants 11 suggested that they were thinking of waiting to ask Judge Illston at the December 15, 2008 pretrial 12 conference for an extension of time to conduct discovery. See Oct. 17, 2008 Tr. at 7:14-17 ("Our 13 thought was we might take it up with Judge Illston at the time of the pretrial conference to try to 14 figure our whether we should be given the opportunity to take some discovery."). Waiting until the 15 eve of trial to ask the trial judge to allow additional discovery would not appear to be a realistic 16 approach, and also appears to be inconsistent with Defendants' decision not to take advantage of this 17 Court's extension of the deadline for the depositions they claimed they were unable to take.

18  Further, although Defendants argued that they were prejudiced by being unable to use the 19 late-produced documents with respect to claim construction, counsel acknowledged that the 20 documents are extrinsic evidence, at best, which has relatively low value for claim construction. See 21 Oct. 17, 2008 Tr. at 5:12:25; see also Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 22 (Fed. Cir. 1996) (holding that only if an analysis of the intrinsic evidence for purposes of claim 23 construction fails to resolve any ambiguity in the claim language may the court then rely on extrinsic 24 evidence, such as expert and inventor testimony, dictionaries, and learned treatises: "In those cases 25 where the public record unambiguously describes the scope of the patented invention, reliance on 26 any extrinsic evidence is improper"); see also Phillips v. AWH Corp., 415 F. 3d 1303, 1318-19 (Fed. 27 Cir. 2005) (stating that extrinsic evidence is generally viewed as less reliable than the patent and its 28 prosecution history in determining how to read claim terms, even if its consideration is within the

9

court's sound discretion). Indeed, the documents (and would-be deponents) do not appear to constitute the type of extrinsic evidence -- expert and inventor testimony, dictionaries and treatises -- contemplated by the Federal Circuit.

All of these factors lead the Court -- while by no means condoning Plaintiffs' misconduct -- to conclude that the additional discovery allegedly thwarted by Plaintiffs' dilatoriness by its nature could have at best only limited relevance to the merits of Defendants' case, but rather is primarily serving as a springboard for Defendants to seek severe sanctions that bypass consideration of the merits. While such sanctions are sometimes warranted, Defendants have not made a sufficient showing to support them here, where less severe sanctions adequately address any prejudice.

**Spoliation**

A party engages in willful spoliation if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002). The scope of the duty to preserve extends to what the party "knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." W.T. Thompson Co. v. General Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984); Columbia Pictures Industries v. Bunnell, 2007 WL 2080419, *14 (C.D. Cal. May 29, 2007); Hynix Semiconductor v. Rambus, Inc., 2006 WL 565893, *21 (N.D. Cal. Jan. 5, 2006) (Whyte, J). "There is no doubt that a litigant has a duty to preserve evidence it knows or should know is relevant to imminent litigation." A. Farber & Partners, Inc. v. Garber, 234 F.R.D. 186, 193 (C.D.Cal.2006). As Judge Patel stated in In re Napster Inc. Copyright Litigation, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006):

> The court in A. Farber thus held imminence to be sufficient, rather than necessary, to trigger the duty to preserve documents. Furthermore, the court in A. Farber did not reach the issue of when, exactly, the duty attached. The duty to preserve documents attaches "when a party should have known that the evidence may be relevant to future litigation." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y.2003). See also National Ass'n of Radiation Survivors, 115 F.R.D. at 556-57. The future litigation must be "probable," which has been held to mean "more than a possibility." Hynix Semiconductor Inc. v. Rambus, Inc., 2006 WL 565893 at *21 (N.D. Cal.2006) (Whyte, J.).

In re Napster, 462 F. Supp. 2d at 1070. The policies underlying the spoliation sanctions are many:

1  "to punish the spoliator, so as to ensure that it does not benefit from its misdeeds; to deter future
2  misconduct; to remedy, or at least minimize, the evidentiary or financial damages caused by the
3  spoliation; and last, but not least, to preserve the integrity of the judicial process and its truth-
4  seeking function." United Medical Supply, 77 Fed. Cl. at 264 (citing West v. Goodyear Tire &
5  Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); see also National Hockey League v. Metropolitan
6  Hockey Club, Inc., 427 U.S. 639, 642-43 (1976).

7  Defendants' allegations of spoliation stem from Plaintiffs' production of documents in
8  March and April 2008. Following that production, Defendants sent four letters to Plaintiffs in May
9  2008 pointing out that some attachments or links from the e-mail production were missing or
10 incorrect. See Malik Decl. Ex. 20-23. It is undisputed that from May 2008 to July 2008, no
11 additional documents were produced in response to Defendants' letters regarding the March and
12 April 2008 production. And it is undisputed that at least some attachments or links to e-mails cannot
13 be located, and therefore may have been spoliated. For example, Plaintiffs concede that the
14 attachment to an e-mail dated January 2004 (KK010980) cannot be located. See Taylor Decl. Ex. H
15 (KK010980); Albagli July 2008 Cert. at 11. As another example, Plaintiffs concede that the
16 attachment to an e-mail with no date (KK010984) cannot be located. See Taylor Decl. Ex. J
17 (KK010984); Albagli July 2008 Cert. at 11. As a third example, Plaintiffs concede that the
18 attachment to an e-mail dated November 2001 (KK017680) cannot be located. See Taylor Ex. P, Q;
19 Albagli Cert. at 15-16. Plaintiffs contend that in some instances they have provided documents that
20 are similar to those that were attached to the e-mails, but Defendants should not have to rely on
21 Plaintiffs' determination of similarity.

