1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    KEVIN L. KEITHLEY and TREN                    No. C 03-4447 SI
     TECHNOLOGIES HOLDINGS, LLC,
9                                                  **ORDER GRANTING DEFENDANTS'**
                Plaintiffs,                        **MOTION FOR SUMMARY JUDGMENT**
10                                                 **AS TO NONINFRINGEMENT AND**
                                                   **INVALIDITY BASED ON**
11      v.                                         **INDEFINITENESS; DENYING OTHER**
                                                   **MOTIONS AS MOOT**
12   THE HOMESTORE.COM, INC., *et al.*,
13              Defendants.
     _____/
14
15          On November 14, 2008, the Court heard argument on various motions for summary judgment

16   filed by defendants.  For the reasons set forth below, the Court GRANTS defendants' motion as to

17   noninfringement and invalidity based on indefiniteness.  In light of the Court's resolution of that motion,

18   the Court DENIES AS MOOT defendants' motion to amend the answer, and defendants' other motions

19   for summary judgment.

20
21                              **BACKGROUND**

22          The '025 patent, titled "Apparatus and Method for Interactive Communication for Tracking and

23   Viewing Data," issued from a "continuation" patent application of an earlier application filed in October

24   of 1993.  The patent is generally directed to use of an information processing system for acquiring and

25   displaying information, and describes and claims methods for acquiring and displaying real estate and

26   property-related information (Claims 1 and 3) and a related system for tracking such information (Claim

27   5).  Pleune Decl. Ex. 1 ('025 patent).

28          Plaintiffs filed suit in 2003, alleging that numerous websites operated by defendant

**United States District Court**
**For the Northern District of California**

United States District Court
For the Northern District of California

Homestore.com (now Move, Inc.) ("Move"), infringe claims of the '025 patent.  Defendant's websites are devoted almost entirely to home and real estate-related content, and include www.realtor.com, www.move.com, www.homestore.com, www.homebuilder.com, www.rentnet.com, www.springstreet.com, and www.seniorhousingnet.com.  Mahnken Decl. ¶ 2. Plaintiffs have also sued the National Association of Realtors ("NAR") and the National Association of Homebuilders of the United States ("NAHB") by virtue of their involvement with Move in the www.realtor.com and www.homebuilder.com websites, respectively.

After this suit was filed, defendants instituted an *ex parte* reexamination of the '025 patent, submitting prior art that they believed showed that the PTO should never have issued the '025 patent. The PTO initially disallowed claims 1-5, but after receiving further written comments from plaintiff Keithley, on March 20, 2007, the PTO issued a reexamination certificate that confirmed the patentability of original claims 1-9 without amendment and deemed new dependent claims 10-15 to also be patentable over the prior art.  Pleune Decl. Ex. 2.  In an order filed September 10, 2007, Judge Jenkins construed 10 terms taken from Claims 1, 3 and 5.

**DISCUSSION**

Defendants have moved for summary judgment of noninfringement as to Claims 1 and 3, and invalidity based on indefiniteness as to Claim 5.

**A.     Claim 1**

Claim 1 provides, in its entirety:

1.      A method of acquiring and displaying real estate information utilizing an information processing system containing file server means for serving files, said file server means having i/o means for receiving and transmitting data, and database storage means for storing information in database files, the method comprising the steps of:

    a)      receiving real estate related information;

    b)      storing digitized real estate data and related information as information records in said database storage means of said file server means in a manner in which data can be selectively accessed;

    c)      receiving digital electronic first end user information from a first end user relating to said first end user's real estate needs;

2

d)      selectively providing digital electronic information of portions of said real estate data based on said digital electronic end user information;

e)      accessing data files by said first end users, said accessing data files by said first end users being a plurality of inquiries from individual first end users, said end user inquiries being the retrieving and viewing of text and/or graphic data from a database;

f)      generating a demographics information database by compiling and merging a plurality of first end user inquiries and storing said compiled and merged inquiries; and

g)      providing a second end user with said demographic information, said demographics information corresponding to the specific text and graphic data selected from said database files by said first end users.

'025 patent col. 14, ll. 34-65.

Defendants contend that step (e) of method Claim 1 describes, at least in part, an action to be taken by first end users acting independently in accessing the system. Defendants argue that "accessing data files by said first end users" means that first end users access data files, and that because this clause requires action by other parties, defendants can only be held liable if plaintiffs can show that the circumstances meet the requirements for a finding of joint infringement. Plaintiffs respond that Judge Jenkins' claim construction of step (e) requires a finding that this step, in its entirety, relates only to the system passively collecting data, and therefore does not require any action by first end users.

In construing step (e) of Claim 1, Judge Jenkins did not construe "accessing data files by said first end users." Judge Jenkins did construe the final clause in step (e) – "said end user inquiries being the retrieving and viewing of text and/or graphic data from a database" – to mean "said end user inquiries being requests for information that are passively monitored." Claim Construction Order at 5-8, 36. Plaintiffs rely on the following language from the Claim Construction Order:

> In reviewing the current record, the Court finds [the inventor's] statements during the '025 Patent prosecution reexamination history to be compelling evidence in support of Plaintiffs' proposed construction. Plaintiffs' proposed construction incorporates the term "passively monitored." To that end, it is undisputed that Keithley consistently explained in March 2005, and again in April 2005, that Claim 1(e) relates only to the system "passively" collecting data by watching the end user, rather than requiring the end user to respond to questions. Because the prosecution history is compelling and because Defendants' arguments to the contrary lack merit, the Court finds that the prosecution history weighs heavily in favor of Plaintiffs' proposed construction.

Order at 7-8.