22 Plaintiffs do not dispute that they had a duty to preserve documents during the time that the
23 e-mails with missing attachments were created. Indeed, the documents in this case show that as
24 early as 2001, Plaintiffs were gathering information in preparation for litigation, and that at least
25 some of the e-mails with missing attachments were created after that date. Therefore, attachments
26 were lost during the time that Plaintiffs were under an obligation to preserve them. However,
27 Defendants have not shown that Plaintiffs destroyed, rather than simply lost, these documents for
28 purposes of the severe sanctions for spoliation that Defendants seek. Moreover, at least with respect

11

to some of the documents that Defendants argue no longer exist, it has not been established that they ever existed in the first place. For example, it is undisputed that a computer folder called *c:\my documents\Patent Information Folder* no longer exists, but Plaintiffs argue persuasively that every document referred to in e-mails as having existed in that folder have been found and produced (see Malik Decl. Ex. 28-31), and the archived version of that folder shows that it only contained three documents. Thus, there is no reason to believe that any documents that have not already been produced were ever in the Patent Information Folder. Other lost documents still appear to exist in similar if not identical form. For example, although Plaintiffs cannot locate the document attached to the March 2002 e-mail entitled "Homestore Balance Sheet.doc," this document is a balance sheet of *Defendants*. See Taylor Decl. Ex. DD. Defendants concede that they have copies of their own balance sheets. Defendants argue, however, that to the extent that the balance sheet was reformatted by Plaintiffs, the reformatted balance sheet would be relevant. While a reformatted balance sheet may perhaps have some limited relevance, the prejudice to Defendants from the loss of this document, which Plaintiffs prepared while they were pro se, is minimal at best.

Accordingly, although Defendants have suffered some limited prejudice caused by the loss of some documents, the terminating and evidentiary sanctions that Defendants seek are disproportionate. As Defendants acknowledged at the hearing, the voluminous late production of documents was more prejudicial than the limited loss of other documents. Instead, the Court concludes that monetary sanctions are sufficient. The Court will award fees and costs that can reasonably be attributed to the spoliation.

**Adverse inference**

Defendants also seek an adverse inference jury instruction. Specifically, Defendants seek an instruction that:

> (1) Plaintiffs failed to preserve and/or destroyed relevant documents and (2) the jury shall infer that the missing documents would tend to support Defendants' positions regarding infringement, invalidity, damages and unenforceability.

Defendants also seek an order reducing the burden of proof to show invalidity from clear and convincing to preponderance of the evidence, and they seek an order precluding Plaintiffs from pursuing any claim for willful infringement.

12

Under either the Court's inherent authority or Rule 37, a court may order an adverse inference instruction. Imposition of an adverse inference is:

> based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. . . .
>
> The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.

Sensonics v. Aerosonic Corp., 81 F.3d 1566 (Fed. Cir.1996) (citing 2 Wigmore on Evidence § 291, at 228 (Chadbourn rev.1979)). In drawing an adverse inference, a court need not find bad faith arising from intentional, as opposed to inadvertent, conduct. See Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993) (citing Unigard Sec. Ins. Co. v. Lakewood Eng'r & Mfg. Corp., 982 F.2d 363, 368-69, n.2 (9th Cir. 1992) (finding of bad faith not required for court to impose adverse inference jury instruction). To decide whether to impose an adverse inference sanction based on spoliation, several California district courts have adopted the Second Circuit's test requiring that a party seeking such an instruction establish that: "(1) the party having control over the evidence had an obligation to preserve it; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 105 (2d Cir.2002) (followed by In re Napster, 462 F.Supp.2d 1060, 1078 (N.D. Cal.2006) (Patel, J); Hamilton v. Signature Flight Support Corp., 2005 WL 3481423, at *3 (N.D. Cal. Dec.20, 2005) (James, J)).

While the Court does not condone Plaintiffs' conduct here, an adverse inference instruction is a harsh remedy that is disproportionate to Plaintiffs' conduct in this case. There has been no showing that Plaintiffs engaged in widespread, reckless or intentional spoliation. At most, the Court concludes that Plaintiffs were negligent in failing to preserve a limited amount of relevant documents. Further, Defendants have obtained many documents of greater relevance than any that were lost. For example, Defendants were able to obtain otherwise privileged documents from third party PatentBridge constituting Plaintiff Keithley's communications with Mr. Holmes regarding the '025 patent, including Plaintiff Keithley's own files regarding its prosecution and reexamination,

13

based on the Court's finding of waiver. Accordingly, the Court declines to recommend an adverse inference instruction.

**Conclusion**

Defendants' Motion for Sanctions is granted in part and denied in part. As stated at the hearing, Defendants are entitled to fees and costs reasonably incurred as a result of the late production of documents and disappearance of a limited number of other documents. At the hearing, the Court ordered Defendants to file a brief setting forth their reasonable fees and costs no later than October 31, 2008, which they did. Plaintiffs may respond no later than November 10, 2008. Defendants may file a reply brief no later than November 12, 2008.

In addition, as ordered orally at the hearing, the discovery cutoff date is extended for the limited purpose of allowing Defendants to take the depositions of Don Levy, Scott Tatro, Mark Holmes, Michael Starkweather and Peter Bennett that they argued they were precluded from taking due to the late production. As noted above, Defendants have indicated that they do not intend to take these depositions, but shall definitively inform Plaintiffs of their decision forthwith. Any additional depositions pursuant to this Order shall be completed as soon as possible. The Court will issue a separate order determining the amount of the monetary sanction. The Court declines to recommend any terminating or evidentiary sanctions, or an adverse inference jury instruction.

**IT IS SO ORDERED.**

Dated: November 6, 2008

ELIZABETH D. LAPORTE
United States Magistrate Judge