Defendants respond that Judge Jenkins was only construing, and thus only discussing, the final

United States District Court
For the Northern District of California

clause in step 1(e) in its order and in no way indicated that the initial clause in 1(e) did not require action by first end users.  Defendants argue that Judge Jenkins was distinguishing between "active" and "passive" monitoring of the first end users' actions when accessing data files ("Keithley's express clarification that the claim term at issue [the final clause of 1(e)] focuses on 'watching the actions of the end user' and monitoring 'the behavior of the first end user as they surf through the database.'" *Id.* at 7.)  Defendants argue that these findings are completely consistent with the plain language of first end users accessing data files, and that in fact they require it because if first end users are not accessing data files, there is nothing for the system to monitor – actively or passively.

The Court agrees with defendants that step (e) requires action by first end users, in addition to passive monitoring by the system of those actions. Step 1(e) introduces the step of "accessing data files *by said first end users*," then further defines the accessing of the data files to be "a plurality of inquiries *from individual first end users*," which reiterates that the action is taken by first end users.  The final clause in 1(e), which is the one construed by the Court, then further defines the *end user inquiries*, but does nothing to alter the fact established by the first two clauses that the end users *make the inquiries*, which is in turn how they *access the files*.  Put differently, defining the inquiries does not change the fact that the inquiries must be made by the first end users; these inquiries are how the first end users access the data files, and they are the actions that the system passively monitors.

Defendants contend that if the Court finds that step 1(e) requires action by first end users, defendants do not infringe Claim 1 because there is no evidence to support a finding of "joint infringement."  "[D]irect infringement requires a single party to perform every step of a claimed method." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008) (citing *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007), and 35 U.S.C. § 271(a)). "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Id.*  "At the other end of this multi-party spectrum, mere 'arms-length' cooperation will not give rise to direct infringement by any party." *Id.*; *see also BMC*, 498 F.3d at 1381 ("The concerns over a party avoiding infringement by arms-length cooperation can usually be offset by proper claim drafting.  A patentee can usually structure a

claim to capture infringement by a single party.").

In *Muniauction*, the Federal Circuit reversed a district court's denial of a motion for judgment as a matter of law following a jury verdict of infringement. The patent in *Muniauction* related to municipal bond auctions conducted over an electronic network, such as the Internet, and it was undisputed that no single party performed every step of the asserted claims. *Id*. at 1328-29. For example, at least one claimed step was performed by the bidders who inputted data and a majority of the remaining steps were performed by the auctioneer's system. *Id*. The jury found the defendant liable under a theory of joint infringement based on evidence of a "connection" between the defendant auctioneer and the bidders. *Id*. at 1329-30. The Federal Circuit reversed, holding "[t]hat Thomson controls access to its systems and instructs bidders on its use is not sufficient to incur liability for direct infringement." *Id*. at 1330. The court clarified that "the control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." *Id*.

In *BMC*, the Federal Circuit affirmed a summary judgment of noninfringement where the plaintiff's evidence was insufficient to create a genuine issue of material fact as to whether the defendant controlled or directed the activity of third party debit networks. The patent in *BMC* claimed a method for processing debit transactions without a personal identification number and required the combined actions of multiple actors, including the payee's agent, a remote payment network, and the card-issuing financial institutions. 498 F.3d at 1375. The plaintiff proffered evidence to establish some relationship between the defendant (which processed financial transactions for clients as a third party) and the debit networks, such as the fact that the defendant provided data including debit card numbers, names, amounts of purchase, etc., to the debit networks. However, the court held that there was no genuine issue of material fact as to whether the defendant controlled or directed the activity of the debit networks because there was no evidence that the defendant also provided instructions or directions regarding the use of that data. *Id*. at 1381.

Here, the evidence is similar to that presented in *Muniauction* and *BMC*, and therefore is insufficient to raise a triable issue of fact regarding defendants' direction or control over the first end user consumers. Defendants have submitted the declaration of Tracy Mahnken, the Senior Vice

President of Move.  Mahnken Decl. (Docket No. 734).  Mahnken describes Move's websites, and the

relationship between the websites and users as follows:

> In connection with its operation of the Move websites, Move acquires detailed
> information about properties for sale or rent and places this information into one or more
> databases that are accessible to people via the internet.  I refer generally to these
> interested persons that access the property information through the Move websites as
> Consumers.  Move receives the data relating to available properties from several
> different sources. . . .
>
> . . .
>
> Consumers access the Move websites via the internet.  Ordinarily, Consumers enter
> search criteria for properties in which they may have an interest by filling in boxes (such
> as location, price, number of bedrooms, etc.) that appear on the consumer screens.
> Move's system then responds by displaying information about properties that meet the
> search criteria entered by the Consumer.  Next, the Consumer can elect to retrieve more
> detailed information about some or all of the properties by clicking through various
> boxes that appear on the screen and viewing the information provided from the database
> or databases.  Move offers the search features on its websites free of charge, and it
> presents basic information about property listings at no charge to the listing agents,
> brokers, home builders, or rental property owners.
>
> Other than the general "Terms of Use" posted on its websites, Move has no contracts
> with Consumers and neither directs nor exercises control over the searches Consumers
> conduct on the Move websites.  The Terms of Use state that Move can "terminate [the
> user's] access to and use of the Move Network" (see printed page 3), but this provision
> is rarely, if ever, invoked.  The Terms of Use explicitly state that "no joint venture,
> partnership, employment, or agency relationship exists between [the user] and Move as
> a result fo the Terms of Use or accessing or using the Move network." (*See* printed page
> 6).
>
> . . .
>
> Move does not generally restrict or control users' access to the Move websites, nor does
> it require or direct its users to any particular function.  Users of the Move websites do
> not need to download or configure any software to use the sites.  Users also do not have
> to "sign up" or submit personal information to use the websites' search features.
>
> Although Consumers can "register" on the websites, registration affords Move no
> direction or control over the actions of the Consumers.  Instead, registration merely
> affords Consumers the ability to save and return to searches that they have previously
> conducted and to listings they have previously identified.  Each registered user has
> exclusive access to the specific searches and listings that they have saved.  Unregistered
> users cannot keep former searches in this manner, but registered and unregistered users
> have equal access to identical information about all of the properties in the database.
>
> Real estate agents, brokers and rental property managers have the option to pay to
> enhance their property listings on the Move websites.  That is, they have the option to
> pay to add more than basic information to their listings, which might include additional
> pictures or a longer than standard description of the property, for example.  Real estate
> agents, brokers, rental property managers, and other advertising customers can also
> purchase banner advertisements to be displayed on the websites.  I refer generally to
> such people and entities as Move's Business Users.

United States District Court
For the Northern District of California

6

**United States District Court**
For the Northern District of California

Move enters into agreements with Business Users in one of two ways: (1) the Business User executes a purchase agreement or (2) Move and the Business User reach an oral agreement. The legal substance of Move's purchase agreements comes in the form of incorporating the "Terms and Conditions" for the particular product that the Business User is purchasing. Likewise, in the case of an oral agreement, the Business User is forwarded an order confirmation that refers the Business User to the particular Terms and Conditions that govern the product being purchased. In either case, the Terms and Conditions control the relationship between the parties. While the Terms and Conditions vary slightly depending on the product purchased, in no event do such Terms and Conditions address the Business User's use of the Move websites to search for or locate available properties or provide Move (or any other entity) with the right to direct or control such use. Instead those Terms and Conditions concern only the particular service the Business User has purchased – *e.g.*, enhanced listings, etc. In every case, the Terms and Conditions that govern the relationship between Move and Business Users specifically state that "[t]he parties are independent contractors, and no agency, partnership, joint venture or employee-employer relationship is created by this Agreement." (*See* Exh. 2 ¶ 20.) . . . .

Business Users are assigned a password, which gives them access to "dashboards" with information about their own specific listings and activity that Consumers and other Business Users do not have.

Just as anyone who has access to the internet, Business Users can acts as Consumers by searching for properties on Move's website. When Business Users access the websites as Consumers, their passwords are not applicable, and they have no greater or lesser access to the property information available on the websites than anyone else. In other words, no access codes are assigned to Consumers, and everyone acting as a Consumer on Move's websites has access to the same information about the properties listed there.

. . .

Those who use the Move websites do not jointly control the Move websites with Move, do not share in the profits from Move's websites and do not have any ownership interest in the Move websites.

Mahnken Decl. ¶¶ 3, 5-6, 8-13, 15.

Plaintiffs emphasize the following facts to contend that there are at least disputed issues of fact regarding the level of direction and control that Move exercises over the users. First, plaintiffs note that the "Terms and Conditions" on the websites state that it is "a binding contract between Move and you [the user]" that expressly grants users "the right to access Move's system." *Id.* at Ex. 1; *see also id.* ("Move grants you [the user] a limited license to access and use the Move Network and Content . . . ."). Plaintiffs also argue that Move limits and controls what users of Move's system can access by routing users to certain Web pages that only allow certain types of searches for real estate information and providing access to certain information (e.g., newly constructed homes) only if a real estate agent or builder has paid Move to provide users to access that "enhanced" information. Herbst Decl. Ex. 3

7

(Mahnken depo. at 135-38 (testifying that for a new home to be part of the group of all new homes that are searched at the Move website, someone must pay Move to have it included in the search pool)) (Docket No. 795).  Plaintiffs also emphasize the fact that Move purposefully grants users access to its content so that it can then monitor the users' actions, tracking what files the users (registered or not) access via requests for information.  *Id*. at Ex. 1 (Tygar Expert Report at 73-78).

Drawing all inferences in favor of plaintiffs, the Court finds that plaintiffs have not raised a triable issue of fact that Move "controls or directs" the users such that it is appropriate to hold Move vicariously liable for the acts of the users.  In *Muniauction*, the plaintiff argued that the defendants directed and controlled the bidders by the following: (1) requiring bidders to install and configure software, including entry of a preassigned bidder ID and password; (2) connecting bidders and issuers to a server maintained by defendant; bidders used defendants' system to calculate and prepare bids for submission during the auction, transmitted those bids to defendants' server, and then financial advisers and issuers accessed the servers after conclusion of the auction to view the bid results online; (3) instructing bidders what to do throughout the auction process using detailed screen shots and written explanations; and (4) exercising contractual control over bidders by licensing the software, requiring that all bids "shall be irrevocable and shall constitute valid offers without a signature by an officer of the Licensee," and reserving the right to "modify or terminate access to BIDCOMP or PARITY at any time in the sole exercise of its discretion."  Orton Decl. Ex. 5 at 12-13 (Brief of Plaintiff-Appellee Muniauction to the Federal Circuit) (Docket No. 733).

Thus, as in *Muniauction*, Move allows users access to its websites, but does not cause those users to access any particular information.  Move's "Terms and Conditions" are analogous to the contracts in *Muniauction* which the Federal Circuit found insufficient.  Indeed, the level of control exerted in *Muniauction* was arguably greater in that there the defendants required bidders to install and configure software in order to access the defendants' server, and all bidders were assigned a password.  At oral argument, plaintiffs attempted to distinguish *Muniauction* by contending that the contracts in *Muniauction* did not specifically address the claim at issue, namely the "inputting" by the bidders. However, that is not a distinction drawn by the *Muniauction* court.  Instead, the court reiterated that "the control or direction standard is satisfied in situations where the law would traditionally hold the accused

United States District Court
For the Northern District of California

direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." *Muniauction*, 532 F.3d at 1330.  The Court concludes that Move does not perform every step of Claim 1, nor does Move have another party perform steps on its behalf. Further, plaintiffs have not articulated any theory under which Move is vicariously liable for the actions of the users of Move's websites.  Accordingly, the Court concludes that defendants do not infringe Claim 1.

**B.      Claim 3**

Defendants move for summary judgment of noninfringement of Claim 3 on the ground that Claim 3 provides consumer first end users with differing levels of access to information depending on the users' access codes.  Defendants argue that there is no infringement because the extent of information available to all consumers on Move's websites is the same and is not determined by an "access code."

Claim 3 provides, in its entirety:

3.      A method of acquiring and displaying property related information utilizing an information processing system containing media means for receiving analog and digitized data and transmitting digitized data; file server means for receiving data from said media means, receiving data inquiries and transmitting data in response to said data inquiries; databases and database storage means for sorting, storing and retrieving information received, the method comprising the steps of:

a)      receiving property related information at said media means;

b)      transmitting said property related information in appropriate format to said file server means;

c)      said file server means analyzing said property related information and storing said property related information in related database storage means;

d)      said file server means receiving an information request from multiple end users relating to the end users' information needs, the extent of information available to said end users being determined by said users' access code;

e)      selectively providing computerized information in response to said end users' information requests;

f)      said end users' information requests being a plurality of inquiries from individual end users, said end user inquiries being the retrieving and viewing of text and/or graphic data from a database; and

g)      generating and updating a demographics pattern database by compiling and

merging a plurality of first end user inquiries and storing said compiled and merged inquiries.

'025 patent at col. 15, ll. 4-35.

Dependent Claim 4,[1] provides in its entirety:

4.     The method of claim 3, further comprising the steps of

   h)     receiving an information request from an agent relating to the agent's information needs, each agent having an access code, the extent of information available to said agent being determined by said agent's access code,

   i)     selectively providing said information in response to said agent's information request,

   j)     said agent's information requests being a plurality of inquiries from a plurality of individual agents, said end user inquiries being the retrieving and viewing of text and/or graphic data from a database;

   k)     generating and updating further said demographics database information by compiling and merging a plurality of agents' inquiries and storing said compiled and merged inquiries in a demographics database, and

wherein each time said server is accessed, data obtained through said access analysis is stored in the appropriate databases as demographic information, thereby continually updating and increasing the available demographics information within the databases.

'025 patent at col. 15, ll.36-57.

Judge Jenkins construed the phrase "said end user inquiries being the retrieving and viewing of text and/or graphic data from a database" in step (f) of this claim (as in step (e) of Claim 1) to mean "said end user inquiries being requests for information that are passively monitored." Claim Construction Order at 5-8, 36. The Court also construed the phrase "compiling and merging a plurality of first end user inquiries" in step (g) of this claim to mean "collecting and combining the results of first end user inquiries." *Id*. at 12-15, 36. The Court did not construe the phrase "the extent of information available to said end users being determined by said users' access code" in step (d) of Claim 3.

Defendants contend that the reference to "said end users" in step (d) of Claim 3 refers only to persons acting as "first end users," in accessing property related information, even if those users also happen to be real estate agents. Defendants note that the specification distinguishes in various ways between "End Users" and "Real Estate Agents." An "End User" is defined as follows:

---

[1]  Plaintiffs do not allege infringement of Claim 4.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

End User – The party viewing the database files.  Typically an End User of real estate looking to lease and/or purchase real property.  The End User generally has access to only limited files and can optionally have input capability to alter the files they are viewing.  The End User can include viewers seeking ideas for home building, decorating, or remodeling.  In addition, relocation companies or departments in corporations, architects, etc., are also included.

'025 patent, col. 5, ll. 5-12.

The specification defines "Real Estate Companies and Agents" as follows:

Real Estate Companies and Agents – The sales agent or facilitator of a real estate transaction and the primary user of the instant system.  The Real Estate Agent has access to the instant system regardless of where the system is accessed.

*Id.* col. 5, ll. 13-16.  The specification also defines, *inter alia*, "Media," "Advertiser," and "Demographic Information Subscriber" and states that "It should be noted that a company or individual can fall into two or more of the foregoing categories."  *Id.* col. 5, ll. 47-48.  For example, "an architect could be an advertiser of their services and, at the same time, be an End User accessing the disclosed system to monitor design trends, new housing developments, and competitive practices."  *Id.* col. 5, ll. 51-55.

Defendants argue that a real estate agent might sometimes act as an "End User" or "first end user" – like someone "looking to lease and/or purchase real property" – in requesting and receiving property information. Defendants argue that when real estate agents are acting as End Users, they would conceivably fall within the reach of Claim 3.  They contend, however, that insofar as real estate agents are engaged in activity other than requesting and receiving property information as End Users, they are acting as Real Estate Agents, not as End Users within the meaning of this claim, and do not fall within the reach of Claim 3.  Defendants argue that it is clear that Claim 3 does not encompass the activities of real estate agents as Real Estate Agents because dependent Claim 4 extends the methods of Claim 3 to additional steps performed by real estate agents.

Thus, defendants contend that Claim 3 requires a method that distinguishes between information that is available to end users based on different access codes held by different end users, while Claim 4 requires a method that further distinguishes the information that is available to real estate agents based on different access codes held by different agents.   Defendants argue that Move's websites do not infringe claim 3 because every consumer on Move's websites has access to the same information about the properties listed there.  Defendants note that there are no access codes assigned to Consumers,

11

1    Mahnken Decl. ¶ 14, and although a Consumer can register, registration simply affords the Consumer

2    the ability to save and return to searches conducted and listings identified: the overall information

3    available to registered and unregistered users is identical.  *Id*. ¶¶ 9-14.

4         Plaintiffs argue that defendants are improperly imposing limitations on Claim 3 that are not

5    contained in the claim language.  Plaintiffs contend that element 3(d) only requires that the "request"

6    from the end user "relat[e] to the end users' information needs" and there is no justification for

7    excluding real estate agents from that claim.  Plaintiffs assert that including real estate agents as end

8    users in Claim 3 does not render Claim 4 superfluous because plain language of Claim 4 indicates that

9    the "demographics pattern database" is "further" generated and updated to reflect the passively

10   monitored "agent" information requests.  However, as defendants persuasively argue, if agents (as

11   agents) were a subset of end users in Claim 3, the demographics pattern database of Claim 3 would

12   already encompass passively monitored real estate agent information requests, and thus Claim 4 would

13   not add anything to the database.

14        Plaintiffs also contend that even if the Court agrees that Claim 3 does not include Real Estate

15   Agents, defendants' websites still infringe Claim 3 – or at least there are disputes of fact sufficient to

16   defeat summary judgment – because registered users can access saved listings, saved searches and other

17   relevant links, while unregistered users cannot access such information.  Defendants respond that access

18   to saved listings and searches does not constitute to access to a different "extent of information."

19   Defendants argue that it is undisputed that unregistered and registered users of its websites have access

20   to the same universe of information, and thus "the extent of information available to said end users" is

21   *not* determined by the those users' access codes.  Defendants argue that allowing registered users to

22   access a *subset* of the same information available to all users does not mean that the "extent" of the

23   information *available* to registered users is different than the extent of the information available to

24   unregistered users.

25        The Court agrees that plaintiffs have not raised a genuine issue of disputed fact.  Where "the

26   relevant aspects of the accused device's structure and operation are undisputed in [a] case, the question

27   of whether [the accused device] literally infringes the asserted claims of the [] patent turns on the

28   interpretation of those claims." *K-2 Corp. v. Salomon S.A.*, 191 f.3d 1356, 1362 (Fed. Cir. 1999) (citing

*Athletic Alternatives, Inc. v.  Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996) ("Where, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over [claim interpretation], the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment.").  Although plaintiffs attempt to characterize the parties' dispute on this point as a factual one, the disagreement actually centers on the interpretation of "extent of information available."  Here, it is undisputed that the overall information available to be searched by registered and unregistered users of defendants' websites is identical.  It is also undisputed that registered users can save searches and access that information, while unregistered users cannot.  The Court agrees with defendants' interpretation of the claim language, and holds that because "the extent of information available" to registered and unregistered users of defendants' websites is the same, defendants do not infringe Claim 3.

**C.    Claim 5**

Defendants contend that Claim 5 is invalid under 35 U.S.C. § 112 ¶¶ 2, 6 because there is no structure – specifically no algorithm – that is adequately disclosed for the "demographics database updating means" in the means-plus-function limitation of that claim. Claim 5 provides, in its entirety:

> 5. A system of tracking real estate and real estate related demographic information using a computer network system comprising:
>
> > a media unit, said media unit having:
> >
> > > a multimedia computer;
> > >
> > > a digitizer, said digitizer receiving information from outside said network system and within said multimedia computer;
> > >
> > > i/o means,
> >
> > a server's unit, said server's unit having:
> >
> > a computer, said computer having storage capabilities;
> >
> > communication means, said communication means enabling said server to interact with remote terminals;
> >
> > a plurality of databases, at least one of said plurality of databases being an automatically updated demographic pattern database, said demographics pattern database being updated automatically by analyzing database information requests, said database information requests being a plurality of inquiries from a plurality of individual

13

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> remote terminals, said remote terminal inquiries being the retrieving and viewing of text and/or graphic data from a database;
>
> demographic database updating means, said updating means automatically updating said demographics pattern database by compiling and merging a plurality of end user inquiries and storing said compiled and merged inquiries in said demographics pattern database.

'025 patent, col.15, l. 58- col.16, l.18.  Judge Jenkins construed the phrase "compiling and merging a plurality of first end user inquiries" in the last element of this claim to mean "collecting and combining the results of first end user inquiries."  Claim Construction Order at 12-15.  Substituting the Court's construction of that phrase results in the following:

> demographic database updating means, said updating means automatically updating said demographics pattern database by collecting and combining the results of end user inquiries and storing said collected and combined results in said demographics pattern database.

The parties agree that "database demographics updating means" is a means-plus-function term that invokes 35 U.S.C. § 112 ¶ 6.  As such, "the scope of that claim limitation [must] be defined by the structure disclosed in the specification plus any equivalents of that structure; in the absence of structure disclosed in the specification to perform those functions, the claim limitation would lack specificity, rendering the claim as a whole invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2."  *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1331 (Fed. Cir. 2008).  "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998).  "To the extent there are any factual findings upon which a trial court's indefiniteness conclusion depends, they must be proven by the challenger by clear and convincing evidence."  *Tech. Licensing Corp. v. Videotek, Inc.*, ___ F.3d ___, Nos. 2007-1441, 2007-1463, 2008 WL 4529095, at *18 (Fed. Cir. Oct. 10, 2008).

The parties further agree that the specification discloses a "Server's computer 412" with a "database" as a corresponding structure for performing the claimed "updating" function.  The question presented by defendants' motion is whether that disclosure is sufficient.  Defendants contend that under two recent Federal Circuit cases, merely referring to a computer to provide the required structure is not sufficient.  *See generally Aristocrat*, 521 F.3d 1328 (Fed. Cir. 2008); *Finisar Corp. v. The DirecTV*

14

*Group, Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008). Instead, defendants contend, the patent must disclose a specific algorithm to perform the function. Plaintiffs respond that the specification sufficiently discloses enough of an algorithm.

In *Aristocrat*, the district court held that a patent's disclosure of a general purpose, programmable microprocessor was not a sufficient disclosure of structure to satisfy § 112 ¶ b. The district court held that in a means-plus-function claim "in which the disclosed structure is a computer or a microprocessor programmed to carry out an algorithm, a corresponding structure must be a specific algorithm disclosed in the specification, rather than merely 'an algorithm executed by a computer.'" *Aristocrat*, 521 F.3d at 1331-32. The district court held that because the specification lacked any specific algorithm or any step-by-step process for performing the claimed functions, the asserted structure was insufficient. *Id.* at 1332.

The Federal Circuit affirmed. The court first explained the general principle that "[i]n cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the specification be more than simply a general purpose computer or microprocessor." *Id.* at 1333. "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6." *Id.* On appeal, Aristocrat acknowledged that the only portion of the specification corresponding to the three functions of the "control means" was a statement that it was within the capability of a worker in the art "to introduce the methodology on any standard microprocessor base [sic] gaming machine by means of appropriate programming." *Id.* at 1334. The Federal Circuit held that this description "goes no farther than saying that the claimed functions are performed by a general purpose computer. The reference to 'appropriate programming' imposes no limitation whatever, as any general purpose computer must be programmed. The term 'appropriate programming' simply references a computer that is programmed so that it performs the function in question, which is to say that the function is performed by a computer that is capable of performing the function." *Id.*

The Federal Circuit rejected Aristocrat's arguments that the specification disclosed algorithms

that were sufficient to constitute a qualifying disclosure of structure. Aristocrat contended that claim language referring to "the game control means being arranged to pay a prize when a predetermined combination of symbols is displayed in a predetermined arrangement of symbol positions selected by a player" implicitly disclosed an algorithm for the microprocessor. The Federal Circuit disagreed, holding that this language simply describes the function to be performed, not the algorithm by which it is performed. *Id*. The court also rejected Aristocrat's "real point," which was that devising an algorithm to perform that function was within the capability of one skilled in the art, and thus it was not necessary to disclose any particular algorithm. *Id*. The court also rejected Aristocrat's reliance on equations and mathematical descriptions contained in the claim language, holding that this language "is not an algorithm that describes how the function is performed, but is merely a mathematical expression that describes the outcome of performing the function." *Id*. The court concluded that Aristocrat "has disclosed, at most, pictorial and mathematical ways of describing the claimed function of the game control means. That is not sufficient to transform the disclosure of a general purpose microprocessor into the disclosure of sufficient structure to satisfy section 112 paragraph 6." *Id*. at 1335.

Shortly after *Aristocrat*, the Federal Circuit decided *Finisar Corporation v. The DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir. 2008). There, the court explained that for computer-implemented means-plus-functions claims where the disclosed structure is a computer programmed to implement an algorithm, the patentee may express that algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Id*. at 1340 (internal citation omitted). In *Finisar*, the claims at issue included the limitation "database editing means . . . for generating . . . and for embedding . . . ." *Id*. The patent disclosed the following purported structure corresponding to this claim term: "software 132 (executed by CPU 130) generates a hierarchical set of indices referencing all the data in the information database 112 and embeds those indices in the information database." *Id*. The court held that this language was insufficient, as it "provides nothing more than a restatement of the function, as recited in the claim." *Id*. "Simply reciting 'software' without providing some detail about the means to accomplish the function is not enough." *Id*. at 1340-41. Similarly, the court noted that the specification described an alternate embodiment wherein a block of packet ID values are assigned to an offline information

1    provider, which then organizes them into a database.  *Id*. at 1340.  However, "[o]nce again, the district

2    court correctly noted that this passage provides no algorithm or description of structure corresponding

3    to the claimed function."  *Id*.

4           Here, plaintiffs argue that the specification discloses a server that runs a database program that

5    executes typical database functions to automatically update demographics pattern (or information)

6    databases by compiling, merging, and storing all "viewer selections" (information requests) by end

7    users.  Plaintiffs argue that one skilled in the art[2] would understand from reading the '025 specification

8    that the disclosed server is executing available database programs, and that such programs at the time

9    of the invention had a system for automatic indexing and otherwise efficient insertion and restructuring

10   and extraction of data.  Plaintiffs rely on the following language:

11           "The mainframe, or computer used as a Server, can be any one of many known
             computers, such as an IBM/370 running MVS and VTAM and any of many available
12           database and support programs, or a Sun workstation running UNIX and any of many
             database programs available."  '025 patent, col. 12, ll. 22-26.
13
             "The software for configuring the system is easily built using standard database
14           development techniques well known to those skilled in the art, based on the
             configurations described herein and the selection of the desired options."  *Id*. at col. 12,
15           ll. 51-54.

16           "Viewership and response patterns can be retrieved by advertisers, agents, and
             subscribers via the disclosed system's demographic retrieval databases."  *Id*. at col. 11,
17           ll. 21-25.

18           "In all cases, viewer selections are captured and stored by the Server."  *Id*. at col. 4, ll.
             24-26.
19
             "All files are stored on their respective databases, providing easy access and
20           manipulation.  The databases are continually updated to ensure accurate, up-to-date
             information at all times."  *Id*. at col. 7, ll. 30-33.
21
             "Because each property profile and advertisement regardless of sponsor has its own
22           identification code and each user of the disclosed system has their own access code, the
             instant invention provides detailed data on all aspects of viewership and response.
23           When, where, and how often an advertisement and/or profile is viewed is instantly
             recorded by the disclosed system."  *Id*. at col. 11, ll. 12-19.
24
             "The Server stores information regarding property profiles, real estate professionals,
25           community profiles, real estate financing, local businesses and services, and
             demographic retrievals . . . ."  *Id*. at col. 4, ll. 2-5.
26

27           [2]  The parties generally agree that a person of ordinary skill in the art is a person with a
     bachelor's degree or its equivalent in engineering with some training in or experience with computers
28   and networkers computers.  *See* Tygar Decl. ¶ 3; Meldal Decl. ¶ 23.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1      "Server – The computer system which stores all files." *Id*. at col. 5, ll. 23-25.

2      "Software for controlling the communication with the Server can be Windows based, and
is easily built using known techniques based on the configurations described herein."
3      *Id*. at col. 12, ll. 58-61.

4      "Viewership and response patterns can be retrieved by advertisers, agents, and
subscribers via the disclosed system's demographic retrieval databases." *Id*. at col. 11,
5      ll. 21-25.

6      "[A] server which has an input/output device for receiving and transmitting data,
database files, and database storage." *Id*. at Abstract.
7

8      "[T]he system utilizes an information processing system containing a Server with i/o for
receiving and providing data and database storage." *Id*. at col. 4, ll. 11-13.

9      Plaintiffs argue that a person of ordinary skill in the art would recognize steps disclosed in the

10  specification for performing the claimed "updating" function. Plaintiffs argue that such a person would

11  recognize that the disclosed server is executing available database programs with the capabilities of

12  compiling, merging, and storing information and generating, maintaining and/or updating a database.

13  Plaintiffs further argue that such a person would recognize that the server is programmed to passively

14  monitor end user requests for information and to compile, merge and store the collected information in

15  a database that is continually updated.

16      Plaintiffs cite the declaration of their expert, Professor Justin Tygar, who states "I believe that

17  one of ordinary skill at the time of the invention reading the '025 specification would understand that

18  corresponding structures to be the "Server's computer 412." Tygar Decl. Ex. C at 87. Dr. Tygar

19  acknowledges that "[t]he '025 specification does not expressly call out the algorithm," but that "[o]ne

20  skilled in the art reading the '025 specification (including the drawings) would understand how the

21  claimed databases were generated as well as how they are maintained, including being updated, by the

22  Server's computer 412. As previously explained herein, the specification describes that all 'viewer

23  selections' (information requests) are captured and that data is compiled, merged, and stored into the

24  claimed demographics information (pattern) databases, which are thereafter 'continually updated to

25  ensure accurate, up-to-date information at all times.'" *Id*. at 88. Dr. Tygar explains,

26      As I have described, the specification amply describes the claimed databases [citation
omitted], and the specification (including the graphical environment diagram of Figure
27      1) associates those databases with the Server's Computer 412, *i.e.*, one of skill would
interpret Figure 1 as indicating that the Server's computer 412 manages the databases.
28      *See, e.g.*, Figure 1; *see* col. 6, ll. 5-9. One of skill in the art would have understood from

United States District Court
For the Northern District of California

1    at least, for example, existing technical knowledge, that the claimed databases (like any
2    database) would need updating in order to remain reasonably useful, and that, based on
     the specification's disclosure, the required "updating" would have been performed by
3    the Server's computer 412 alone with other typical database functions.  The '025
     specification expressly refers to updating databases.  *See* col. 7, ll. 33-34 (describing that
4    "databases are continually updated to ensure accurate, up-to-date information at all
     times"); *see also e.g.*, col. 12, ll. 51-61 ("The software for configuring the system is
5    easily built using standard database development techniques well known to those skilled
     in the art, based on the configurations described herein and the selection of the desired
6    options. . . .   Software for controlling the communication with the Server can be
     Windows based, and is easily built using known techniques based on the configurations
7    described herein.").

8    *Id.* at 87-88.

9         In contrast, defendants' expert opines that a person or ordinary skill would not know what falls

10   within the scope of the "demographic database updating means" element of Claim 5.  Meldal Decl. Ex.

11   1 at 93.  Dr. Meldal states,

12        [T]he '025 patent does not specify a specific algorithm for automatically updating a
          demographics pattern database by compiling and merging a plurality of end user
13        inquiries and storing said compiled and merged inquiries in said demographic pattern
          database.  The '025 patent specification includes only one line relating to updating a
14        database, stating that "[t]he databases are continually updated to ensure accurate, up-to-
          date information at all times." (Col 7, lns. 32-33).  But the specification does not recite
15        structure that performs this function.  And, while the specification does make a passing
          reference to database "support program," it says little about these programs.  (Col. 12,
16        lns. 22-27.)  For example, the specification does not state whether these support
          programs actually perform the function of updating the databases.   Nor does the
17        specification list the algorithm by which the updating occurs.

18   *Id.*

19        "It is certainly true that the sufficiency of the disclosure of algorithmic structure must be judged

20   in light of what one of ordinary skill in the art would understand the disclosure to impart." *Aristocrat*,

21   521 F.3d at 1337.  Even accepting plaintiffs' (and Dr. Tygar's) view, however, the Court finds that the

22   specification does not sufficiently describe a structure to perform the "updating" function.  Plaintiffs

23   assert that the specification discloses a structure – the Server 412 – and that one of ordinary skill in the

24   art would have understood that the Server maintains databases, and that such a person would have been

25   able to build "software for configuring the system . . . using standard database development techniques

26   well known to those skilled in the art, based on the configurations described herein and the selection of

27   the desired options."  Tygar Decl. Ex. C at 87.  However, the Federal Circuit has repeatedly held that

28   for a computer-implemented function, it is insufficient to simply disclose a general purpose computer

United States District Court
For the Northern District of California

that can be programmed by a person of ordinary skill in the art to carry out the claimed function. *See, e.g.*, 521 F.3d at 1337 ("It is not enough for the patentee simply to state or later argue that persons of ordinary skill in the art would know what structures to use to accomplish the claimed function."); *see also Biomedino, LLC v. Waters Tech. Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007) ("The inquiry is whether one skilled in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing that structure.").

Although plaintiffs are correct that the patent need not disclose source code, the patent must disclose the steps showing how the updating of the demographic database occurs. There is no such disclosure in the patent. Instead, as in *Aristocrat*, much of the language relied on by plaintiffs (and quoted above) simply describes the claimed function. For example, "Viewership and response patterns can be retrieved by advertisers, agents, and subscribers via the disclosed system's demographic retrieval databases," "In all cases, viewer selections are captured and stored by the Server," "the instant invention provides detailed data on all aspects of viewership and response. When, where, and how often an advertisement and/or profile is viewed is instantly recorded by the disclosed system," and "All files are stored on their respective databases, providing easy access and manipulation. The databases are continually updated to ensure accurate, up-to-date information at all times," all simply describe the function of monitoring, updating and storing viewership and response patterns.

The Court finds instructive *Medical Instrumentation & Diagnostics Corporation v. Elekta AB*, 344 F.3d 1205, 1211-12 (Fed. Cir. 2003). In that case, the patent related to a system for planning surgical treatment using a presentation of images from multiple sources. The district court construed the function of the "means for converting said plurality of images into a selected format" to be converting multiple acquired images into a particular selected digital format, and found that the structures corresponding to this function were a "VME bus based framegrabber video display board," a computer video processor ("CVP"), and "[s]oftware routines for converting digital-to-digital known to those of skill in the art." On appeal, the Federal Circuit agreed that the specification disclosed the structures of a framegrabber and the CVP, but disagreed that the specification disclosed the structure of software for digital-to-digital conversion. The Federal Circuit explained:

In this case, even the district court acknowledged that the link between software and the

United States District Court
For the Northern District of California

converting function was not completely clear.  The court stated that "the specification is not very explicit in its disclosures of a means for performing a digital-to-digital conversion."  Nevertheless, the court concluded that because techniques for performing those conversions were known to those of skill in the art at the time the application was filed, a person of skill in the art would understand software to be a corresponding structure for the converting function.  It is of course correct that to answer the question of whether the specification adequately describes and links structure that corresponds to the claimed function, we must look at the disclosure from the point of view of one skilled in the relevant art.  *Budde*, 250 F.3d at 1376.  MIDCO presented some evidence before the district court that a skilled programmer at the time of the application's filing could have written a program for digital-to-digital conversion of image size, and we have no reason to doubt that assertion.  In discussing software programs in the medical imaging field, MIDCO's expert explained that "a software programmer having ordinary skill in the art . . . would be aware of the sources of routines, modules and even small programs . . . that could be incorporated into the larger program being developed.  These programs were widely available from well-known sources or available from other software developers . . . ."  MIDCO then provided examples of programs for digital-to-digital image conversion (none of which are cited in the patents) that would have been available at the time the patent was filed.

However, that is not the correct inquiry.  The correct inquiry is to look at the disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass software for digital-to-digital conversion and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program.  *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999) ("[I]nterpretation of what is disclosed must be made in light of the knowledge of one skilled in the art."); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1331-32 (Fed.Cir. 2003) (explaining that statements from experts cannot be used to "rewrite the patent's specification" to create a clear link where the language in the specification provides none); *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001) (finding particular structures not to be corresponding structures because "one skilled in the art would not perceive any clear link or association between these structures and the [recited] function of connecting adjacent elements together").  It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure.  *See Atmel*, 198 F.3d at 1382 ("Fulfillment of the § 112, ¶ 6 trade-off cannot be satisfied when there is a total omission of structure. There must be structure in the specification.").  Indeed, the requirement of looking to the disclosure to find the corresponding structure comes from section 112, paragraph 6 itself. It is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent.

*Medical Instrumentation & Diagnostics Corp. v. Electa AB*, 344 F.3d at 1211-12).

Here, as in *Medical Instrumentation*, the specification does not specifically disclose any structure, such as specific types of software, to perform the "updating" function.  Plaintiffs' contention that a person of ordinary skill in the art would know how to build "software for configuring the system . . . using standard database development techniques well known to those skilled in the art, based on the configurations described herein and the selection of the desired options," Tygar Decl. Ex. C at 87, is precisely the argument rejected in *Medical Instrumentation*.  "The correct inquiry is to look at the

1   disclosure of the patent and determine if one of skill in the art would have understood that disclosure

2   to encompass software for digital-to-digital conversion and been able to implement such a program, not

3   simply whether one of skill in the art would have been able to write such a software program." *Medical*

4   *Instrumentation*, 344 F.3d at 1212.

5          Accordingly, the Court holds that because Claim 5 does not sufficiently disclose a structure for

6   carrying out the "updating" function, that claim is invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2.

7   This conclusion is a legal one, based on this Court's "performance of its of its duty as the construer of

8   patent claims," *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d at 705; no factual

9   findings are required.

10

11                                            **CONCLUSION**

12         For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants'

13  motion for summary judgment of noninfringement and invalidity.  (Docket No. 732).  The Court

14  DENIES AS MOOT defendant's motion to amend the answer, as well as the other motions for summary

15  judgment filed by defendants.  (Docket No. 627, 729, 764, & 776).

16

17         **IT IS SO ORDERED.**

18

19  Dated: November 19, 2008                          _____

20                                                    SUSAN ILLSTON
                                                      United States District Judge
21

22

23

24

25

26

27

28